724 A.2d 129

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. DONALD LOFTIN, DEFENDANT–APPELLANT.

Argued March 18, 1997—Decided February 1, 1999.

*Mordecai D. Garelick* and *Daniel V. Gautieri,* Assistant Deputy Public Defenders, argued the cause for appellant (*Ivelisse Torres,* Public Defender, attorney; *Mr. Garelick, Mr. Gautieri* and *Claudia Van Wyk,* Deputy Public Defender II, on the briefs).

*Paul H. Heinzel,* Deputy Attorney General, argued the cause for respondent (*Peter Verniero,* Attorney General of New Jersey, attorney).

*Lawrence S. Lustberg* argued the cause for *amici curiae* Association of Criminal Defense Lawyers of New Jersey and New Jersey State Conference of NAACP Branches (*Gibbons, Del Deo, Dolan, Griffinger & Vecchione,* attorneys; *Mr. Lustberg, James E. Ryan* and *Laura K. Abel,* on the briefs).

The opinion of the Court was delivered by

PORITZ, C.J.

262

## TABLE OF CONTENTS

I.  The Origin and History of Proportionality Review.....266
    A.  From *Furman* to *Pulley* ........................266
    B.  Proportionality Review in Other States ...........268
    C.  Proportionality Review in New Jersey ............274

II. The Constitutionality of *N.J.S.A.* 2C:11–3e as
    Amended......................................277
    A.  Pending Appeals ..............................277
    B.  The Supreme Court's Appellate Review Func-
        tion .........................................279
    C.  Application of Proportionality Review............285
        1.  The Scope of the Statistical Universe of
            Comparison Cases ........................287
        2.  Individual Proportionality Review ............291
            a.  Frequency Analysis .....................291
                i.   Salient–Factors Test...............292
                ii.  Numerical–Preponderance–of–
                     Aggravating–and–Mitigating–
                     Factors Test.....................294
                iii. Index–of–Outcomes Test ...........295
            b.  Precedent–Seeking Review .............296
        3.  Systemic Proportionality Review and Pos-
            sible Racial Disparity in the Imposition
            of the Death Penalty......................298
            a.  Race as a Predictor of Outcome...........299
            b.  Review of the Statistical Models .........302
        4.  Proportionality Review and Its Status as a
            Separate Proceeding in Death Penalty
            Appeals ................................316

III. Application of the Methods of Individual Propor-
     tionality Review to Loftin .........................317
     A.  Facts.......................................317
     B.  Focus of Review ..............................321
         1.  The Universe of Cases ......................323
         2.  Method of Classifying Cases .................323
     C.  Comparison of Cases .........................324
         1.  Comparison Group.........................325
         2.  Frequency Analysis.........................327
             a.  Salient–Factors Test ....................328
             b.  Index–of–Outcomes Test.................330

      c.  Frequency–Analysis Conclusion ..........335
   3.  Precedent–Seeking Review .................335
      a.  Assessment of Defendant's
          Culpability ...........................336
         i.   Moral Blameworthiness ............336
         ii.  Degree of Victimization ............338
        iii.  Character of Defendant ............338
      b.  Comparison of Defendant's Case to
          the B Cases ........................339
  D.  Other Arguments .............................345

IV.  Conclusion .......................................345
     Appendix A........................................346
     Appendix B........................................347
     Appendix C........................................348

Comparison Case Summaries

   I.  Prior Murderers with Two Ad-
      ditional Aggravating Factors
      or Particular Violence/Terror:
      B(1) ...........................348
      A)  George Booker (1 and 2) .......348
      B)  John Fauntenberry ............350
      C)  Richard Feaster (2) ............351
      D)  James Koedatich (1A) ..........353
      E)  James Koedatich (1B) ..........354

  II.  Prior Murderers with One Ad-
      ditional Aggravating Factor
      or Particular Violence/Terror:
      B(2) ...........................355
      A)  Marko Bey (2B) ...............355
      B)  Richard Biegenwald (1A) .......356
      C)  Richard Biegenwald (1B) .......358
      D)  Richard Biegenwald (1C) .......358
      E)  Bryan Coyle (1A) ..............358
      F)  Bryan Coyle (1B) ..............359
      G)  Samuel Erazo (1A) .............359
      H)  Samuel Erazo (1B) .............360
      I)  William Godette ...............361
      J)  Frank Pennington .............362
      K)  Frank Pennington (1B) .........364
      L)  Braynard Purnell (1A)..........364
      M)  Braynard Purnell (1B)..........365

N) Thomas Ramseur . . . . . . . . . . . . . . 365
O) Carlos Vasquez . . . . . . . . . . . . . . . 366

III. Prior Murderers with No Other
Aggravating    Circumstances
or Particular Violence/Terror:
B(3) . . . . . . . . . . . . . . . . . . . . . . . . . . 367
A) Richard Biegenwald (2) . . . . . . . . 367
B) Jihad Muhammed . . . . . . . . . . . . . . 368
C) Alberto Nieves . . . . . . . . . . . . . . . 370
D) Thomas Williams . . . . . . . . . . . . . . 371

In *State v. Loftin*, 146 *N.J.* 295, 680 *A.2d* 677 (1996) (*Loftin I* ), we affirmed defendant Donald Loftin's conviction and sentence of death for the murder of Gary Marsh. We also acknowledged defendant's request for proportionality review of his death sentence pursuant to *N.J.S.A.* 2C:11–3e. *Id.* at 397, 680 *A.2d* 677. This appeal requires us first to consider the constitutionality of an amendment to *N.J.S.A.* 2C:11–3e that limits proportionality review to a specific group of similar cases in which a jury has sentenced the defendant to death and, then, to conduct defendant's review.

██  Proportionality review, although statutory in origin, is carried out by this Court in the exercise of its general authority as an appellate tribunal, *N.J. Const.* art. VI, § 2, ¶ 2, and its specific exclusive jurisdiction over capital causes, *id.* at § 5, ¶ 1(c). This authority is central to our primary function as the Court of last resort in the state judicial system and carries with it the power to determine the scope and content of appellate review. The integrity of appellate review by the Court is critical to the judiciary as an independent and coequal branch of government, and to the separation of powers among the executive, legislative and judicial branches. In exercising its authority in this case, the Court must ultimately decide whether the limitation on the proportionality review universe imposed by the Legislature precludes meaningful appellate review.

Prior to this case, we established the size of the proportionality review universe to include both death-eligible defendants and

defendants who proceed to a penalty trial. *State v. Marshall,* 130 *N.J.* 109, 134, 137, 613 *A.*2d 1059 (1992) (*Marshall II* ), *cert. denied,* 507 *U.S.* .929, 113 *S.Ct.* 1306, 122 *L.Ed.*2d 694 (1993). We anticipated that such broad categories would provide the most useful information about how decisions are made in the capital sentencing system by prosecutors and by juries. *Id.* at 132–37, 613 *A.*2d 1059. We also decided to conduct our review in two parts: a statistical comparison we call "frequency review," and a descriptive analytic comparison of like cases described as "precedent-seeking review." *Id.* at 152–59, 613 *A.*2d 1059. Always, we have sought a principled, careful approach "to ensure that the death penalty is being administered in a rational, non-arbitrary, and evenhanded manner, fairly and with reasonable consistency." *Id.* at 131, 613 *A.*2d 1059.

Despite these efforts, many questions have been raised by our early cases, the parties, the Special Master appointed to consider Loftin's allegations of racial disparity, and the Administrative Office of the Courts (AOC) about our present system of proportionality review. These questions cover a broad range of factual issues that must be resolved before we can rule on whether the statutory limitation unduly restricts appellate review by this Court. To this end, we are remanding these issues to a Special Master, appointed to hear and take testimony and to report to the Court. His general charge is to examine the proportionality review methodology used by the Court since *Marshall II* was decided over six years ago, and to test the assumptions on which the current system is based. Through a remand, a record can be developed that will enable us to consider the effect of the statute on our review function, including our ability to address any future claims that New Jersey's system of capital punishment operates in an invidiously discriminatory manner.

We are cognizant of the Legislature's clearly expressed intent to limit the boundaries of proportionality review and would not lightly reject its views. Our consideration of those boundaries must, however, await the findings and recommendations of the

Special Master. Until we have had the benefit of his report, due pursuant to our Order on May 14, 1999, we will continue, with one exception described below, *see infra* at 294–295, 724 *A.*2d at 149–150, to carry out proportionality review as before. Based on our proportionality review herein, we hold that defendant has not shown his death sentence to be disproportionate to the penalty imposed in similar cases.

# I

## *The Origin and History of Proportionality Review*

In *Marshall II,* we observed that "[t]he best way to understand the concept of proportionality review is to understand its origin." 130 *N.J.* at 124, 613 *A.*2d 1059. That observation remains true today. It is helpful, also, to consider the history of proportionality review both in this state and in our sister states to gain perspective on the role of this form of review in New Jersey's death penalty scheme.

### A. *From Furman to Pulley*

Proportionality review arose in response to the United States Supreme Court's decision in *Furman v. Georgia,* 408 *U.S.* 238, 92 *S.Ct.* 2726, 33 *L.Ed.*2d 346 (1972), wherein the Court held that a Georgia statute permitting defendants to be sentenced to death at the unfettered discretion of the judge or jury violated the Eighth Amendment prohibition on cruel and unusual punishment. *Id.* at 239–40, 92 *S.Ct.* at 2727, 33 *L.Ed.*2d at 350; *see also U.S. Const.* amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted"). Justice Stewart, in his concurring opinion, described "legal systems that permit ... [the death] penalty to be so wantonly and so freakishly imposed" as "cruel and unusual in the same way that being struck by lightening is cruel and unusual." *Furman, supra,* 408 *U.S.* at 309–10, 92 *S.Ct.* at 2762–63, 33 *L.Ed.*2d at 390 (Stewart, J., concurring).

Four years later, the United States Supreme Court upheld statutes passed in response to *Furman* by Georgia, Texas and Florida, finding that the procedural safeguards provided by those statutes would prevent the death penalty from being imposed "capriciously or in a freakish manner." *Gregg v. Georgia*, 428 *U.S.* 153, 195, 96 *S.Ct.* 2909, 2935, 49 *L. Ed.*2d 859, 886–87 (1976); *see also Jurek v. Texas*, 428 *U.S.* 262, 96 *S.Ct.* 2950, 49 *L.Ed.*2d 929 (1976); *Proffitt v. Florida*, 428 *U.S.* 242, 96 *S.Ct.* 2960, 49 *L.Ed.*2d 913 (1976).

The Georgia statute sustained by the Court in *Gregg* bifurcated capital proceedings into separate guilt-phase and penalty-phase trials, and provided that during the penalty phase the judge or jury would hear evidence of mitigating and aggravating factors. 428 *U.S.* at 163–64, 96 *S.Ct.* at 2920–21, 49 *L.Ed.*2d at 869–70. The defendant could be sentenced to death only if the judge or jury found that at least one of the statutory aggravating factors was present and outweighed the mitigating factors. *Id.* at 165–66, 96 *S.Ct.* at 2921–22, 49 *L.Ed.*2d at 870. The Georgia statute also provided for direct appeal to the state supreme court which, among other things, was to conduct a proportionality review to determine " '[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant'." *Id.* at 166–67, 96 *S.Ct.* at 2922, 49 *L.Ed.*2d at 871 (quoting *Ga.Code Ann.* § 27–2537 (Supp. 1975)).

States seeking to enact constitutional death penalty statutes followed the statute upheld in *Gregg* like a recipe, careful to include provisions for appellate proportionality review. *See infra* at 268, 724 *A.*2d at 136. Six years later, however, in *Pulley v. Harris*, 465 *U.S.* 37, 104 *S.Ct.* 871, 79 *L.Ed.*2d 29 (1984), the United States Supreme Court held that proportionality review was not "indispensable" to a constitutionally acceptable capital punishment statute. *Id.* at 45, 104 *S.Ct.* at 876, 79 *L.Ed.*2d at 37.

### B. *Proportionality Review in Other States*

*Gregg* did "not intend to suggest that only ... procedures [similar to the Georgia procedures] would be permissible under *Furman* or that any sentencing system constructed along ... [such] general lines would inevitably satisfy the concerns of *Furman*." 428 *U.S.* at 195, 96 *S.Ct.* at 2935, 49 *L.Ed.*2d at 887. Nonetheless, in the 1970s and early 1980s, twenty-five states enacted capital punishment statutes that required appellate proportionality review in all capital cases. *See Ala.Code* § 13A–5–53(b)(3) (enacted 1981); *Conn. Gen.Stat.* § 53a–46b (enacted 1980); *Del.Code Ann.* tit. 11 § 4209(g)(2)(a) (enacted 1977); *Ga. Code. Ann.* § 17–10–35(c)(3) (enacted 1973); *Idaho Code* § 19–2827(c)(3) (enacted 1977); *Ky.Rev.Stat. Ann.* § 532.075(3)(c) (enacted 1976); *La.Code Crim. Proc. Ann.* art. 905.9 (enacted 1976); *Md. Ann.Code,* art. 27, § 414(e)(4) (enacted 1978); *Mass. Gen. Laws Ann.* ch. 279, § 71 (enacted 1982); *Miss.Code Ann.* § 99–19–105(3)(c) (enacted 1977); *Mo. Ann. Stat.* § 565.035 (enacted 1983); *Mont.Code. Ann.* § 46–18–310(1)(c) (enacted 1977); *Neb. Rev.Stat.* § 29–2521.03 (enacted 1978); *Nev.Rev.Stat.* § 177.055(2)(d) (enacted 1977); *N.M. Stat. Ann.* § 31–20A–4(C)(4) (enacted 1979); *N.C. Gen.Stat.* § 15A–2000(d)(2) (enacted 1977); *Ohio Rev.Code. Ann.* § 2929.05(A) (enacted 1981); *Okla. Stat. Ann.* tit. 21, § 701.13(C)(3) (enacted 1976); 42 *Pa. Cons.Stat. Ann.* § 9711(h)(3)(iii) (enacted 1974); *S.C.Code Ann.* § 16–3–25(C)(3) (enacted 1977); *S.D. Codified Laws* § 23A–27A–12(3) (enacted 1979); *Tenn.Code Ann.* § 39–13–206(c)(1)(D) (enacted 1977); *Va. Code. Ann.* § 17–110.1(C)(2) (enacted 1977); *Wash. Rev.Code Ann.* § 10.95.130(2)(b) (enacted 1981); *Wyo. Stat. Ann.* § 6–2–103(d)(iii) (enacted 1982). These statutes were passed because of the then widely-held perception that the Supreme Court would not uphold state capital punishment legislation that lacked such provisions. *See* Leigh B. Bienen, *The Proportionality Review of Capital Cases by State High Courts After Gregg: Only "The Appearance of Justice"?,* 87 *J.Crim. L. & Criminology* 130, 140 (1996).

After *Pulley,* nine states repealed their proportionality review requirements. *See* 1995 *Conn. Legis. Serv.* P.A. 95–16(West); 1994 *Idaho Sess. Laws* ch. 127; 1992 *Md. Laws* ch. 331; 1985 *Nev. Stat.* ch. 527 § 1; 1985 *Okla Sess. Laws* ch. 265 (West), § 1; 1997 *Pa. Legis. Serv.* Act 1997–28 (West); 1992 *Tenn. Pub. Acts* ch. 952; 1998 *Va. Acts* ch. 872; 1989 *Wyo. Sess. Laws* ch. 171, § 2. A substantial number of jurisdictions, however, conduct proportionality review today pursuant to express statutory authority. In addition to the twenty-five states that enacted proportionality review provisions in the 1970s and early 1980s, three states passed similar statutes subsequent to *Pulley,* including Tennessee after having repealed its earlier statute, *see N.H.Rev.Stat. Ann.* § 630:5(XI) (enacted 1986); *N.Y.Crim. Proc. Law* § 470.30 (enacted 1995); *Tenn.Code Ann.* § 39–13–206(c)(1)(D) (enacted 1992). Today, twenty states, including New Jersey, conduct statutory proportionality review. In one state, Florida, the state supreme court has declared the court's intention to conduct comparative review on its own initiative. *See Sinclair v. Florida,* 657 *So.*2d 1138, 1142 (Fla.1995).

As might be expected, the absence of any uniform requirements enforceable under the federal Constitution has led, over the years, to variation in the conduct of proportionality review. Thus, for example, the scope of the pool or "universe" of comparison cases used for proportionality review varies among the states. New York and Washington have defined broad universes encompassing some homicide cases that were not capitally prosecuted. *See N.Y. Jud. Law* § 211–a; *N.Y. Ct. Rules* § 510.18 (authorizing collection of case data for every criminal action in which defendant is indicted for first-degree murder); *Wash. Rev.Code Ann.* §§ 10.195.120, 10.195.130(2)(b) (authorizing collection of case data for every criminal action in which defendant is convicted of aggravated first-degree murder, regardless of whether defendant is capitally prosecuted).

Some states have limited the universe of comparison cases to those cases advancing to a penalty-phase trial. *See, e.g., South*

Dakota v. Rhines, 548 N.W.2d 415, 455–56 (S.D.), cert. denied, 519 U.S. 1013, 117 S.Ct. 522, 136 L.Ed.2d 410 (1996) (finding that " '[b]ecause the aim of proportionality review is to ascertain what other capital sentencing authorities have done with similar capital murder offenses, the only cases that could be deemed similar ... are those in which imposition of the death penalty was properly before the sentencing authority for determination' ") (quoting Tichnell v. Maryland, 297 Md. 432, 468 A.2d 1, 15–16 (Md.1983), cert. denied, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984), and citing Flamer v. Delaware, 490 A.2d 104, 139 (Del.), cert. denied, 464 U.S. 865, 104 S.Ct. 198, 78 L.Ed.2d 173 (1983), and cert. denied, 474 U.S. 865, 106 S.Ct. 185, 88 L. Ed.2d 154 (1985)); Flamer, supra, 490 A.2d at 139 (declaring "it inherently fair, logical and necessary to prevent disproportionate sentencing that this Court compare the sentence below to the facts and circumstances of cases in which a capital sentencing proceeding was actually conducted, whether the murderers have been sentenced to life imprisonment or death"); Missouri v. Bolder, 635 S.W.2d 673, 685 (Mo.1982) (finding court's "inquiry would be unduly slanted were [the court] to compare only those cases in which the death penalty has been imposed" and determining "as similar [t]hose cases in which both death and life imprisonment were submitted to the jury") (internal quotation marks omitted) (alteration in original), cert. denied, 459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983). Other states have defined the universe of comparison cases to include only those cases in which a death sentence was imposed. See, e.g., Sanborn v. Kentucky, 892 S.W.2d 542, 556 (Ky.1994) (considering all cases in which death penalty was imposed, as required by statute), cert. denied, 516 U.S. 854, 116 S.Ct. 154, 133 L.Ed.2d 98 (1995); Nebraska v. Palmer, 224 Neb. 282, 399 N.W.2d 706, 737 (1986) (finding universe of death-sentenced cases to be "a threshold requirement for comparative study"), cert. denied, 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987); South Carolina v. Copeland, 278 S.C. 572, 300 S.E.2d 63, 74 (S.C.1982) (relying only on death-sentenced cases because "[f]act findings of the trial court ... provide a fundamental line of demarcation" and

because larger universe would cause court to "enter a realm of pure conjecture" and to engage in "intolerable speculation"), *cert. denied,* 460 *U.S.* 1103, 103 *S.Ct.* 1802, 76 *L.Ed.*2d 367 (1983).

Similarly, there is considerable variation among the states in respect of the methods used both to select cases for comparison purposes and to make factual comparisons among selected cases. By way of illustration, the Tennessee Supreme Court has identified at least seventeen separate factors to be used in selecting and comparing similar cases including, among others, the means of death, the manner of death, the motivation for the killing, the absence or presence of premeditation, the defendant's prior criminal record or prior criminal activity, the defendant's cooperation with authorities, and the defendant's remorse. *Tennessee v. Bland,* 958 *S.W.*2d 651, 667 (Tenn.1997), *cert. denied,* —— *U.S.* ——, 118 *S.Ct.* 1536, 140 *L.Ed.*2d 686 (1998). The Washington Supreme Court considers four factors: "(1) the nature of the crime, (2) the aggravating circumstances, (3) the defendant's criminal history and (4) the defendant's personal history." *Washington v. Brown,* 132 *Wash.*2d 529, 940 *P.*2d 546, 562 (Wash.1997), *cert. denied,* —— *U.S.* ——, 118 *S.Ct.* 1192, 140 *L.Ed.*2d 322 (1998). In contrast, many courts have issued proportionality determinations without a particularized statement describing the comparative process. *See, e.g., DeYoung v. Georgia,* 268 *Ga.* 780, 493 *S.E.*2d 157, 168 (Ga.1997) (referring without discussion to appendix listing similar cases where death penalty upheld), *cert. denied,* —— *U.S.* ——, 118 *S.Ct.* 1848, 140 *L.Ed.*2d 1097 (1998); *Sanborn, supra,* 892 *S.W.*2d at 556–57 (incorporating by reference list of cases cited in previous decisions and referring to list of five additional cases); *Davis v. Mississippi,* 660 *So.*2d 1228, 1261–62 (Miss.1995) (referring without discussion to appendix with list of capital cases court previously affirmed), *cert. denied,* 517 *U.S.* 1192, 116 *S.Ct.* 1684, 134 *L.Ed.*2d 785 (1996); *Pennsylvania v. Uderra,* 550 *Pa.* 389, 706 *A.*2d 334, 342 (Pa.1998) (making passing reference to statistical data without mention of similar cases).

Although eleven state supreme courts have vacated death sentences as disproportionate, most have done so rarely. *See, e.g., Hall v. Georgia,* 241 *Ga.* 252, 244 *S.E.*2d 833, 839 (Ga.1978) (only one aggravating factor and co-defendant received life sentence); *Idaho v. Pratt,* 125 *Idaho* 546, 873 *P.*2d 800, 806 (Idaho 1993) (no prior criminal record); *Missouri v. McIlvoy,* 629 *S.W.*2d 333, 341 (Mo.1982) (minimal juvenile criminal record, limited education, limited intelligence, substantial alcohol problems, weak follower of co-defendant who received life sentence, and promptly turned himself in to police). The Florida Supreme Court, however, has vacated over thirty death sentences based on proportionality review, *see, e.g., Williams v. Florida,* 707 *So.*2d 683 (Fla.1998); *Jones v. Florida,* 705 *So.*2d 1364 (Fla.1998); *Voorhees v. Florida,* 699 *So.*2d 602 (Fla.1997); *Curtis v. Florida,* 685 *So.*2d 1234 (Fla.1996), *cert. denied,* —— *U.S.* ——, 117 *S.Ct.* 2521, 138 *L.Ed.*2d 1022 (1997); *Sinclair, supra,* and the North Carolina Supreme Court has vacated at least seven death sentences on proportionality grounds, *see, e.g., North Carolina v. Benson,* 323 *N.C.* 318, 372 *S.E.*2d 517 (N.C.1988); *North Carolina v. Stokes,* 319 *N.C.* 1, 352 *S.E.*2d 653 (N.C.1987); *North Carolina v. Rogers,* 316 *N.C.* 203, 341 *S.E.*2d 713 (N.C.1986). It is perhaps significant that Florida and North Carolina have relatively large death-row populations compared to other states, *see* Bienen, *supra,* 87 *J.Crim. L. & Criminology* at 169; more important, in those states proportionality review functions as a check against the arbitrary imposition of the death penalty.

The experience of other states is instructive, if only because it demonstrates the diverse responses to questions about the conduct of proportionality review. For example, the propriety of courts utilizing quantitative methods has been vigorously debated. *Compare Washington v. Pirtle,* 127 *Wash.*2d 628, 904 *P.*2d 245, 277 (Wash.1995) (noting that quantitative approach—comparing number of aggravating circumstances, victims and prior convictions in similar cases—"can point to areas of concern" and help court "to be as objective as possible"), *cert. denied,* 518 *U.S.* 1026, 116 *S.Ct.* 2568, 135 *L.Ed.*2d 1084 (1996), *and* Governor's Memorandum of

Approval of 1995 *N.Y. Laws, c.* 1, *reprinted in N.Y. Correct L.*
§ 650 (approving consideration of statistical evidence in conduct-
ing proportionality review to determine whether race is "having a
significant impact upon the imposition of the death penalty"), *with*
*Connecticut v. Webb,* 238 *Conn.* 389, 680 *A.*2d 147, 209 (Conn.1996)
(rejecting New Jersey Supreme Court's statistical methods as
unworkable attempt to "quantify the unquantifiable"),[1] *and Bland,*
*supra,* 958 *S.W.*2d at 665 (criticizing New Jersey Supreme Court's
use of statistics as departure from jurisprudence of "individualized
consideration"). Despite the concerns expressed by some courts
about these methods, several states remain committed to a form of
quantitative proportionality review to detect possible racial bias.
*See N.Y.Crim. Proc. Law* § 470.30 (requiring proportionality re-
view if request based on race of defendant or victim); *Connecticut*
*v. Cobb,* 234 *Conn.* 735, 663 *A.*2d 948, 961–62 (Conn.1995) (recog-
nizing statutory basis for statistical claim of racial disparity in
imposition of death penalty);[2] *Washington v. Gentry,* 125 *Wash.*2d
570, 888 *P.*2d 1105, 1154 (Wash.) (utilizing proportionality review
to examine patterns in death sentencing based on race), *cert.*
*denied,* 516 *U.S.* 843, 116 *S.Ct.* 131, 133 *L.Ed.*2d 79 (1995). Yet,
statistical claims of racial bias in the administration of the death
penalty present legal and methodological issues of exceptional
complexity. We keep in mind the dialogue engendered by these
difficult questions when considering how we might answer them
ourselves.

---

[1] The Connecticut Supreme Court continues to conduct proportionality review
for capital cases that were pending at the time the state repealing statute became
effective. *See Webb, supra,* 680 *A.*2d at 200 n. 71; 1995 *Conn. Legis. Serv.* P.A.
95–16 (West).

[2] Although the Connecticut Supreme Court rejected statistical analysis as a
means to identify an aberrant death sentence under the state's proportionality
review statute, *see Webb, supra,* 680 *A.*2d at 209–10 (construing *Conn. Gen.Stat.*
§ 53a–46b(b)(3)), the court decided that statistical methods should be used to
look for possible systemic racial bias in the imposition of the death penalty under
a separate statutory provision, *Conn. Gen.Stat.* § 53a–46b(b)(1); *Cobb, supra,*
663 *A.*2d at 961–62. Unlike the section dealing with proportionality review,
section 53a–46b(b)(1) has not been repealed.

We turn now to our own experience in applying proportionality review in capital cases.

## C. *Proportionality Review in New Jersey*

When the New Jersey Legislature reintroduced the death penalty in 1982, it too substantially incorporated the procedural safeguards in the Georgia law sustained by the United States Supreme Court in *Gregg,* including the provision for proportionality review. *See State v. Ramseur,* 106 *N.J.* 123, 202–03, 524 *A.*2d 188 (1987). The New Jersey Capital Punishment Act, *L.* 1982, *c.* 111 (codified at *N.J.S.A.* 2C:11–3), like the Georgia statute, called for a determination by this Court on "[e]very judgment of conviction which results in a sentence of death .... whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant," *N.J.S.A.* 2C:11–3e. Later, the Senate Judiciary Committee explained that, at the time the Act was passed by the State Legislature, "it was thought that the United States Supreme Court would not uphold a capital punishment law that did not contain such a 'proportionality review'" provision. Senate Judiciary Committee, *Statement to Senate Bill No. 950* (*L.* 1985, *c.* 178).

As enacted in 1982, the Capital Punishment Act required proportionality review, but did not describe the manner in which it was to be conducted or limit the "universe" of similar cases to be used for comparison purposes. In response to *Pulley,* however, the New Jersey Legislature amended *N.J.S.A.* 2C:11–3e to abolish mandatory proportionality review and to require instead that defendants request such review by this Court. *L.* 1985, *c.* 178. Then, in 1992, the proportionality review provision of *N.J.S.A.* 2C:11–3e was amended yet again to define the universe of "similar" cases to be compared to defendant's case as those "in which a sentence of death has been imposed." *L.* 1992, *c.* 5. This amendment became effective on May 12, 1992, *L.* 1992, *c.* 5, and will, if ultimately determined to be valid, limit the scope of

proportionality review undertaken by this Court since *Marshall II.*

In *Ramseur,* we explained that the development of "a procedure of review ... [would] be an evolving process," requiring the advice of "criminal justice experts ... [and] experts from disciplines outside the law." 106 *N.J.* at 328, 524 *A.*2d 188. Our view of the fundamental purpose of proportionality review would guide this process:

> Proportionality review has a function entirely unique among the review proceedings in a capital proceeding. Proportionality review, in the context of a capital sentencing scheme, is not appellate review to ensure that the aggravating factors outweigh beyond a reasonable doubt all the mitigating factors, *L.* 1985, *c.* 178, or to determine if the death sentence is disproportionate to the crime in violation of the ban against cruel and unusual punishment. That death is not disproportionate in the sense of being a cruel and unusual punishment is presumed by the nature of the review. *Pulley v. Harris,* 465 *U.S.* at 43, 104 *S.Ct.* at 875, 79 *L.Ed.*2d at 36. Rather, the purpose of review here is "of a different sort.... It purports to inquire instead whether the penalty is nonetheless unacceptable in a particular case because disproportionate to the punishment imposed on others convicted of the same crime."
> ` [*Id.* at 326, 524 *A.*2d 188 (quoting *Pulley, supra,* 465 *U.S.* at 43, 104 *S.Ct.* at 875, 79 *L.Ed.*2d at 36).]

Therefore, when we conduct a proportionality review, we ask whether the "punishment fits the criminal," *Marshall II, supra,* 130 *N.J.* at 129, 613 *A.*2d 1059, so as "to ensure that the death penalty is being administered in a rational, non-arbitrary, and evenhanded manner, fairly and with reasonable consistency," *id.* at 131, 613 *A.*2d 1059.

*Ramseur* also explained that proportionality review provides a mechanism by which death sentences may be monitored, "to prevent any impermissible discrimination in imposing the death penalty." 106 *N.J.* at 327, 524 *A.*2d 188. In *Marshall II,* we spoke of the "unique" commitment of the people of New Jersey "to the elimination of racial discrimination." 130 *N.J.* at 207, 613 *A.*2d 1059. Today, as then, we believe that "[t]o countenance racial discrimination in capital sentencing would mock that tradition and our own constitutional guarantee of equal protection of the laws under New Jersey Constitution Article I, paragraph 1." *Ibid.*. Comparison of like cases presents an opportunity for the

Court to monitor whether impermissible factors are present in the capital sentencing system.

*Marshall II* describes in detail the creation of a database and the sorting processes we have used as a basis for comparison of similar cases. *Id.* at 141–45, 613 *A*.2d 1059. We have substantially relied on the Final Report of our first Special Master, David C. Baldus, *Death Penalty Proportionality Review Project, Final Report to the New Jersey Supreme Court* (Sept. 24, 1991) (*Final Report* ). As outlined in *Marshall II, supra,* 130 *N.J.* at 152–59, 613 *A*.2d 1059, and followed in our subsequent proportionality review cases, we conduct a frequency analysis using statistical methods and a precedent-seeking review consisting of case-by-case analyses of comparative culpability. *State v. Bey,* 137 *N.J.* 334, 350, 645 *A*.2d 685 (1994) (*Bey IV* ), *cert. denied,* 513 *U.S.* 1164, 115 *S.Ct.* 1131, 130 *L.Ed.*2d 1093 (1995); *State v. Martini,* 139 *N.J.* 3, 28, 651 *A*.2d 949 (1994) (*Martini II* ), *cert. denied,* 516 *U.S.* 875, 116 *S.Ct.* 203, 133 *L.Ed.*2d 137 (1995); *State v. DiFrisco,* 142 *N.J.* 148, 165–66, 662 *A*.2d 442 (1995) (*DiFrisco III* ), *cert. denied,* 516 *U.S.* 1129, 116 *S.Ct.* 949, 133 *L.Ed.*2d 873 (1996). These methods compare the case at bar to other cases that have been found to have either similar fact patterns or similar levels of culpability and are used to determine whether the sentence imposed on the defendant in the case at bar is disproportionate to the sentences imposed in those similar cases.

More specifically, frequency analysis is a statistical approach that determines in three ways which cases have similar levels of culpability: (1) the salient-factors test; (2) the numerical-preponderance-of-aggravating-and-mitigating-factors test; and (3) the index-of-outcomes test. *Bey IV, supra,* 137 *N.J.* at 350–51, 645 *A*.2d 685. The salient-factors test "defines 'similar cases in terms of factual comparability,' " while the numerical-preponderance-of-aggravating-and-mitigating-factors test compares the raw number of those factors in each case. *Marshall II, supra,* 130 *N.J.* at 146–47, 613 *A*.2d 1059 (citations omitted). The index-of-outcomes test is a regression analysis that determines the culpability levels of defendants " 'as measured by the presence or absence in the cases

of [statutory and non-statutory aggravating and mitigating] factors that appear to influence prosecutorial and jury decision-making.' " *Id.* at 147–48, 613 *A.*2d 1059 (citation omitted). Precedent-seeking review, on the other hand, compares all relevant statutory and nonstatutory aggravating and mitigating factors present in factually similar cases in order to determine defendant's criminal culpability, or relative degree of deathworthiness. *See DiFrisco III, supra,* 142 *N.J.* at 184–85, 662 *A.*2d 442.

From the beginning, there has been extensive critical commentary by the Public Defender and Attorney General, along with alternative suggested approaches, on the frequency analysis methodologies accepted by the Court. We have considered that commentary and have chosen in each case to discuss the results of our frequency tests despite their acknowledged deficiencies, with the caveat that ultimately our judgments about the proportionality of death sentences are unquantifiable. Frequency review has always functioned as an adjunct to the detailed comparison of like cases that we undertake in precedent-seeking review and that, as judges, we are by training and experience best equipped to do.[3]

## II

### *The Constitutionality of N.J.S.A. 2C:11–3e As Amended*

#### A. *Pending Appeals*

In *Marshall II,* we determined that *N.J.S.A.* 2C:11–3e, as amended, would not apply to defendant's case because his appeal

---

[3] In a 1996 luncheon address printed in Seton Hall Law Review, our first Special Master David Baldus spoke on this issue:

A word about complex statistical analyses. They may be helpful in some cases, but they are clearly not essential. Indeed, for the purpose of helping the community dialogue focus on the worst cases, quite rudimentary pictures of the system are sufficient.... Also, principled, well-focused reviews can be conducted strictly with narrative factual summaries of the death sentenced review case and the comparison cases.

[David Baldus, *When Symbols Clash: Reflections on the Future of the Comparative Proportionality Review of Death Sentences,* 26 *Seton Hall L.Rev.* 1582, 1604 (1996).]

was pending at the time the amendment took effect on May 12, 1992. 130 *N.J.* at 119, 613 *A.*2d 1059. Under the pre–1992 proportionality review provision of *N.J.S.A.* 2C:11–3e, we held that the appropriate "universe" from which to choose similar cases included not only all cases in which the death penalty had been imposed, or had been sought, but also "clearly death eligible homicides in which the prosecutor elected not to seek the death penalty." *Id.* at 137, 613 *A.*2d 1059. We chose the larger universe in order to consider the possibility that a jury had imposed a disproportionate sentence, *id.* at 133–34, 613 *A.*2d 1059, or that a prosecutor had misused his or her discretion, *id.* at 134, 613 *A.*2d 1059, and, in order to prevent " 'any impermissible discrimination in imposing the death penalty,' " *id.* at 135, 613 *A.*2d 1059 (quoting *Ramseur, supra,* 106 *N.J.* at 327, 524 *A.*2d 188).

In the three cases following *Marshall II,* we continued to make use of a universe of death-eligible homicides. *DiFrisco III, supra,* 142 *N.J.* at 162–63, 662 *A.*2d 442; *Martini II, supra,* 139 *N.J.* at 23, 651 *A.*2d 949; *Bey IV, supra,* 137 *N.J.* at 343–44, 645 *A.*2d 685. In each of these cases, the 1992 statutory amendment limiting our review to death-sentenced cases was inapplicable because the appeals in these cases were pending as of the effective date of the amendment. *DiFrisco III, supra,* 142 *N.J.* at 163, 662 *A.*2d 442;[4] *Martini II, supra,* 139 *N.J.* at 23, 651 *A.*2d 949; *Bey IV, supra,* 137 *N.J.* at 343–44, 645 *A.*2d 685. In this case, defendant was not convicted until July 8, 1994, more than two years after the

---

[4] We declined to apply the 1992 statutory amendment in *DiFrisco III* for reasons that are specific to the procedural history of that case. DiFrisco was first sentenced to death in 1988. *DiFrisco III, supra,* 142 *N.J.* at 163, 662 *A.*2d 442. On direct appeal, this Court affirmed the conviction but reversed the death sentence and remanded for a penalty phase retrial. *Ibid.* DiFrisco was again sentenced to death in February 1993, after the 1992 statutory amendment took effect. *Ibid.* Because "the genesis of ... [the proportionality review] proceeding was defendant's first conviction, which occurred long before the statute was amended," we held that the amendment would not be applied in *DiFrisco III. Ibid.*

effective date of the 1992 statutory amendment.[5]  For that reason, we now consider whether we must conform our proportionality review methodology to the 1992 amendment thereby limiting proportionality review "to a comparison of similar cases in which a sentence of death has been imposed." *N.J.S.A.* 2C:11–3e.

### B.  *The Supreme Court's Appellate Review Function*

■  Comparing a death-sentenced defendant's case to other similar cases enables us to consider whether the death penalty has been imposed arbitrarily on the defendant.  Moreover, proportionality review may be the only mechanism that permits system-wide evaluation of both prosecutorial and jury decision making so as to determine whether there has been racial or other impermissible discrimination.  These considerations weigh heavily when a life is at stake.  It is a mark of our humanity that, no matter how heinous the crime, we focus, finally, on individual defendants, their acts and their lives.  We seek to administer the most extreme penalty in a fair and consistent manner by comparing the defendant to others who have committed like crimes, thereby to decide whether there is a societal consensus that the defendant before us should be put to death.  In our constitutional system, this Court is entrusted with that ultimate decision.

■  The source of the Supreme Court's appellate review authority can be found in Article VI, Section 2, Paragraph 2 of the 1947 Constitution: "The Supreme Court shall exercise appellate jurisdiction in the last resort in all causes provided in this Constitution."  As defined by Article VI, Section 5, Paragraph 1, the Court hears appeals:

---

[5] Defendant committed the offense giving rise to his conviction on May 5, 1992, seven days before *L.* 1992, *c.* 5 took effect.  Thus, defendant asserts that the law as applied to him violates the *Ex Post Facto* Clauses of the federal and state constitutions.  *See U.S. Const.* art. I, § 10, cl. 1; *N.J. Const.* art. IV, § 7, ¶ 3. As we are not restricting the universe of similar cases in conducting defendant's proportionality review, we need not address his *ex post facto* claims.

(a) In causes determined by the appellate division of the Superior Court involving a question arising under the Constitution of the United States or this State;

(b) In causes where there is a dissent in the Appellate Division of the Superior Court;

(c) In capital causes;

(d) On certification by the Supreme Court to the Superior Court and, where provided by rules of the Supreme Court, to the inferior courts; and

(e) In such causes as may be provided by law.

[*Ibid.*]

We derive from this grant of power, in both its discretionary and mandatory forms, our core function as this State's highest Court—the power of appellate review.

In *State v. Laws,* 51 *N.J.* 494, 242 *A.*2d 333 (1968), Justice Jacobs described "the scope of this Court's reviewing authority" under the 1947 Constitution:

That organic document purposefully modernized and greatly strengthened our judicial system. In the process it vested this Court with wide judicial power, perhaps more sweeping than that granted to any other court of last resort, and all to the end that it would be in a fair position to ensure that justice is truly and equally done.

[*Id.* at 500, 242 *A.*2d 333.]

*See also Hager v. Weber,* 7 *N.J.* 201, 205, 81 *A.*2d 155 (1951) (holding appellate review by Supreme Court "is a remedial procedure secured against legislative interference" by various provisions of State Constitution).

Justice Jacobs's understanding of this Court's broad appellate power echoes Governor Driscoll's speech to the Committee on the Judiciary at the 1947 Constitutional Convention. Governor Driscoll had a vision of an integrated court system administered through a centralized authority and capable of "achieving the degree of uniformity [in dispensing justice] that is so highly desirable in a republic." Alfred E. Driscoll, Address to Committee on the Judiciary, *in* 4 *State of New Jersey Constitutional Convention of 1947* 427, 435 (Sidney Goldmann & Herman Crystal eds., 1951) (*Driscoll Address* ). He told the Committee on the Judiciary:

It is, as you know, the courts that have traditionally been the guardians of our constitutions, to whom the meanest citizen may appeal for protection against a wayward executive or a capricious legislature. Without independent courts, the whole republican system must surely fail. Our primary, our basic purpose in the drafting of a new Constitution is to secure beyond any question a strong, competent, easily functioning, but always independent, judiciary, and, therefore, in a position to curb any tendency on the part of the other two branches of government to exceed their constitutional authority.

It was Hamilton who quoted Montesquieu: "There is no liberty if the powers of judging be not separate from the legislative and executive powers." "The complete independence of the courts of justice is peculiarly essential in a limited constitution," Hamilton added.

[*Id.* at 428–29.]

Governor Driscoll's call did not go unheeded. Students of New Jersey constitutional history, and particularly of the Judicial Article, often point to the extraordinary accomplishments of the 1947 Constitution in recasting an antiquated collection of multiple overlapping courts into a modern efficient judiciary. Leon S. Milmed, *Introduction to the New Jersey Constitution of 1947* 1, 12 (1954). The Report of the Committee on the Judiciary, submitted to the Convention on July 24, 1947, recommended simplifying and streamlining the court system, including centralizing administrative responsibility, merging the Courts of Law and Equity, and reducing the multiple functions of appellate court judges as well as multiple appeals at the intermediate appellate court level. *See* Committee on the Judiciary, Report and Proposal (Aug. 26, 1947), *in* 2 *State of New Jersey Constitutional Convention of 1947*, *supra*, 1180, 1182–83 (*Committee Report*). Although the thrust of the Committee's recommendations was administrative in nature, we must not forget that the purpose was to create an efficient vehicle in which judges could carry out their most basic function— deciding cases—and in which all New Jersey citizens would, in Governor Driscoll's words, be "equal[ ] before the law." *Driscoll Address, supra*, at 434.

Broad powers were granted to the Supreme Court at the same time that the Court's as-of-right jurisdiction was limited. *Committee Report, supra*, at 1184. The Committee explained its decision:

> There was some difference of opinion as to whether the jurisdiction of [the Supreme C]ourt should be selective and limited to important cases, including constitutional questions and capital offenses, or whether it should take appeals comprehensively, as does the present Court of Errors and Appeals.... By making the new Supreme Court's appellate jurisdiction selective, that court is assured of an adequate opportunity to hear, consider and decide every case which comes before it.

[<em>Id.</em> at 1183–84.]

The framers of the 1947 Constitution clearly intended that the Supreme Court carry out its appellate review function by undertaking a thorough and comprehensive consideration of each case. To this end, the Court was also empowered to "exercise such original jurisdiction as may be necessary to the complete determination of any cause on review." *N.J. Const.* art. VI, § 5, ¶ 3. "This grant of original jurisdiction . . . [permits the Court to] review . . . matters of fact as well as of law, in accordance with the historic function of an 'appeal.' " *Hager, supra,* 7 *N.J.* at 211, 81 *A.*2d 155. How such comprehensive power was to be effectuated by the Court was left to the Court. At issue in this case is the process by which the Court fulfills its substantive constitutional responsibility to review matters on appeal and, specifically, to review capital causes.

◼ In *State v. Laws*, we held that our authority to undertake appellate review necessarily encompasses the exercise of discretion in modifying a death sentence to a life sentence "whenever the interests of justice so require." 51 *N.J.* at 509–10, 242 *A.*2d 333. The constitutional dimension of this exercise of discretion is underscored by our exclusive appellate jurisdiction over capital causes. *N.J. Const.* art. VI, § 5, ¶ 1(c); *see* Joseph H. Rodriguez et al., *Proportionality Review in New Jersey: An Indispensable Safeguard in the Capital Sentencing Process*, 15 *Rutgers L.J.* 399, 422 (1984) (observing that framers of 1947 Constitution intended to vest Supreme Court with "the power to review fully all aspects of capital cases"). We cannot properly exercise this discretion unless we have the means to ensure that the death penalty is being administered in an evenhanded and nondiscriminatory man-

ner.  Proportionality review is one way to achieve those objectives.

The Florida Supreme Court has held that its authority to conduct proportionality review rests on several provisions of its state constitution, including the court's "mandatory, exclusive jurisdiction ... over death appeals." *Tillman v. Florida*, 591 *So.*2d 167, 169 (Fla.1991) (citing *Fla. Const.* art. I, § 9).  The court observed:

> The obvious purpose of this special grant of jurisdiction is to ensure the uniformity of death-penalty law by preventing the disagreement over controlling points of law that may arise when the district courts of appeal are the only appellate courts with mandatory appellate jurisdiction.  Thus, proportionality review is a unique and highly serious function of this Court, the purpose of which is to foster uniformity in death-penalty law.
>
> [*Ibid.* (citation omitted).]

Our own jurisprudence reflects a continuing concern with proportionality and fairness in both noncapital and capital cases. *See State v. Roth*, 95 *N.J.* 334, 342, 471 *A.*2d 370 (1984) (noting that " 'the defendant's right to appeal from his [noncapital] sentence as manifestly excessive has become firmly established in our State' ") (citation omitted); *State v. Bess*, 53 *N.J.* 10, 18, 247 *A.*2d 669 (1968) (holding that appellate court has "the power to revise a prison sentence where it is manifestly excessive, even though within statutory limits"); *Laws, supra*, 51 *N.J.* at 509–10, 242 *A.*2d 333 (asserting appellate power to modify death sentence to life sentence "whenever the interests of justice so require").  In *Ramseur*, we recognized that the interests of justice are heightened when a life is at stake.  106 *N.J.* at 326, 524 *A.*2d 188.  The scope and conduct of proportionality review are therefore questions that require our most careful determination.

■  It is in this context that we must grapple with a statute in which a coequal branch of government has set limits on our review.[6] *See N.J.S.A.* 2C:11–3e.  By its terms, the State Constitu-

---

[6] This case may be distinguished from *Winberry v. Salisbury*, 5 *N.J.* 240, 74 *A.*2d 406, *cert. denied*, 340 *U.S.* 877, 71 *S.Ct.* 123, 95 *L.Ed.* 638 (1950), the

tion prohibits any one branch of government from exercising powers assigned to a coordinate branch. *N.J. Const.* art. III, ¶ 1. Nonetheless, we have long recognized that "[t]he compartmentalization of governmental powers ... has never been watertight," *In re Salaries for Probation Officers of Bergen County,* 58 *N.J.* 422, 425, 278 *A.*2d 417 (1971); *accord Communications Workers of America v. Florio,* 130 *N.J.* 439, 449, 617 *A.*2d 223 (1992), and have applied a flexible approach to the separation of powers issues that have been brought to the Court, *Knight v. Margate,* 86 *N.J.* 374, 389, 431 *A.*2d 833 (1981).

More than forty-eight years ago, we held that appellate review is an unqualified and exclusive function of the judiciary "secured against legislative interference," *Hager, supra,* 7 *N.J.* at 205, 81 *A.*2d 155, and we continue to adhere to that bedrock principle today. That appellate review is an exclusive power of the judiciary does not foreclose our "cooperative accommodation" of the views of the Legislature. Marie L. Garibaldi, *The New Jersey Experience: Accommodating the Separation Between the*

seminal case construing the nature and extent of judicial rulemaking power under Art. VI, § 2, ¶ 3. In *Winberry,* the Court was faced with a statute and a conflicting court rule purporting to establish the time to appeal a judgment. *Id.* at 243, 74 *A.*2d 406. The court rule was adopted pursuant to the Court's constitutional authority to "make rules governing ... the practice and procedure in all ... [state] courts," an authority made "subject to the law." Art. VI, § 2, ¶ 3. The Court interpreted the constitutional qualification "subject to the law" as relating exclusively to "substantive law." *Winberry, supra,* 5 *N.J.* at 247, 74 *A.*2d 406. Because the challenged legislation purporting to govern the time to appeal was not "substantive," the Court held that the court rule should prevail. *Id.* at 255, 74 *A.*2d 406. In essence, *Winberry* established that the Court's rulemaking power, when applied to matters of practice and procedure, is "not subject to overriding legislation." *Ibid.*

In this case, *Winberry*'s procedural/substantive distinction is not dispositive because the Court's authority to undertake proportionality review does not arise from the rulemaking power granted to it by Article VI, § 2, ¶ 3. Rather, the Court's authority to undertake proportionality review arises from its general appellate review powers and from its specific power to hear capital causes. *See supra* at 279–284, 724 *A.*2d at 142–144; *see also N.J. Const.* art. VI, § 2, ¶ 2; *N.J. Const.* art. VI, § 5, ¶ 1; *N.J. Const.* art. VI, § 5, ¶ 3.

*Legislature and the Judiciary,* 23 *Seton Hall L.Rev.* 3, 5 (1992). Where "legislative arrangements ... have not in any way interfered with this Court's constitutional obligation," we have accepted such arrangements in the interests "of comity and respect for other branches of government." *Passaic County Probation Officers' Assoc. v. County of Passaic,* 73 *N.J.* 247, 255, 374 *A.2d* 449 (1977). Our constitutional obligation has rarely dictated "a result different from that ordained by the Legislature." *CWA Local 1044 v. Chief Justice,* 118 *N.J.* 495, 501, 572 *A.2d* 613 (1990).

When a legislative enactment impedes our ability to fulfill that obligation, however, we have "examine[d] the terms of the legislative enactment, its importance, the extent of its interference with sound judicial administration, and the significance of the issue to the judiciary, ultimately striking a balance between the interests served by comity and those served by the administration of justice." *Ibid.; see also* Garibaldi, *supra,* 23 *Seton Hall L.Rev.* at 9 ("The constitutional validity of a coordinate branch's action turns on the legitimacy of the action's underlying purpose and the nature and extent of its encroachment on judicial prerogatives and interests."). In conducting this evaluation, we remain mindful of our obligation to uphold a legislative enactment absent constitutional repugnance. *See Smith v. Penta,* 81 *N.J.* 65, 74–75, 405 *A.2d* 350 (1979).

### C. *Application of Proportionality Review*

To determine the validity of the Legislature's limitation on the proportionality review universe to death-sentenced defendants, we must examine whether the limitation prevents meaningful appellate review. *Ramseur, supra,* 106 *N.J.* at 186 n. 18, 524 *A.2d* 188 (observing state death penalty statute's provision for appellate review recognizes Court's constitutional obligation to ensure "meaningful" review). The appropriate size of the universe is, however, but one of many questions that have been raised about the conduct of proportionality review and cannot be considered apart from those other questions. At the start, we characterized

our effort to define the scope and conduct of proportionality review as an "evolving process." *Id.* at 328, 524 *A.2d* 188. We observed that proportionality issues are "difficult and sensitive ... and hence review, reflection, and modification of the analysis ... may be required as more information is gathered." *Ibid.*

In the past six years, we have gained considerable experience in applying the methodologies developed by Professor Baldus and generally adopted by the Court in *Marshall II, supra,* 130 *N.J.* at 131–66, 613 *A.2d* 1059. *See DiFrisco III, supra,* 142 *N.J.* 148, 662 *A.2d* 442; *Martini II, supra,* 139 *N.J.* 3, 651 *A.2d* 949; *Bey IV, supra,* 137 *N.J.* 334, 645 *A.2d* 685; *Marshall II, supra,* 130 *N.J.* 109, 613 *A.2d* 1059. Our experience teaches us that the proportionality review methodologies we use are not without substantial shortcomings and, accordingly, warrant careful reconsideration. Our goal is to retain those elements of the present system that provide useful information, to refine and improve that which we retain, if appropriate, and to reject methods that have proved unhelpful. We seek a practical approach that ensures every defendant before us a rigorous and complete review of his or her sentence of death.

██ Our reconsideration extends to four discrete areas of concern: the size of the universe of comparison cases; particular issues in respect of individual proportionality review; questions relating to the statistical models used in both individual and systemic proportionality review; and the status of proportionality review as a separate proceeding in death penalty appeals.[7] Because these issues, with one exception, cannot be resolved on the

---

[7] We use the term "individual proportionality review" to describe our efforts "to ensure that the death penalty is being administered in a rational, non-arbitrary, and evenhanded manner, fairly and with reasonable consistency." *Marshall II, supra,* 130 *N.J.* at 131, 613 *A.2d* 1059. We use the term "systemic proportionality review" to describe our efforts to monitor the death penalty for the purpose of "prevent[ing] discrimination on an impermissible basis, including, but not limited to, race and sex." *Ramseur, supra,* 106 *N.J.* at 330, 524 *A.2d* 188.

record before us, we are appointing a Special Master to conduct additional fact-finding and make recommendations to the Court. On our receipt of his report, we will be in a position to determine whether the statutory limitation on the proportionality review universe prevents meaningful appellate review. Until that time, we will continue to use the full universe of death-eligible cases as described below. Today we decide, based on our experience and on the record before us, that the numerical-preponderance-of-aggravating-and-mitigating-factors test should be abandoned.

We turn now to a discussion of each area of concern.

### 1. *The Scope of the Statistical Universe of Comparison Cases*

We have observed that "[t]he first step in any proportionality undertaking is to establish the 'universe' of cases that the Court will consider." *Marshall II, supra,* 130 *N.J.* at 131, 613 *A.*2d 1059. In *Marshall II,* we examined three possible statistical universes from which to draw comparison cases: a universe consisting of only those cases in which a death sentence was imposed, a universe consisting of all penalty-trial cases, and a universe consisting of all penalty-trial cases plus clearly death-eligible homicides in which the prosecutor elected not to seek the death penalty. *Id.* at 131–37, 613 *A.*2d 1059. After careful evaluation, we selected the third option as best serving the "purposes to be achieved by proportionality review." *Id.* at 137, 613 *A.*2d 1059. We rejected a universe consisting of only death-sentenced cases as "inadequate," *id.* at 133, 613 *A.*2d 1059, and offered in support of our determination this simple example:

> On the assumption that 100 robbery-felony-murder cases are prosecuted as capital crimes, all defendants are convicted and one defendant is sentenced to death, a comparison of the death-sentenced defendant's punishment with a punishment imposed only on other death-sentenced defendants would exclude from the proportionality-review process the ninety-nine robbery-felony-murder defendants that juries did not sentence to death. Indisputably, the determination whether that single death sentence is disproportionate can be made only by comparing it with the life sentences imposed on the ninety-nine defendants convicted of the same crime.

[*Id.* at 133–34, 613 *A.*2d 1059.]

We concluded that it was "self-evident that the universe for proportionality review must, at a minimum, include all penalty-trial cases." *Id.* at 134, 613 *A.*2d 1059.

We next considered whether the statistical universe also should encompass death-eligible homicides not prosecuted as capital crimes. Recognizing that disproportionality could originate in decisions made by prosecutors as well as decisions made by juries, we determined that our mandate to prevent arbitrariness in death sentencing should extend to review of prosecutorial decisions whether to seek the death penalty. *Id.* at 134–35, 613 *A.*2d 1059. We returned to our prior example of 100 robbery-felony-murder defendants, only one of whom was sentenced to death:

> Were we to assume that the remaining ninety-nine defendants were prosecuted and convicted of *non-capital* murder because of prosecutorial decisions not to seek the death penalty, the disproportionality of the single defendant's death sentence would arise not because of a disproportionate jury determination but because the prosecutorial decision to seek the death penalty was unique. That type of disproportionate death sentence could not be identified by a proportionality-review process that was limited to capital cases tried to a penalty phase; it could be identified, however, by a universe that included clearly death-eligible homicides that were not prosecuted as capital cases.

[*Ibid.*]

We further noted that prosecutorial decisions not to seek the death penalty were often influenced by prosecutors' predictions of whether a jury would impose the death penalty after a penalty trial. In this sense, the prosecutorial decision may be understood as a calculation of "deathworthiness," and this calculation, the Court concluded, should be considered in determining whether a particular death sentence was disproportionate. *Id.* at 135, 613 *A.*2d 1059.

In concluding that the proper scope of the statistical universe encompasses all death-eligible homicides, the Court in *Marshall II* observed that proportionality review is premised not only on the prevention of arbitrariness, but also on the prevention of impermissible discrimination in the administration of the death penalty. *Ibid.* (citing *Ramseur, supra,* 106 *N.J.* at 327, 524 *A.*2d 188). This

purpose would be best served by including within the statistical universe those death-eligible homicides that did not advance to penalty trial. *Id.* at 136, 613 *A.*2d 1059. As in individual proportionality review, the larger universe would enable the Court to consider possible discrimination in prosecutors' charging decisions as well as in juries' sentencing decisions.

Our reasons for choosing the larger universe remain valid today. Yet, the reliability of the data underlying a prosecutor's decision to seek or not to seek the death penalty continues to concern the Court. In each case, a prosecutor must decide what to do based on a complex of factors including, among other things, the strength of the State's case, the availability and credibility of witnesses, and the resources of the prosecutor's office. *Id.* at 225, 613 *A.*2d 1059 (Garibaldi, J., concurring in part and dissenting in part) (citing *State v. Koedatich,* 112 *N.J.* 225, 256, 548 *A.*2d 939 (1988)). Such a decision does not necessarily reflect a determination of deathworthiness. As a result, we are uncertain whether under our current approach the addition of death-eligible but noncapitally prosecuted homicides to the statistical universe of comparable cases is helpful to the proportionality review process. As a matter of general principle, the broadest possible statistical database should provide the most useful information; we are concerned when the additional quantum of data may be unreliable.

Even if we were fully convinced that a universe of death-eligible cases was otherwise warranted, our understanding of the practical difficulties attendant to data collection and analysis of noncapital cases requires further review of this issue. Data collection and analysis, which is performed by staff of the AOC, entail difficult and highly subjective determinations of whether a prosecutor could have proven a case and whether a case is death-eligible. In a case that went to trial but was not capitally prosecuted, the AOC staff must make an assessment of aggravating and mitigating factors based on a review of the trial record. In a noncapital homicide, the sentencing of a defendant to a term of imprisonment is guided by statutory aggravating and mitigating factors.

*N.J.S.A.* 2C:44–1. Those factors, however, are different from the aggravating and mitigating factors to be applied by a penalty-phase jury in determining whether to return a verdict of death or life imprisonment. *See N.J.S.A.* 2C:11–3c(4), c(5). Thus, with respect to a homicide case that was not capitally prosecuted, the AOC must make its own assessment of the applicable *capital* statutory aggravating and mitigating factors.

In a case in which the defendant pled guilty, the AOC must make a determination of deathworthiness without the benefit of a trial and based on a record of the offense, the offender, and the surrounding circumstances that may not be complete. We understand that the initial determination, both for noncapital trials and for pleas, is communicated to the parties and that they may object based on information available from their files. After the AOC conducts a meeting with the parties to address their objections, a final coding decision is made. Yet, it is not clear that this process can effectively deal with the potential for errors or omissions in particular case summaries. In turn, the relatively small size of the proportionality review database suggests that the cumulative effect of individual case errors could undermine the reliability of the results produced by the statistical models. We note, however, that the impact of such errors on the precedent-seeking review process, which uses the AOC case summaries, may not be substantial.

For these reasons, on remand to the Special Master, there should be additional fact-finding concerning the proper scope of the proportionality review universe. The Special Master should make an independent evaluation of the deathworthiness of a sample of cases previously classified by the AOC as either death-eligible or death-ineligible. The "provability" of the selected cases and the presence or absence of aggravating and mitigating factors should be considered, and the results compared to the data-coding decisions made by the AOC. If there is a variance between the survey results and the AOC data-coding decisions, possible causes of the variance should be identified along with recommendations

for improved data-coding procedures. Perhaps, a questionnaire, such as that used in the State of Delaware, could be filled out by the judge in each case and used to improve both the data-collection and the data-coding process. Alternatively, if the Special Master determines that the intrinsic difficulties and ambiguities of data-coding death-eligible cases cannot be overcome, he should consider the impact of anticipated coding errors on the AOC models.

We are not aware of particular difficulties associated with the cases that proceed to capital prosecution but reserve decision on the composition of the proportionality review universe generally until we receive the Special Master's report.

### 2. *Individual Proportionality Review*
#### a. *Frequency Analysis*

Although we have recognized the analytic potential of frequency analysis, we have also acknowledged, in each of our cases, that frequency analysis has so far fallen short of this potential. *See DiFrisco III, supra,* 142 *N.J.* at 171, 662 *A.*2d 442; *Martini II, supra,* 139 *N.J.* at 28–29, 651 *A.*2d 949; *Bey IV, supra,* 137 *N.J.* at 350–51, 645 *A.*2d 685; *Marshall II, supra,* 130 *N.J.* at 173–74, 613 *A.*2d 1059. Much of the difficulty has arisen because of the small size of the pool of cases used for comparison purposes. *See Martini II, supra,* 139 *N.J.* at 28–29, 651 *A.*2d 949. Because frequency analysis is statistically based, and because conclusions drawn from small sample sizes are inherently unreliable, we have not had confidence in the results produced by the models. *See DiFrisco III, supra,* 142 *N.J.* at 171, 662 *A.*2d 442; *Martini II, supra,* 139 *N.J.* at 28–29, 651 *A.*2d 949; *Bey IV, supra,* 137 *N.J.* at 350–51, 645 *A.*2d 685; *Marshall II, supra,* 130 *N.J.* at 173–74, 613 *A.*2d 1059. Still, we remained convinced that as the size of the pool of comparison cases increased over time, we would reach a level of statistical reliability that would enable us to place greater weight on the models. *See Bey IV, supra,* 137 *N.J.* at 350, 645 *A.*2d 685.

Our review of the records maintained by the AOC discloses that the number of penalty trials and the number of death sentences imposed by penalty-phase juries have remained small. *Chew/Cooper/Harvey Report,* tbl.2. In each year since 1995, fewer than ten penalty trials have been conducted and fewer than five death sentences have been handed down. *Ibid.* In contrast, the number of penalty trials conducted and death sentences imposed in the late 1980s was considerably higher. For example, in 1987 alone twenty-one penalty trials were held and nine death sentences were handed down. *Ibid.* We recite these numbers not to draw conclusions about the decisions made by prosecutors and juries in respect of the death penalty, but rather to point out that key components of our statistical database are not growing at the rate that earlier had been expected. Review and reflection suggest that a level of statistical reliability may not be attained in the near future. It may be possible to determine, based on projections about the size of the database over time, how long it will actually take before frequency review results can be useful to the Court. We expect the Special Master to make findings on this issue.

We turn now to a discussion of the problems specific to the individual frequency analysis tests.

### i. *Salient–Factors Test*

The salient-factors test employs thirteen major comparison groups or categories of cases ranked generally in descending order of blameworthiness and derived from the statutory aggravating factors. *Final Report, supra,* at 81–82. Each of these thirteen major categories contains two to seven subcategories based on additional statutory and nonstatutory aggravating factors. A defendant is assigned to only one of the thirteen categories and, then, to only one subcategory. *DiFrisco III, supra,* 142 *N.J.* at 166–67, 662 *A.*2d 442. Most important here, the model contains a total of forty-seven groups or categories of cases. *Final Report, supra,* at 83–84, tbl.7.

Although we regard the salient-factors test as the "most persuasive" of our frequency tests, *DiFrisco III, supra,* 142 *N.J.* at 173,

662 *A.*2d 442; *Martini II, supra,* 139 *N.J.* at 33, 651 *A.*2d 949; *Bey IV, supra,* 137 *N.J.* at 353, 645 *A.*2d 685; *Marshall II, supra,* 130 *N.J.* at 168, 613 *A.*2d 1059, we have said repeatedly that the small size of the comparison groups "preclude[s] us from investing great weight in ... [the] results." *DiFrisco III, supra,* 142 *N.J.* at 174, 662 *A.*2d 442; *see also Martini II, supra,* 139 *N.J.* at 37–38, 651 *A.*2d 949. These small samples are, in part, a consequence of the relatively small universe of comparison cases, but also stem from the decision made by Special Master Baldus and adopted by this Court to establish a large number of comparison groups. *Marshall II, supra,* 130 *N.J.* at 146, 613 *A.*2d 1059 (citing *Final Report, supra,* at 80). In designing the salient-factors test, Professor Baldus sought to achieve "factual comparability" of similar cases by narrowly and precisely delineating the salient-factors classifications, *Final Report, supra,* at 80, with the result that there are forty-seven separate categories in this test.

As a matter of general principle, we continue to accept the rationale of Professor Baldus that the salient-factors test should be "sensitiv[e] to [the] nuances of the cases which appear to be statistically and practically important." *Id.* at 83. Our experience in conducting the test since *Marshall II* indicates, however, that a narrow and precise delineation of case classifications may not be optimal when the comparison group of cases produced by the classification scheme is insufficient to support reliable results. *See DiFrisco III, supra,* 142 *N.J.* at 174, 662 *A.*2d 442; *Martini II, supra,* 139 *N.J.* at 37–38, 651 *A.*2d 949. It may well be that realigned compact groupings would prove more useful to the Court. We note, by way of illustration, that the Tennessee Supreme Court employs seventeen separate factors in identifying and analyzing comparable cases and that the Washington Supreme Court employs only four. *See Bland, supra,* 958 *S.W.*2d at 667; *Brown, supra,* 940 *P.*2d at 562.

Special Master Baldus anticipated that the salient-factors test would "evolve in light of experience." *Final Report, supra,* at 80. We agree, and conclude that experience requires us to reexamine

the test's present case classification scheme, and to ask the Special Master to consider in particular whether some reduction in the number of case classifications is possible without compromising the overarching principle that only similar cases be compared. The Special Master should also examine alternate case sorting approaches which account for mitigating factors in order to provide a more complete picture for comparison purposes.

### ii. Numerical–Preponderance–of–Aggravating–and–Mitigating–Factors Test

In the numerical-preponderance test, a defendant's case is compared to other cases having the same number of aggravating and mitigating factors. When adopted, the test was believed to "shed[ ] important light on how, over the long run, juries are likely to sentence defendants with any given number of aggravating and mitigating circumstances." *Id.* at 89. The test was nonetheless recognized to have inherent limitations in "that it assumes an equal weight for all aggravating and mitigating circumstances." *Id.* at 92.

In *Marshall II*, the Court expressed its reservations about the quantitative nature of the test:

> This test is more problematic than either the salient-factors or the index-of-outcomes analyses. Abstractly, we sense that a quantitative rather than a qualitative analysis will be rather unproductive. No matter how many aggravating factors and how few mitigating factors are presented, the jury's decision is intensely qualitative. . . . We have repeatedly emphasized that juries are to make a qualitative, and not a quantitative, analysis of aggravating and mitigating factors.
>
> [130 *N.J.* at 171, 613 *A.*2d 1059.]

Later proportionality review opinions have echoed these concerns. *See DiFrisco III, supra,* 142 *N.J.* at 175, 662 *A.*2d 442 ("[T]his test, too, is fraught with uncertainty. . . . [I]t assumes that juries weigh each of the aggravating and mitigating factors equally, an assumption that fails to account for the qualitative nature of jury deliberations.") (citations omitted); *Martini II, supra,* 139 *N.J.* at 38, 651 *A.*2d 949 (acknowledging same concern). Nevertheless, we adopted and have continued to apply the numerical-preponderance test because of its potential to provide larger sample sizes, and

possibly more reliable results, particularly in comparison to the salient-factors test. *DiFrisco III, supra,* 142 *N.J.* at 175, 662 *A.*2d 442. In fact, the results of the numerical-preponderance test have been consistently discounted, not only because the test fails "to account for the qualitative character of jury deliberations," *Martini II, supra,* 139 *N.J.* at 38, 651 *A.*2d 949, but also due to persistently small sample sizes, *see, e.g., DiFrisco III, supra,* 142 *N.J.* at 178, 662 *A.*2d 442.

In our experience the numerical-preponderance test has not contributed to the Court's proportionality reviews and, in light of its inherent flaws, cannot be expected to do so in the future. We have determined, therefore, that this test should be abandoned.

### iii. *Index–of–Outcomes Test*

In the index-of-outcomes test, the Court "compare[s] the blameworthiness of different defendants by statistically-relevant measures of culpability." *Martini II, supra,* 139 *N.J.* at 42, 651 *A.*2d 949. The test uses multiple-regression analyses [8] employing formulas containing as many as thirty-two factors or variables. By this method, cases are ranked "according to overall defendant culpability, as measured by the presence or absence ... of factors that appear to influence prosecutorial and jury decision-making." *Final Report, supra,* at 93. Yet, as early as *Marshall II,* and most recently in *DiFrisco III,* the Court has recognized that "the small sample size of cases with similar levels of blameworthiness and the great ranges in the confidence intervals" prevent us from

---

[8] Multiple-regression analysis is a statistical tool used to describe the relationship between one or more independent variables (*e.g.,* prior murder) and a dependent variable (*e.g.,* the death penalty). *See Final Report, supra,* at 117. The tool is used in employment discrimination cases when it is claimed that a class of employees has been denied promotion or accorded differential compensation based on factors such as race or gender. Salary would be the dependent variable to be explained whereas gender and race would be the explanatory or independent variables. *EEOC v. Sears Roebuck & Co.,* 839 *F.*2d 302, 325 (7th Cir.1988).

relying on the results. 142 *N.J.* at 182, 662 *A.*2d 442.[9] In essence, although we have assigned a predicted probability of receiving a death sentence to each of the defendants before us, we have been unable to rely on that prediction because of the instability of the multiple-regression models. Most important, for reasons we have discussed, *supra* at 291–292, 724 *A.*2d at 148–149, we are uncertain whether we will soon reach a sample size capable of supporting reliable results in these models.

We will ask the Special Master to undertake a review of both the strengths and the weaknesses of this test and to make recommendations whether the models can be modified and improved, or whether the index-of-outcomes test should also be eliminated.

### b. *Precedent–Seeking Review*

Precedent-seeking review requires us to engage in a traditional case-by-case analysis of similar death-eligible cases. *Martini II, supra,* 139 *N.J.* at 46, 651 *A.*2d 949. We have consistently placed our reliance on this form of review because of the analytic difficulties we have encountered in applying frequency analysis. *See DiFrisco III, supra,* 142 *N.J.* at 171, 662 *A.*2d 442; *Martini II, supra,* 139 *N.J.* at 28–29, 651 *A.*2d 949; *Bey IV, supra,* 137 *N.J.* at 350, 645 *A.*2d 685; *Marshall II, supra,* 130 *N.J.* at 173–74, 613 *A.*2d 1059. Yet, our concerns with respect to precedent-seeking review overlap with our concerns about the underlying reliability of the data.

We have observed that data collection in cases that were not capitally prosecuted entails difficult and highly subjective determinations of whether a prosecutor could have proven the case and whether the case is death-eligible. *Ibid.* Because precedent-seeking review requires that we do a careful analysis of the facts developed by the AOC, and because the pool of cases that were not capitally prosecuted constitutes over fifty-percent of the total

---

[9] For a discussion of confidence intervals see *infra* at 330–331, 724 *A.*2d at 167–168.

universe of cases, the reliability and sufficiency of this data is especially critical to the precedent-seeking inquiry.

Moreover, precedent-seeking review is directly affected by the case-classification scheme employed in the salient-factors test because that test and precedent-seeking review rely on the same initial classifications. *See Bey IV, supra,* 137 *N.J.* at 366, 645 *A.*2d 685. We have determined that an independent assessment is warranted on the question whether some reduction in the number of case classifications, presently forty-seven in number, is possible without compromising the principle that only similar cases be compared. As we have pointed out, the Tennessee Supreme Court does a precedent-seeking review based on seventeen separate groups of comparable cases. *See Bland, supra,* 958 *S.W.*2d at 667. Its approach may serve as an example for the Special Master in his review.

We are aware that a reduction in case classifications will result in more cases in each group. Larger groups present practical difficulties if we continue our present practice of giving separate consideration to each case in the classification to which the defendant's case has been assigned. Even if we retain our present classification scheme, we would be unable to describe and review each comparable case because of the slow but continuing growth in the number of cases. Therefore, as part of our reconsideration of precedent-seeking review, we will ask the Special Master to examine appropriate methods by which to select a representative number of cases within the group of similar cases for consideration and comparison to the defendant's case.

Precedent-seeking review has been and continues to be our most effective means of reviewing the proportionality of a defendant's sentence of death. For this reason, the database and case groups should be constructed with great care. We will rely on this form of review even as we anticipate recommendations for improvements from the Special Master.

### 3. Systemic Proportionality Review and Possible Racial Disparity in the Imposition of the Death Penalty

In *Marshall II*, we said that one purpose of proportionality review is "the prevention of 'any impermissible discrimination in imposing the death penalty.'" 130 *N.J.* at 135, 613 *A.*2d 1059 (quoting *Ramseur, supra,* 106 *N.J.* at 327, 524 *A.*2d 188). We rejected the view of the United States Supreme Court that "'[a]pparent disparities in sentencing are an inevitable part of our criminal justice system,'" *id.* at 207, 613 *A.*2d 1059 (quoting *McCleskey v. Kemp,* 481 *U.S.* 279, 312, 107 *S.Ct.* 1756, 1778, 95 *L.Ed.*2d 262, 291 (1987)), and turned for guidance to the history and traditions of our state to "provide a basis for the independent application of [our] constitution," *State v. Hunt,* 91 *N.J.* 338, 366, 450 *A.*2d 952 (1982) (Handler, J., concurring). We found in our past, reflected in New Jersey's statutory and decisional law, the commitment of this state's citizens "to the elimination of racial discrimination" in all of its invidious forms. *Marshall II, supra,* 130 *N.J.* at 207, 613 *A.*2d 1059. To accept racial disparity in capital sentencing would be to abandon that commitment and "our own constitutional guarantee of equal protection of the laws under New Jersey Constitution Article I, paragraph 1." *Ibid.* We cannot follow such a course. "[W]ere we to believe that the race of the victim and race of the defendant played a significant part in capital-sentencing decisions in New Jersey, we would seek corrective measures, and if that failed we would not, consistent with our State's policy, tolerate discrimination that threatened the foundation of our system of law." *Id.* at 209, 613 *A.*2d 1059.

Robert Marshall was the first defendant to present a statistically based claim purporting to show systemic racial disparity in capital sentencing. *Id.* at 210, 613 *A.*2d 1059. His claim was based on an apparent disparity in the rate at which black and nonblack defendants were sentenced to death at the middle range of culpability. *Id.* at 210–11, 613 *A.*2d 1059. We were, however, unable to draw any conclusions from the data because there "'were too few penalty-trial death-verdict cases involving black

and non-black defendants with comparable levels of culpability to support any finding at all.'" *Id.* at 213, 613 *A.*2d 1059 (quoting David C. Baldus, Special Master, *State v. Robert Marshall:* Death Penalty Proportionality Review Project, A Report to the New Jersey Supreme Court 103 (Sept. 24, 1991) (*Marshall Report*)), We also considered statistical data showing an apparent disparity in the rate at which prosecutors seek the death penalty in black-victim cases as distinct from white-victim cases. *Id.* at 211, 613 *A.*2d 1059. Here too, we were unable to rely on the data, noting that the Special Master characterized the statistical results as "'strictly preliminary.'" *Ibid.* (quoting *Marshall Report, supra,* at 101). We concluded that "evidence of constitutionally-significant race-based disparities in sentencing" had not been found. *Id.* at 210, 613 *A.*2d 1059.

In *Bey IV,* the defendant presented new statistical data purporting to show evidence of racial disparity in the imposition of the death penalty. 137 *N.J.* at 392, 645 *A.*2d 685. As in *Marshall II,* we rejected Bey's claim because the statistical database did not contain "a sufficient number of cases to determine whether a significant statistical disparity exists between death-sentenc[ed] black and non-black defendants." *Id.* at 393, 645 *A.*2d 685. We observed:

> Without a sufficient number of similar cases, we cannot hold that race impermissibly influences the imposition of the death penalty. As vexing as waiting for more data may be, we have no alternative but to wait.
>
> [*Id.* at 394, 645 *A.*2d 685.]

For similar reasons, we rejected claims of racial disparity in the two proportionality review cases following *Bey IV. See Martini II, supra,* 139 *N.J.* at 80, 651 *A.*2d 949; *DiFrisco III, supra,* 142 *N.J.* at 210, 662 *A.*2d 442.

### a. *Race as a Predictor of Outcome*

In this case, the number of death-sentenced cases in the database has risen to forty-seven, *Loftin Report,* tbl.1, an increase of almost twenty-five percent over the number of cases in the Court's previous proportionality review decision in *DiFrisco III, supra,*

142 *N.J.* at 163, 662 *A.*2d 442; *see also DiFrisco Report,* tbl.1. Similarly, there are now 369 death-eligible cases, *Loftin Report,* tbl.1, an increase of nearly twenty percent over *DiFrisco III, supra,* 142 *N.J.* at 163, 662 *A.*2d 442; *see also DiFrisco Report,* tbl.1. Because of the larger database, the AOC used logistic regression procedures to model defendant's racial disparity claim instead of the less reliable discriminate regression procedures used in all prior proportionality review cases. Discriminate analysis assumes that the independent variables used in the model are of the "interval" variety, *i.e.,* the variables represent factors that are capable of appearing across a broad scale. Memorandum from David Weisburd, AOC statistical consultant, to John P. McCarthy, Jr., Assistant Director, AOC 1 (Dec. 16, 1995) (*reprinted in Loftin Report,* technical app. 9). Examples of interval variables include age and income. *Ibid.* Many of the variables considered in the AOC models, however, are of the "nominal" variety, *i.e.,* the variables stand for simple "yes/no" choices. *Ibid.* For example, all of the statutory aggravating and mitigating factors are of the nominal variety, *i.e.,* they are either present (yes), or not present (no). *Ibid.* In contrast to discriminate analysis, logistic analysis "allows a mix of variables with different levels of measurement."[10]

The AOC employs three different statistical models to measure the race effect in capital sentencing—Schedules 2, 5 and 8. *See Loftin Report,* technical app. 10, at 16, 20. In each of the models, white victims ("whitvic") and black defendants ("blackd") are included as suspect variables. Schedules 2 and 5 attempt to measure the race effect of decisions made by penalty-trial juries. Schedule 2 includes twenty statutory aggravating and mitigating factors in addition to the suspect race variables. Schedule 5 includes all of the variables in Schedule 2 and adds eight nonstatu-

---

[10] Logistic regression analysis was first employed in the AOC report prepared for *State v. Harris,* No. A–3–96. *Harris Report,* tbls.1, 3. That case, however, was not decided by this Court because of defendant's unrelated death. *See State v. Loftin,* No. A–86–96, slip op. at 2 (Oct. 22, 1996).

tory variables. Schedule 8 attempts to measure the race effect in all death-eligible cases, and contains variables identical to those found in Schedule 2.

The results of the AOC's logistic regression analyses are summarized as follows:

| Variable | Schedule | Coefficient | Observed * Significance |
|----------|----------|-------------|-------------------------|
| whitvic | 2 | 1.3555 | .0412 |
| blackd | 2 | 1.4522 | .0171 |
| whitvic | 5 | .5157 | .5535 |
| blackd | 5 | 2.3796 | .0066 |
| whitvic | 8 | 1.0699 | .0240 |
| blackd | 8 | .9520 | .0418 |

\* Odds that chance alone would account for the result.
[*Id.* at 16, 18, 20.]

These outcomes show statistical significance in five of the six categories, *i.e.*, five categories have a p-value or p-level of .05 or less.[11] On this basis, the AOC informed us that the outcomes "suggest[ ] a possible 'race effect' in capital jury decision making." *See* Memorandum from John P. McCarthy, Jr., Assistant Director, AOC, to Stephen W. Townsend, Clerk of the Supreme Court 1 (Nov. 25, 1996) (*McCarthy Memorandum*) (*reprinted in Loftin Report*).

---

[11] A finding is said to be statistically significant if chance, acting alone, probably would not have caused it. In many situations, the probability of the chance occurrence of a relationship or difference ... of a particular magnitude can be calculated and expressed in terms of a p-value. In many research contexts, a relationship or difference will be considered statistically significant if p <.05; that is, if there is less than a one-in-twenty probability that a comparable finding would have emerged as a matter of chance alone.
[John M. Conley & David W. Peterson, *The Science of Gatekeeping: The Federal Judicial Center's New Reference Manual on Scientific Evidence*, 74 *N.C. L.Rev.* 1183, 1209 n. 159 (1996).]

According to defendant, Schedules 2 and 5 provide strong evidence that race is a predictor of the outcome of a penalty trial. With respect to Schedule 2, defendant points out that the variable "blackd" achieves a higher level of statistical significance than such statutory aggravating factors as murder of a law enforcement officer, *N.J.S.A.* 2C:11–3c(4)(h), contract principal, *N.J.S.A.* 2C:11–3c(4)(e) or felony murder, *N.J.S.A.* 2C:11–3c(4)(g). *See Loftin Report,* technical app. 10, at 16. Schedule 5 evidences a similar level of statistical significance for the variable "blackd" compared to other statutory aggravating factors. *Id.* at 18. As to Schedule 8, which encompasses all death-eligible cases, defendant notes that the "whitevic" variable achieves statistical significance, *id.* at 20, and suggests that this outcome shows the presence of a white victim has a pernicious effect on the capital prosecution and sentencing system as a whole.

The State vigorously disputes the accuracy and reliability of the statistical models. Relying on its own statistical expert, Dr. John E. Rolph, the State argues that the models contain numerous methodological flaws, including under-inclusion of variables relevant to jury decision making, an insufficient number of cases in the database, and the failure to account for the interaction effect that certain variables may have on one another. The State also questions the accuracy of the database and, in particular, certain data coding decisions made by the AOC. The claim is that errors in the coding of cases may infect the entire database, thereby rendering suspect any conclusions drawn from the models.

### b. *Review of the Statistical Models*

The outcomes produced by the models, and the sharply contested interpretations concerning their significance, caused the Court to seek assistance in resolving the highly technical issues raised by the parties. On October 22, 1996, the Court appointed retired Superior Court Judge Richard S. Cohen as Special Master, and directed that he "conduct a review, perform analyses, and make findings and recommendations relating to defendants' race as a possible factor in the decision of juries to impose the death

penalty." *State v. Loftin,* No. A–86–96, slip op. at 3 (Oct. 22, 1996). The Court directed the Special Master to perform the following tasks:

(1) ... examine and issue findings on the reliability of the data obtained by the Administrative Office of the Courts as it relates to the issue of racial discrimination in the proportionality-review proceedings [in this case and in *State v. Harris* ] ...;

(2) ... independently assess and rank by culpability, sentence and race of defendant all penalty-phase cases in the Administrative Office of the Courts' proportionality review universe....;

(3) ... attempt independently to corroborate the appropriateness of the culpability rankings ...; and

(4) ... undertake or cause to be undertaken a precedent-seeking review of those cases within the mid-range of culpability....

[*Id.* at 3–4.]

Dr. John Tukey, Professor Emeritus of Statistics at Princeton University, served as a technical consultant to the Special Master.

Because of the Court's calendar requirements, Judge Cohen was afforded only three months in which to perform his assigned tasks and file his report. Within this short period of time, he was able to define the universe of cases to be considered, analyze the raw numbers produced by the AOC, make findings concerning the reliability of the culpability rankings, and carry out an independent assessment of those rankings by conducting a survey in which fifty judges were asked to order groups of penalty-trial cases by culpability. The Special Master did not have sufficient time, however, to undertake a precedent-seeking review of those cases falling in the mid-range of culpability.

Judge Cohen presented his findings and recommendations in a report dated January 27, 1997. Richard S. Cohen, *Report to the Supreme Court of New Jersey* (Jan. 27, 1997) (*Special Master Report* ). In his report, he concluded that "the statistical evidence does not prove the defendant's assertions of racial bias in penalty-trial verdicts, [and] neither does it prove that the system operates without bias." *Id.* at 44–45. The Special Master found some indications of bias that "seem to trend, to a degree not revealed by the statistical evidence, toward showing a race effect." *Id.* at 45.

Nonetheless, in his view, "the Court is no closer than it was in the past to statistical evidence of race effect." *Ibid.*

The parties were afforded the opportunity to respond to the findings and recommendations of the Special Master. Following the submission of briefs and oral argument, the Court asked the Special Master and Dr. Tukey to address certain issues raised by the Public Defender and several questions discussed at oral argument. Accordingly, Judge Cohen and Dr. Tukey filed a supplemental report dated May 4, 1997. Richard S. Cohen & Dr. John W. Tukey, *A Study of Statistical Evidence of Race Bias in Penalty Trials* (May 4, 1997) (*Supplemental Report*).

The most significant aspect of the *Supplemental Report* is the modification of a principal conclusion set forth in the first report. On further consideration and in response to comments in Dr. Tukey's supplemental report, Judge Cohen rejects his earlier statement that " 'it is troubling that so much of [the statistical evidence] tends in the same direction [toward a showing of racial bias].' " *Id.* at 10 (quoting *Special Master Report, supra,* at 43). The Special Master adopts the view of his consultant that the common leaning of the statistical evidence is of no significance when, as here, the separate analyses of the evidence are " 'substantially overlapping' " and have much in common with one another. *Ibid.* (quoting Dr. John W. Tukey, *Report to the Special Master* 2 (Jan. 27, 1997) (*Tukey Report*)).

Moreover, in his earlier report, the Special Master had pointed to certain raw data as independent sources indicating some evidence of racial bias. In particular, he had noted the disparity in death-sentencing rates between black-defendant-white-victim cases and nonblack-defendant-nonwhite-victim cases. *Special Master Report, supra,* at 10, 43. He had acknowledged the difficulties in drawing conclusions from a small number of transracial cases,[12] but nevertheless believed the disparity in the transra-

---

[12] In a letter to the Court dated May 15, 1997, Judge Cohen focused on this problem. He said that because there are so few cases in the database, an

cial data supported his observation that " 'so much of [the data] tends in the same direction.' " *Id.* at 43. In his *Supplemental Report,* however, Judge Cohen found inconsistencies in coding transracial cases, *i.e.,* black defendants included black hispanics, and nonblack defendants included Asians and "others"; whereas white victims "excluded all hispanics, Asians, and others" who were instead included in the nonwhite-victim category. *Supplemental Report, supra,* at 10. When the coding was revised to realign the racial categories there were substantial shifts in the number of cases in various of the realigned categories. *See* Appendix A. As Judge Cohen pointed out, "sorting choices affect outcomes, sometimes a lot and sometimes a little, and the outcomes cannot be evaluated without keeping in mind the underlying choices that produced them." Letter from Richard S. Cohen to the Supreme Court 2 (Feb. 7, 1997). The "ambivalence of the coding decisions" was another reason the Special Master rejected his earlier conclusion that apparent trends in the data suggest racial bias. *Supplemental Report, supra,* at 10.

Our dissenting colleague makes much of the Special Master's initial concern about the tendency of the data to show discrimination, *post* at 381, 410, 724 *A.*2d at 194, 209, and downplays the modifications in the *Supplemental Report.* In our view, the *Supplemental Report* highlights the dangers inherent in the improper use of statistics. When separate analyses operate on the same data, it is not surprising that the results trend in the same direction. It is also not surprising that the results do not provide "mutually supportive[ ] evidence of race effect." *Supplemental Report, supra,* at 10.

Judge Cohen does not, however, retreat from his earlier position that further inquiry on the question of racial bias is warranted. In the concluding section of his first report, he recommended

increase of four new penalty trials can cause the "percentage race difference ... [to] drop by 23%," a rather dramatic change. Letter from Richard S. Cohen to the Supreme Court 2 (May 15, 1997).

continued efforts to develop and adopt more reliable statistical models of the race effect in capital sentencing. *Special Master Report, supra,* at 45. He further suggested that the Court consider establishing a permanent group of experienced judges to conduct assessments of penalty trial outcomes. *Ibid.* His conclusions were based on three discrete modes of inquiry: an examination of raw data, interpretations of statistical models prepared by the AOC, and the results of the judges' survey on the comparative culpability of penalty-phase defendants.

We turn first to the raw data. Of the 362 death-eligible cases under study, fifty-six percent (203 cases) involved black defendants and forty-four percent (159 cases) involved nonblack defendants. Prosecutors capitally tried thirty-six percent ($73/203$ cases) of the black defendants and forty-seven percent (74/159) of the nonblack defendants. Thus, nonblack defendants were capitally tried thirty percent more frequently than blacks. Juries imposed death sentences on thirty-eight percent (28/73 cases) of the black defendants who were capitally tried and thirty percent (22/74 cases) of the nonblack defendants who were capitally tried, with the result that juries imposed the death sentence on black defendants twenty-seven percent more frequently than on nonblack defendants.

Considering the cumulative effect of these frequencies, the Special Master found that 13.79 percent ($28/203$ cases) of death-eligible black defendants were sentenced to death and 13.84 percent (22/159 cases) of the nonblack defendants were sentenced to death. *Id.* at 8–9. Although he observed that the cumulative data are "race-neutral," *id.* at 9, contrary to the dissent's claim, the Special Master did not imply "that capital-murder prosecution is 'race neutral.'" *Post* at 381, 724 *A.*2d at 195. Rather, Judge Cohen specifically stated:

The limited scope and significance of these findings should be made clear. They do not rule out race bias as a factor upstream in the process of investigation, arrest and indictment in homicide cases, and they do not deal at all with the fairness or accuracy of the guilt-determining process. Also, they say nothing about the significance (if any) or the causes of an overage of capital prosecutions against

nonblacks or an overage of death sentences against blacks. All they say is that nonblacks were 30% brought to penalty trial more frequently than blacks, and black penalty trial defendants received death sentences 27% more often than nonblack defendants.

[*Special Master Report, supra,* at 9 (footnote omitted).]

In the end, the Special Master determined that none of these results could be considered statistically significant including, most importantly, the apparent racial disparity in penalty-phase verdicts. *Id.* at 44 (finding the penalty-trial results are "well within one standard error ... and so are not near statistical significance").

One final point in respect of the raw data deserves mention. To explain why the disparity between black defendants who were sentenced to death and nonblack defendants who were similarly sentenced is not statistically significant, the Special Master suggested an analogy to the random picking of balls out of a sack that contains an equal number of green and red balls. *Id.* at 14–15. He explained that even if there are 74 green balls and 74 red balls in the sack, a random picking of 50 balls will not necessarily produce 25 of each color. *Id.* at 14. The Special Master used this analogy to demonstrate that the disparity in the number of black defendants (28), as opposed to nonblack defendants (22), sentenced to death is not in and of itself statistically significant and "cannot be taken to prove a racial difference in results." *Ibid.*

The dissent criticizes the Special Master's analogy, stating that he "fail[ed] to account for culpability, the factor that should dictate a jury's decision to sentence someone to death." *See post* at 384, 724 *A.*2d at 196. Again, the dissent misreads Judge Cohen's point: the Special Master understood the importance of the culpability rankings but found them to be unsound. The data simply does not "reveal tangible and frightening disparities .... adversely affect[ing] black defendants, killers of white victims, and black defendants who kill white victims." *Id.* at 385, 724 *A.*2d at 197. The dissent's rhetoric notwithstanding, the data cannot now inform us whether there is or there is not discrimination at any level in the death penalty system.

The Special Master counsels against reliance on the culpability rankings produced by the statistical models for many reasons, including numerous ambiguities in coding the cases, *Special Master Report, supra,* at 30–42, the small size of the database, *id.* at 20, and the manifest unsuitability of the models as a means to test racial bias, *id.* at 25–30. Notably, the small size of the database means that small changes in data coding can produce anomalous results; for example, if one defendant shifts one culpability level up or down, the statistical outcome may change substantially. These concerns led the Special Master to conclude that the models are simply not "reliable bases for consequential decisions." *Id.* at 44.

More specifically, the Special Master pointed to one of the culpability rankings assigned to defendant as evidence of the unreliability of the statistical models. *Supplemental Report, supra,* at 5. Defendant, a prior murderer, falls into culpability level one, the lowest level of culpability, in one of the three logistic regression models. *Loftin Report,* tbl.22 (reporting culpability scores among penalty-trial cases applying statutory and nonstatutory factors). The Special Master observed that penalty juries have returned death verdicts against a majority of prior murderers in a relatively large number of cases. *Supplemental Report, supra,* at 5. Thus, in his view, the AOC methodology "underrate[s] an aggravating factor which sound intuition and courthouse experience rank high." *Id.* at 6. In so doing, the methodology "proceeds to give unwarranted support to the thesis that Loftin was condemned to death for his color." *Ibid.*

Because this Court's order to the Special Master "contemplated independent assessment of the culpability rankings and ratings of the penalty trial cases," *Special Master Report, supra,* at 21, Judge Cohen asked experienced penalty-trial judges to participate in a culpability ranking survey that could then be compared to the AOC statistical results. In the survey, fifty judges were given short narrative statements describing each case in a group of penalty-phase cases and were told to rank the individual cases in

order of deathworthiness. The statements "included no information from which the judges could ascertain the race of either the defendant or the victim, or the outcome of the penalty trial." *Id.* at 22. The judges were told to place each defendant into one of five culpability levels and to rank each `case in order of deathworthiness, with one being the least deathworthy and five being the most deathworthy. *Id.* at 23.

The judges' culpability scores were averaged for each defendant and the results analyzed. The average rating of all penalty-trial defendants was 3.34, with 3.30 for black defendants and 3.38 for nonblack defendants. *Ibid.* The difference, 2.4 percent, was characterized by the Special Master as "insignificant." *Ibid.* The average culpability rating of defendants who received a death sentence was 3.72, with 3.68 for blacks and 3.77 for nonblacks. *Ibid.* The Special Master found this difference to be without meaning, *id.* at 23–24, and concluded that the judges "gave culpability ratings that were essentially colorblind." *Id.* at 23. Judge Cohen believed these results to be important because

the survey judges did not know defendants' race; the juries did.... [T]he judges' race-blind ratings turned out to be race-neutral in culpability levels. They did not rate nonblack defendants ... more deathworthy than black defendants.

[*Id.* at 24–25.]

Judge Cohen concluded that the results of the judges' survey challenge the accuracy and reliability of the statistical models indicating a race effect. *Id.* at 25.

The dissent believes that the Special Master's decision to average the results of the judges' culpability survey "may not reveal the true level of disparity in culpability between the races." *See post* at 393, 724 *A.*2d at 201. By way of example, the dissent points out that averaging might be misleading because a large number of nonblack defendants could be at the extreme levels of culpability and the black defendants could be evenly divided among the five culpability levels. *Id.* at 393–394 n. 13, 724 *A.*2d at 201 n. 13 (assuming that there are nine nonblacks with culpability levels of 1, 1, 1, 3, 3, 3, 5, 5, and 5, and nine blacks all with

culpability levels of 3). The fear is that the "true level of disparity" is hidden by averaging.

In fact, the judges' culpability ratings essentially "produced a classic normal distribution" for both black and nonblack defendants. *Special Master Report, supra*, at 23; *see also* Appendix B. As the Special Master explained,

> There is always a risk in averaging judgments that an idiosyncratic response or two will distort the results. If there were a large number of responses, so that an ample number remained after discarding outliers, that course of action might make sense. In our survey, however, we ordinarily had five judges rating each case, and we felt it unwise to discard any outlier, and leave only three or four. In addition, it appeared to us that *the incidence of very disparate responses was low, and therefore outliers were not a significant problem. Furthermore, there is no reason to believe that outliers leaned more in one direction than the other, and therefore no indication that the course we took had any effect on the accuracy of the results.*
>
> [*Supplemental Report, supra*, at 8 (emphasis added).]

We agree with the Special Master's conclusion "that the essentially race-blind results of the survey seriously undercut the notion that non-black penalty-trial defendants are noticeably more death-worthy than their black counterparts." *Id.* at 7. We observe that the different results produced by the AOC data and the judges' survey in respect of the relative culpability of nonblack defendants and black defendants may be explained by the small size of the database. It is possible that nonblack defendants are disproportionately represented in certain categories and that the small number of cases in each of these categories could distort the culpability estimates, resulting in an exaggeration of the death-worthiness of nonblack defendants.

There are, however, more fundamental problems with the statistical models. The methods we use were developed by Professor David Baldus for use by this Court in conducting individual proportionality reviews, not for the purpose of assessing systemic discrimination. *See Marshall II, supra*, 130 *N.J.* at 152–55, 172–74, 613 *A.*2d 1059. Special Master Cohen considered whether the models are capable of providing information about racial disparity in death sentencing and found that "the methodology reveals serious flaws when diverted to the task of providing reliable

evidence relating to the race question." *Special Master Report,* *supra,* at 42. In the view of the Special Master and Dr. Tukey, a statistical model designed to test racial bias should employ between five and ten parameters or variables, whereas the AOC models employ as many as thirty-two.[13] *Id.* at 27–28. A statistical model with a relatively small number of well-crafted parameters is known as a parsimonious model. *Id.* at 28; *Tukey Report,* *supra,* at 5–7.

Judge Cohen and Dr. Tukey further advise that a reasonably parsimonious model is necessary to achieve a minimal degree of statistical reliability when, as here, the size of the database is small and the purpose of the analysis is to "generalize" from the data "and make judgments about their significance." *Supplemental Report,* *supra,* at 2. Dr. Tukey, in an effort to illustrate the parsimony principle, created three variants of parsimonious models to look at possible race effects. He then employed two methods for assessing the standard of error for the black defendant variable: (1) SAS, the off-the-shelf program used by the AOC; and (2) an alternative, known as the "jackknife technique." *Tukey Report,* *supra,* at 9. Although Model 3 showed a statistically significant race effect when the SAS program was used, the results of the jackknife did not achieve statistical significance. *Id.* at 10. The dissent relies heavily on the SAS program results, again ignoring contrary outcomes, to conclude that there is racial bias against black defendants. The conflicting results derived from the same data set actually compel a conclusion that racial disparity has not been demonstrated.

---

[13] A model containing an excessive number of parameters in relation to the small number of cases studied can lead to a statistical phenomenon known as "overfitting." *Special Master Report, supra,* at 27. Overfitting "can result in the false attribution of effect to one or more of [the parameters]." *Ibid.* Judge Cohen opined that the AOC models were subject to overfitting, *i.e.,* "there is such an excess of factors compared to the number of death verdicts as to cripple the system's predictive capacities." *Id.* at 42.

Equally important, the Tukey models were not the result of independent research, but were based on the Baldus-methodology culpability ratings and operated on the same small body of data. They were done in an attempt to "alleviate some of the pathology that infected the models the AOC employed," *Supplemental Report, supra,* at 14, and not as the most effective means of studying possible racial bias. In this context, the dissent's suggestion that Model 3 is the "most methodologically sound" of the Tukey models, *post* at 388, 724 *A*.2d at 198, has little meaning. Given the limited usefulness of the Tukey models generally, and the mixed results from the third model specifically, the dissent's reliance on Model 3 is misplaced.

Many of the Special Master's findings are vigorously disputed by defendant. He asserts that the Special Master erred in discounting the reliability of the AOC culpability models and presents his own expert, Dr. Paul Allison, who states that the AOC "data compare favorably with some of the best research work in the social sciences and cannot be casually dismissed as 'unreliable'." Memorandum from Dr. Paul Allison, defendant's statistical expert, to Mordecai Garelick and Claudia Van Wyck, defendant's counsel 1 (May 22, 1997) (on file with Court). Defendant also offers alternate statistical models prepared by Dr. Allison. In an attempt to refine Dr. Tukey's work, Dr. Allison added the white-victim variable to the three Tukey models. Two of the reconfigured models showed a statistically significant race effect.

Like the Tukey models, however, Dr. Allison's models are "infected" by the suspect culpability ratings and the small size of the database. *See supra* at 310–312, 724 *A*.2d at 158. Moreover, Dr. Allison apparently relied on transracial data in which the black-nonblack coding of defendants differed from the white-nonwhite coding of victims. *Supplemental Report, supra,* at 13–14. As discussed earlier, *supra* at 305, 724 *A*.2d at 155, Judge Cohen found that after the data were recoded, there were dramatic changes in the number of cases in certain categories, *Supple-*

*mental Report, supra* at 13, indicating that the effect of coding decisions on the statistical results can be substantial. Even setting aside the coding and database problems, the models represent but preliminary efforts to develop adequate parsimonious models. Indeed, both the Allison and the Tukey versions have not been subject to the type of study and analysis that would permit the Court to make an informed decision about their usefulness.

Finally, we disagree with our dissenting colleague's suggestion that, despite the statistical models' "imperfections," the Court "should not hesitate" to find evidence of a race effect. *Post* at 400, 724 *A*.2d at 204. The dissent relies on our toxic-tort cases for the proposition that strict scientific standards may be relaxed where "'the scientific method fails ... to address or accommodate the needs and goals' to be achieved by a judicial determination." *Id.* at 400, 724 *A*.2d at 204 (quoting *Rubanick v. Witco Chemical Corp.*, 125 *N.J.* 421, 436–37, 593 *A*.2d 733 (1991)). In *Rubanick v. Witco Chemical Corp.*, we held that "a scientific theory of causation that has not yet reached general acceptance may be found to be sufficiently reliable if it is based on a sound, adequately-founded scientific methodology involving data and information of the type reasonably relied on by experts in the scientific field." *Rubanick, supra,* 125 *N.J.* at 449, 593 *A*.2d 733; *see also Landrigan v. Celotex,* 127 *N.J.* 404, 414, 605 *A*.2d 1079 (1992) (stating that "the key to admission of the opinion is the validity of the expert's reasoning and methodology"). The difficulty with the dissent's argument, however, is that here the statistical models we use for proportionality review do not even meet the more lenient standard accepted by the Court in toxic-tort cases.

Our dissenting colleague further suggests that the risk of discrimination is sufficient to invalidate our capital punishment system. *See post* at 387, 724 *A*.2d at 198 (declaring that the Court cannot "continue to ignore the risk that racial discrimination is infecting the State's imposition of the death penalty"). He eloquently details this country's terrible history of slavery and con-

tinuing racial discrimination, *id.* at 404–410, 724 *A.*2d at 206–209, and finds that the "legacy of racism confirm[s] the statistical evidence that racial discrimination influences the imposition of capital punishment," *id.* at 405, 724 *A.*2d at 207 (citing *McCleskey, supra,* 481 *U.S.* at 328–30, 107 *S.Ct.* at 1786–87, 95 *L.Ed.*2d at 302 (Brennan, J., dissenting)). But "[t]he question 'is at what point that risk [of discrimination] becomes constitutionally unacceptable.'" *McCleskey, supra,* 481 *U.S.* at 308–09, 107 *S.Ct.* at 1776, 95 *L.Ed.*2d at 289 (quoting *Turner v. Murray,* 476 *U.S.* 28, 36 n. 8, 106 *S.Ct.* 1683, 1688 n. 8, 90 *L.Ed.*2d 27 (1986)). Past discrimination cannot validate flawed statistical data and prove present discrimination in the administration of the death penalty.

Under our system of proportionality review, the burden rests with the defendant to establish disproportionality. *Bey IV, supra,* 137 *N.J.* at 343, 645 *A.*2d 685. We conduct systemic proportionality review because of the risk of discrimination, but it is the defendant who must show that the risk is "constitutionally significant." *McCleskey, supra,* 481 *U.S.* at 313, 107 *S.Ct.* at 1778, 95 *L.Ed.*2d at 292. Judge Cohen stressed the inherent limitations of statistical analysis when applied to the task of recognizing racial bias in the administration of the death penalty. He said that statistical approaches such as the AOC models are "incapable of *disproving* race bias." *Supplemental Report, supra,* at 11 (emphasis added). At best, statistical approaches can furnish evidence that the administration of the death penalty is "inconsistent with raceblindness." *Id.* at 12. In Judge Cohen's view, a defendant seeking to invoke statistical analysis to show racial bias in the administration of the death penalty should be subject to "a burden of proof consistent with the nature of the evidence and conforming to the science he invokes." *Ibid.* On the statistical evidence before him, Judge Cohen concluded that he did not find "relentless documentation or even a preponderance in the direction of the existence of any race bias." *Ibid.; see Marshall II, supra,* 130 *N.J.* at 213, 613 *A.*2d 1059 (concluding that, where "'statistical evidence ... relentlessly documents the risk that [death] sentence

was influenced by racial considerations,' " the sentence would be invalidated) (quoting *McCleskey, supra*, 481 *U.S.* at 328, 107 *S.Ct.* at 1786, 95 *L.Ed.*2d at 301, Brennan, J. dissenting). Our consideration of the record in this case convinces us that defendant has not "relentlessly document[ed] the risk" of racial disparity in the imposition of the death penalty.

We make one other point in response to the dissent's claim that we have "turned the convenient measure of 'statistical significance' into a talismanic rule." *Post* at 401, 724 *A.*2d at 205. We agree that "[t]here is nothing magic about . . . .05" as a measure of statistical significance. *Id.* at 402, 724 *A.*2d at 205 (quoting Joseph Sanders, *From Science to Evidence: The Testimony on Causation in the Benediction Cases*, 46 *Stan. L.Rev.* 1, 15 (1993)). This standard is generally used by scientists "[b]ecause [they] want to be satisfied that they are not claiming false positives-causal relationships that do not exist. . . ." Sanders, *supra*, 46 *Stan. L.Rev.* at 15. We, also, expect the link between racial bias and the death penalty to be clearly established before we find that our system of capital punishment is so seriously flawed as to require intervention by this Court. We do not seek "punctilious and pristine statistical analyses," *post* at 398, 724 *A.*2d at 203, but, rather, a sound methodology that is capable of producing reliable results.

This Court is committed to a course of review that is capable of discerning possible racial discrimination in our capital sentencing system. Judge Cohen recommended that we continue our efforts to "develop and adopt more parsimonious models for more reliable regression studies of the race effect." *Special Master Report*, *supra*, at 45. We adopt his recommendation and will ask the Special Master to undertake that effort.[14] In addition, the survey of judges conducted by Judge Cohen provides encouraging but

---

[14] We ask also that the Special Master review the question whether purging, *i.e.*, the removal of the indirect effects of race from variables that appear to be unrelated to race, produces results that are useful. In the opinion of Dr. Tukey, it does not. *Tukey Report, supra*, at 11.

provisional evidence of nondiscrimination. At the least, the survey suggests that the culpability ratings derived from the statistical models should be subject to a form of independent verification. *See id.* at 25, 45. For this reason, Judge Cohen recommended that we appoint a panel of judges to perform periodic assessments of penalty-trial outcomes and thereby "provide another source of useful culpability ratings to guide not only tests for race effect but also [individual] proportionality review generally." *Id.* at 45. This recommendation should be considered by the Special Master along with the composition and mandate of an independent judicial panel if appropriate.

Our review of the record in this case convinces us that defendant has not demonstrated racial disparity in the imposition of the death penalty.

### 4. *Proportionality Review and its Status as a Separate Proceeding in Death Penalty Appeals*

Proportionality review has been conducted as a separate proceeding following a defendant's unsuccessful direct appeal. *See DiFrisco III,* 142 *N.J.* at 156, 662 *A.*2d 442; *Martini II,* 139 *N.J.* at 15, 651 *A.*2d 949; *Bey IV,* 137 *N.J.* at 339, 645 *A.*2d 685; *Marshall II,* 130 *N.J.* at 117, 613 *A.*2d 1059. The Court expected that a separate proceeding would conserve resources because a proportionality review would not occur if the defendant's direct appeal was successful. We recognize, however, that this practice also exacts a cost by drawing out the appeals process when a death sentence is affirmed.

The Court is sensitive to the need to achieve finality in the appeals process within a reasonable period of time consistent with a full and fair hearing of all of defendant's claims on appeal. We will ask the Special Master to develop a factual record and issue findings concerning the desirability of maintaining proportionality review as a separate proceeding or, alternately, conducting proportionality review in connection with a capital defendant's direct appeal.

## III

### *Application of the Methods of Individual Proportionality Review to Loftin*

We have decided that, until our review of the Special Master's findings and recommendations is complete, we will not apply the 1992 statutory amendment limiting proportionality review to similar cases in which the defendant has been sentenced to death, but rather will continue to compare all death-eligible homicides with the case before us. *See supra* at 286, 724 *A*.2d at 145. In addition, while we await the Special Master's recommendations vis-a-vis proportionality review generally, we will continue to analyze defendants' cases according to the methodologies and procedures previously utilized, except that we will no longer conduct the numerical-preponderance test previously used as part of our frequency approach.

### A. *Facts*

The facts of this case are set forth in detail in *Loftin I, supra*, 146 *N.J.* at 318–33, 680 *A*.2d 677. We repeat here only those facts that are relevant to our proportionality review.

Sometime between 4:10 a.m. and 6:10 a.m. on the morning of May 5, 1992, Gary Marsh was shot in the head with a single bullet from a .380 caliber pistol during a robbery. He was working the night shift at a gas station in Lawrenceville, New Jersey. A co-worker who arrived at 6:10 a.m. found Marsh lying on the floor in the office of the station, unconscious and struggling for breath, with his head in a puddle of blood. The office keys were in the door, the cash drawer was found empty on the counter, and there was loose change on the floor. Approximately ninety dollars was missing, including one fifty-dollar bill. There were no signs of a struggle in the small, narrow office. Marsh never regained consciousness and died approximately nine-and-one-half hours after he was discovered. An autopsy revealed no defensive wounds that would have indicated Marsh struggled with his assailant.

Defendant, twenty-six-years old at the time, was arrested four days after the murder when he attempted to purchase a computer using a Sears credit card belonging to Marsh. At the time of his arrest, defendant possessed Marsh's identification, a Washington State gun permit, a receipt for the purchase of a .380 caliber pistol, and a fifty-dollar bill. The murder weapon was recovered from defendant's car, as was a plastic mask.

On July 8, 1994, defendant was found guilty of purposeful or knowing murder by his own conduct. The guilt phase jury found specifically "that defendant's intent was to kill [Marsh] ... as opposed to causing him serious bodily injury." *Id.* at 324, 680 *A.*2d 677. A separate penalty-phase jury heard much of the same evidence the State had presented during the guilt phase. In mitigation, defendant called, among others, Carmeta Albarus, an expert in compiling psychosocial histories, and Dr. Edward J. Dougherty, a defense psychologist.

Albarus, who had constructed defendant's social history through interviews and document review, described his life to the jury. She testified that defendant was one of seven children born to Fred and Ellen Loftin. Fred, though nurturing, was a poor provider and disappeared when defendant was five-years old leaving Ellen as the sole support for the family. Because she worked long hours, Ellen was rarely at home. In Albarus's view, Mrs. Loftin did not relate well to her children and had little ability to nurture them.

When only six-years old, defendant set his mattress on fire and burned the family home to the ground. After that, he and his family moved to a one-bedroom hotel room for an extended period. Although defendant struggled with drugs in his early teens, he later obtained his GED and "expended significant time and effort trying to help his siblings get on or stay on the right path." *Id.* at 329, 680 *A.*2d 677.

Defendant married when he was twenty-years old. Because his mother did not approve of his marriage, defendant abandoned his birth family in order to remain loyal to his wife. As a result, his

mother did not attend the funeral of his stillborn son. In part because of his inability to provide for his new family, defendant's marriage was conflict-ridden. After searching for a job he could hold, defendant joined the Navy and attained some success. However, on the day he was due to sail, his wife attempted suicide and he was discharged to take care of her. Although he then attended and completed school to become an auto mechanic, he could only find work washing cars. Defendant subsequently went to community college but became depressed and frustrated because of his poor grades. His frustrations manifested themselves in his mental, and perhaps physical, abuse of his wife and children.

Dr. Dougherty testified that defendant suffered from a "borderline personality disorder." The doctor explained that a person is diagnosed with a borderline personality if he or she satisfies five or more of the nine criteria set forth in the DSM–IV manual for evaluating this disorder. According to Dr. Dougherty, defendant exhibited symptoms of six or seven of the nine criteria:

> He demonstrated: (1) frantic efforts to avoid real or imagined abandonment ... [;] (2) a pattern of unstable and intense interpersonal relationships characterized by alternating between extremes of idealization and devaluation (overidealization of his wife and mother); (3) identity disturbance: markedly and persistently unstable self-image or sense of self; (6) affective instability due to a marked reactivity of mood ... [;] (7) chronic feelings of emptiness ... [;] (8) inappropriate, intense anger or difficulty controlling anger ... [;] and (9) transient, stress-related paranoid ideation or severe dissociative symptoms.
>
> [*Id.* at 331, 680 *A.*2d 677.]

In rebuttal, Dr. Charles Martinson, a psychiatric expert for the State, testified that defendant did not suffer from a borderline personality disorder at the time of the offense, but rather "exhibited narcissistic and antisocial personality traits." *Id.* at 332, 680 *A.*2d 677. Dr. Martinson said that defendant "committed the murder for economic reasons," *id.* at 331, 680 *A.*2d 677, and "that the only 'remorse' defendant exhibited occurred when he learned that Marsh held two jobs." *Id.* at 332, 680 *A.*2d 677. The defendant's substantial inability to feel remorse was further demonstrated in a sentence completion test administered by a defense psychiatrist when, after the words " 'My greatest mistake was

...'[,] defendant wrote, 'become incarcerated.'" *Ibid.* On December 6, 1994, the penalty-phase jury sentenced defendant to death. The jury determined the State had proven beyond a reasonable doubt three statutory aggravating factors: *N.J.S.A.* 2C:11–3c(4)(a) (prior murder); *N.J.S.A.* 2C:11–3c(4)(f) (escape detection); and *N.J.S.A.* 2C:11–3c(4)(g) (felony murder). The c(4)(f) aggravating factor was based on: the defendant's attempt to disguise his appearance by wearing a mask and fatigues; the distance defendant traveled from his Bristol, Pennsylvania home "passing hundreds of potential targets along the way, to a secluded station in Lawrenceville Township, New Jersey;" the fact that Marsh "might have been able to identify his assailant's voice, height, weight, and overall build" and could have "described the color, make, and model of defendant's car, not to mention its Pennsylvania license plates;" the lack of a "forced entry or of physical struggle inside or outside the office;" and the fact that "defendant did not have to kill Marsh to effectuate the robbery." *Loftin I, supra,* 146 *N.J.* at 376–78, 680 *A.2d* 677. The c(4)(a) aggravating factor was based on defendant's March 28, 1992, knowing or purposeful murder of Sophia Fetter in which defendant was implicated after his arrest for the Marsh murder. He was convicted of the Fetter murder on September 22, 1993, and that conviction was affirmed on appeal. *State v. Loftin,* 287 *N.J.Super.* 76, 670 *A.2d* 557 (App.Div.), *certif. denied,* 144 *N.J.* 175, 675 *A.2d* 1123 (1996).

At least one juror found the existence of three statutory mitigating factors. One juror found the c(5)(a) mitigating factor (extreme mental or emotional disturbance); two jurors found the c(5)(c) mitigating factor (defendant's age); and several jurors found the c(5)(h) mitigating factor (catch-all) for different reasons: defendant was traumatized by the loss of his father at an early age; he was traumatized by the fire he set; he was emotionally impoverished growing up; he was raised in poverty; he was deprived of a positive male role model during his youth; he was a considerate and loving son; he provided his siblings with a positive sense of direction; he had assumed the responsibility of being a family man

before he was emotionally and financially prepared to do so; he was traumatized by the loss of his first son; he had served in the Navy, attended community college, and been a model prisoner; he led a crime-free existence for his first twenty-five years; he has the love and support of his family; he was under the influence of mental and emotional pressure at the time the crime was committed; and he had offered to plead guilty in exchange for a life sentence. No juror found that defendant had sincere and heartfelt remorse.

The jurors unanimously concluded that the three aggravating factors outweighed the mitigating factors and sentenced defendant to death. We affirmed defendant's conviction and death sentence and acknowledged his request for proportionality review. *Loftin I, supra,* 146 *N.J.* at 397–98, 680 *A.*2d 677. Subsequently, the Clerk of the Court set a briefing schedule and directed the AOC to undertake its usual statistical study in connection with the proportionality of defendant's sentence. The AOC issued its *Loftin Report* on November 25, 1996.

### B. *Focus of Review*

We conduct proportionality review to determine whether a particular defendant's death sentence is disproportionate when compared to other defendants "with similar characteristics ... [who have] committ[ed] factually similar offenses in the same jurisdiction." *Bey IV, supra,* 137 *N.J.* at 343, 645 *A.*2d 685 (internal quotation marks and citations omitted). Our review is offender-oriented. We "presume[ ] that the death penalty is proportional to the offense," and ask " 'whether the punishment fits the criminal,' " *DiFrisco III, supra,* 142 *N.J.* at 161, 662 *A.*2d 442 (citing *Marshall II, supra,* 130 *N.J.* at 129, 613 *A.*2d 1059, additional citations omitted). " '[A] death sentence is comparatively excessive if other defendants with similar characteristics generally receive sentences other than death for committing factually similar offenses....' " *Marshall II, supra,* 130 *N.J.* at 153–54, 613 *A.*2d 1059 (quoting *Tichnell, supra,* 468 *A.*2d at 17 n. 18).

Our dissenting colleague turns this concept on its head when he asserts that "[t]he standard measuring disproportionality ... must require ... that, for defendants similarly situated, the death sentence be received in a defined preponderance of cases." *Post* at 425, 724 *A.*2d at 217. Because New Jersey jurors have been sparing in their imposition of the death sentence, it will never be the case that death would be "generally received" or "received in a defined preponderance of cases." Because juries impose death infrequently, we have recognized that "death need not be normal or general to be a licit sentence." *Marshall II, supra,* 130 *N.J.* at 153, 613 *A.*2d 1059. The dissent has missed the point. He would have us find that death is the normal sentence when that can never be so.

"Proportionality review seeks to determine only whether a particular death sentence is aberrational, not whether it compares perfectly with other sentences." *Bey IV, supra,* 137 *N.J.* at 352, 645 *A.*2d 685 (citation omitted). For this reason, statistical disparity is permissible, indeed expected. For this reason also, the Court has repeatedly declined to set a threshold at which the imposition of the death penalty becomes disproportionate. *DiFrisco III, supra,* 142 *N.J.* at 171–72, 662 *A.*2d 442; *Martini II, supra,* 139 *N.J.* at 30, 651 *A.*2d 949; *Bey IV, supra,* 137 *N.J.* at 351, 645 *A.*2d 685. Yet, the dissent again urges a numerical standard for determining proportionality. *Post* at 418, 724 *A.*2d at 214; *see also DiFrisco III, supra,* 142 *N.J.* at 233, 662 *A.*2d 442 (Handler, J., dissenting); *Martini II, supra,* 139 *N.J.* at 90–91, 651 *A.*2d 949 (Handler, J., dissenting); *Bey IV, supra,* 137 *N.J.* at 408, 645 *A.*2d 685 (Handler, J., dissenting). We continue to believe, however, that setting such a standard "would introduce unacceptable arbitrariness into proportionality review." *Martini II, supra,* 139 *N.J.* at 20, 651 *A.*2d 949; *see also Bey IV, supra,* 137 *N.J.* at 351, 645 *A.*2d 685 (stating that "[a] general standard, although admittedly imprecise, is not necessarily arbitrary"). As we observed in *Martini,* an absolute numerical standard "suffers from an inherent failure to distinguish between defendants."

*Martini II, supra,* 139 *N.J.* at 32, 651 *A.*2d 949. Furthermore, application of a strictly quantitative approach may unduly " 'limit the legitimate exercise of judicial discretion' " and " 'inappropriately suggest that the complex judgments involved in proportionality determinations can be expressed with mathematical precision.' " *Marshall II, supra,* 130 *N.J.* at 153, 613 *A.*2d 1059 (quoting *Final Report, supra,* at 42–43). We have never believed that statistics can replace the process of judging; we do believe that statistical results, properly used and understood, can alert us to the need for increased vigilance in our quest for impartial justice.

## 1. *The Universe of Cases*

The *Loftin Report* includes all death-eligible cases collected by the AOC from 1983 to September 1, 1996. *Loftin Report,* tbl.1 n. 1. There are 369 death-eligible cases, 154 of which went to penalty trial, producing a rate of forty-two percent. *Id.,* tbl.3. Of the 154 penalty-trial cases, forty-seven, or thirty-one percent, resulted in a death sentence. *Id.,* tbl.2. The overall death-sentencing rate is therefore thirteen percent (47/369). *Id.,* tbl.1.

## 2. *Method of Classifying Cases*

After establishing the universe of cases, we next convert that universe into a database for comparison purposes. As in our previous proportionality cases, we use two approaches: an *a priori* approach and an empirical approach. *See DiFrisco III, supra,* 142 *N.J.* at 163–64, 662 *A.*2d 442; *Martini II, supra,* 139 *N.J.* at 24, 651 *A.*2d 949; *Bey IV, supra,* 137 *N.J.* at 345, 645 *A.*2d 685; *Marshall II, supra,* 130 *N.J.* at 141–43, 613 *A.*2d 1059. In the *a priori* method, we analyze cases based on those factors that experience has shown influenced whether a defendant was sentenced capitally. *See DiFrisco III, supra,* 142 *N.J.* at 164, 662 *A.*2d 442; *Martini II, supra,* 139 *N.J.* at 24, 651 *A.*2d 949; *Bey IV, supra,* 137 *N.J.* at 345, 645 *A.*2d 685; *Marshall II, supra,* 130 *N.J.* at 141–42, 613 *A.*2d 1059. In the empirical method, we review both defendants who were sentenced to death and those who were not to "identify those characteristics that determine the

patterns of life sentencing versus death sentencing." *DiFrisco III, supra*, 142 *N.J.* at 164, 662 *A*.2d 442; *see also Martini II, supra*, 139 *N.J.* at 24, 651 *A*.2d 949; *Bey IV, supra*, 137 *N.J.* at 345, 645 *A*.2d 685; *Marshall II, supra*, 130 *N.J.* at 142–43, 613 *A*.2d 1059.

We decline once again to attempt to define in advance all characteristics of a murder case that would capture the critical facts of a particular defendant's case. *DiFrisco III, supra*, 142 *N.J.* at 164, 662 *A*.2d 442. Such an exercise "would fail [both] to distinguish between individual defendants" and to recognize the uniqueness of every case. *Martini II, supra*, 139 *N.J.* at 24–25, 651 *A*.2d 949. Also, as in previous cases, we include in the death-sentenced universe those cases where the defendant's death sentence was reversed on appeal and where the prosecutor chose not to proceed capitally on remand. *DiFrisco III, supra*, 142 *N.J.* at 164, 662 *A*.2d 442; *Martini II, supra*, 139 *N.J.* at 25–26, 651 *A*.2d 949; *Bey IV, supra*, 137 *N.J.* at 345–48, 645 *A*.2d 685; *Marshall II, supra*, 130 *N.J.* at 194 n. 10, 613 *A*.2d 1059. Although reversed for a variety of reasons, we have found that "the original penalty trials ... [still] reflect[ ] juror values of deathworthiness." *Marshall II, supra*, 130 *N.J.* at 194 n. 10, 613 *A*.2d 1059.

We continue to analyze the data in two sets, one including defendant and one excluding him. "[P]roportionality review is a search for community values, and the case under review is a partial reflection of ... those values." *Martini II, supra*, 139 *N.J.* at 27–28, 651 *A*.2d 949. An analysis which utilizes both sets of data is therefore more complete but does not attempt to conceal its own limitations, *i.e.*, "the bias produced by including defendant's case." *Id.* at 28, 651 *A*.2d 949.

### C. *Comparison of Cases*

Once we establish the universe of cases on which we will rely and the criteria for coding those cases, we "next group those cases according to their comparative levels of blameworthiness." *Ibid.* We measure blameworthiness according to statutory

aggravating and mitigating factors as well as "nonstatutory factors based on 'objectively-verified measures of blameworthiness.'" *Bey IV, supra,* 137 *N.J.* at 350, 645 *A.*2d 685 (quoting *Marshall II, supra,* 130 *N.J.* at 145, 613 *A.*2d 1059). As explained earlier, we evaluate these factors using two approaches: frequency analysis and precedent-seeking review, placing our reliance on precedent-seeking review in deciding disproportionality.

## 1. *Comparison Group*

The AOC characterizes the various death-eligible cases on the basis of the aggravating factors present in those cases. The similar cases to be examined in proportionality review are then selected on the basis of the aggravating factors present in defendant's case. *DiFrisco III, supra,* 142 *N.J.* at 185, 662 *A.*2d 442 (citing *Martini II, supra,* 139 *N.J.* at 49, 651 *A.*2d 949). There are thirteen basic categories,[15] each of which contains two to seven subcategories.

---

[15] The thirteen basic categories are as follows:
  (A) Multiple–Victim Murder
    (aggravating factor c(4)(b));
  (B) Prior Murder Conviction without (A) above
    (aggravating factor c(4)(a));
  (C) Sexual Assault Murder without (A)-(B) above
    (aggravating factor c(4)(g));
  (D) Victim a Public Servant without (A)-(C) above
    (aggravating factor c(4)(h));
  (E) Robbery Murder without (A)-(D) above
    (aggravating factor c(4)(g));
  (F) Arson Murder without (A)-(E) above
    (aggravating factor c(4)(g));
  (G) Burglary Murder without (A)-(F) above
    (aggravating factor c(4)(g));
  (H) Kidnapping Murder without (A)-(G) above
    (aggravating factor c(4)(g));
  (I) Pecuniary Motive Murder without (A)-(H) above
    (aggravating factors c(4)(d) and c(4)(e));
  (J) Torture/Aggravated Assault Murder without (A)-(I) above
    (aggravating factor c(4)(c));
  (K) Depravity of Mind Murder without (A)-(J) above

Here, the penalty-phase jury found that the State had proven beyond a reasonable doubt three statutory aggravating factors: *N.J.S.A.* 2C:11–3c(4)(a) (prior murder); *N.J.S.A.* 2C:11–3c(4)(f) (escape detection); and *N.J.S.A.* 2C:11–3c(4)(g) (felony murder). The AOC therefore coded defendant's case as a B, or a murder by a defendant with a prior murder conviction. Further, the AOC placed Loftin's case in the B(1) subcategory [16] because, in addition to the prior murder conviction, the case presented two other aggravating circumstances. *Loftin Report,* tbl.7A.

Defendant argues that his case should be compared not only to all death-eligible B(1) cases, but also to all other death-eligible B cases and to all death-eligible A, multiple-murder, cases in which the defendant killed during the course of a robbery. Defendant asserts that certain A cases are similar to his case in that all A defendants also killed more than one person and some committed murders in the course of a robbery. The State argues that defendant's case should be compared only to other prior murder cases, as in the proportionality review in *Bey IV, supra,* 137 *N.J.* at 367, 645 *A.2d* 685, another case involving a prior murderer.

Defendant's "essential attribute" is his prior murder conviction. Because of the "exceedingly small number of cases" in the B(1) subcategory, *DiFrisco III, supra,* 142 *N.J.* at 170, 662 *A.2d* 442,

---

(aggravating factor c(4)(c));

(L) Grave Risk of Death to Another Person as primary statutory aggravating circumstance without (A)-(K) above
   (aggravating factors c(4)(b) and (c)(4)(g));

(M) Escape Detection Murder without (A)-(L) above
   (aggravating factor c(4)(f)).

[*Loftin Report,* tbls.6–7.]

[16] The subcategories of category (B), murder by a defendant with a prior murder conviction, are as follows:

1. With two or more additional aggravating circumstances or particular violence/terror.

2. With a single additional aggravating circumstance or particular violence/terror.

3. With no other aggravating circumstances or particular violence/terror.

[*Loftin Report,* tbl.6.]

we will compare defendant's case to all death-eligible cases in the B, or prior murder, category. We will not, however, compare defendant's case, as he has proposed, to certain category A cases—murders involving multiple victims where the murders were committed in the course of a robbery. "We defer generally to the AOC's expertise, and particularly to its unique assignment of defendants to only one comparison category." *Id.* at 167, 662 A.2d 442. In this case, the AOC designated defendant's case a B, or prior murder, case; we see no compelling reason to disagree with this designation or to deviate from it by including in defendant's comparison group certain of the A, or multiple-murder, cases.

Loftin's comparison group thus consists of sixteen defendants: George Booker, John Fauntenberry, Richard Feaster, James Koedatich, Marko Bey, Richard Biegenwald, Bryan Coyle, Samuel Erazo, William Godette, Frank Pennington, Braynard Purnell, Thomas Ramseur, Carlos Vasquez, Jihad Muhammed, Alberto Nieves, and Thomas Williams. We glean the facts of these comparison cases from opinions previously published by this Court and from the AOC's *Detailed Narrative Summaries.*

## 2. *Frequency Analysis*

We have described frequency analysis earlier in this opinion. To summarize, this approach has heretofore consisted of three different statistical tests designed to gauge a defendant's relative criminal culpability: the salient-factors test, the numerical-preponderance-of-aggravating-and-mitigating-factors test, and the index-of-outcomes test. *DiFrisco III, supra,* 142 *N.J.* at 171, 662 A.2d 442; *Martini II, supra,* 139 *N.J.* at 29–30, 651 A.2d 949; *Bey IV, supra,* 137 *N.J.* at 350–51, 645 A.2d 685; *Marshall II, supra,* 130 *N.J.* at 154, 613 A.2d 1059. As discussed *supra* at 294–295, 724 A.2d at 149–150, based on our experience over the six-year period that we have conducted proportionality reviews, we have determined that the numerical-preponderance test does not assist our efforts and should be abandoned. We will confine frequency

analysis in this case, and in cases to follow, to the salient-factors and index-of-outcomes tests.

### a. *Salient–Factors Test*

In the salient-factors test, we consider the sentences imposed in factually-similar cases to measure the relative frequency of the imposition of the death sentence. "Its purpose is to help us determine whether the death sentence is imposed in a category of comparable cases often enough to create confidence in the existence of a societal consensus that death is the appropriate remedy." *Martini II, supra,* 139 *N.J.* at 33, 651 *A.*2d 949. Cases are first categorized according to the presence of statutory aggravating factors and then placed into subcategories "according to circumstances that serve either to aggravate or to mitigate the blameworthiness of the defendants in those cases." *Ibid.* This test has been consistently viewed as the most persuasive of the frequency tests. *DiFrisco III, supra,* 142 *N.J.* at 173, 662 *A.*2d 442; *Martini II, supra,* 139 *N.J.* at 33, 651 *A.*2d 949; *Bey IV, supra,* 137 *N.J.* at 353, 645 *A.*2d 685; *Marshall II, supra,* 130 *N.J.* at 168, 613 *A.*2d 1059.

In this case, the most salient factor is that Loftin had been convicted of a prior murder. *Loftin, supra,* 287 *N.J.Super.* at 89, 670 *A.*2d 557. Loftin is placed in category B for his prior murder, and in the B(1) subcategory because his case presents two additional aggravating factors. Of the seven death-eligible cases in the B(1) subcategory, five went to penalty trial and, of those penalty-trial cases, two resulted in death sentences, including defendant's case. *Loftin Report, supra,* tbl.7A. Thus, the death sentencing rate for all B(1) murderers is twenty-nine percent and, for those advancing to penalty trial, forty percent. Those figures are significantly higher than the overall death-sentencing rates of thirteen percent for all death-eligible cases and thirty-one percent for all penalty-phase cases. *Id.,* tbls.1, 2. Moreover, B(1) murderers are much more likely to advance to the penalty phase than the general death-eligible murderer. *Id.,* tbls.1, 2, 7. In tabular form, the figures are:

Death–Sentencing Rates for B(1)* Murderers and All Death–Eligible Murderers

|  | Death–Sentencing Rate at Penalty Trial | Death–Sentencing Rate for All Death- Eligible Cases | Proportion of Cases Advancing to Penalty Trial |
|---|---|---|---|
| B–1   incl. D | .40 (2/5) | .29 (2/7) | .71 (5/7) |
| B–1   excl. D | .25 (1/4) | .17 (1/6) | .67 (4/6) |
| All Ds | .31 (47/154) | .13 (47/369) | .42 (154/369) |
| All Ds but D | .30 (46/153) | .125 (46/368) | .42 (153/368) |

*B(1)—prior murder, two additional aggravating factors.

Removing defendant's case from the group lowers the rates somewhat, but still places him at 12.5% and 30% within the general overall range of thirteen percent for all death-eligible cases and thirty-one percent for all penalty-phase cases.

For the entire prior-murderer category, the figures are as follows:

Death–Sentencing Rates for All B Prior Murderers and All
Death–Eligible Murderers

|  | Death–Sentencing Rate at Penalty Trial | Death–Sentencing Rate for All Death- Eligible Cases | Proportion of Cases Advancing to Penalty Trial |
|---|---|---|---|
| B   incl. D | .59 (10/17) | .38 (10/26) | .65 (17/26) |
| B   excl. D | .56 (9/16) | .36 (9/25) | .64 (16/25) |
| All Ds | .31 (47/154) | .13 (47/369) | .42 (154/ 369) |
| All Ds but D | .30 (46/153) | .125 (46/368) | .42 (153/ 368) |

Of the twenty-six death-eligible cases in category B, seventeen, or sixty-five percent, went to penalty trial and, of those penalty-trial cases, ten resulted in death sentences. *Id.*, tbl.7. The death-sentencing rate for all death-eligible prior murderers is thirty-eight percent, while the rate is fifty-nine percent for those advancing to penalty trial. *Ibid.* Once again, these figures are significantly higher than the rates for other types of murderers. *Ibid.*

In sum, application of the salient-factors test appears to suggest that prior murderers receive the death penalty more frequently than most defendants in the death-eligible and penalty-trial universes and that they are considered by community consensus to be highly blameworthy. In fact, prior murderers are sentenced to death at a higher rate than any other category of murderers. *See ibid.* While we are mindful that the small sample sizes prevent us from relying on the results of this test, *Martini II, supra,* 139

*N.J.* at 38, 651 *A.*2d 949, they do support a finding of no disproportionality.

### b. *Index–of–Outcomes Test*

As explained *supra* at 295, 724 *A.*2d at 150, in the index-of-outcomes test, "we compare cases that are factually dissimilar but that are nevertheless comparable from the perspective of the defendants' blameworthiness." *Martini II, supra,* 139 *N.J.* at 42, 651 *A.*2d 949. More specifically, we seek to identify those factors, both statutory and nonstatutory, that inform jury and prosecutorial determinations of blameworthiness. The AOC calculates the weight of each factor by performing a multiple-regression analysis on the cases within the proportionality review universe. *DiFrisco III, supra,* 142 *N.J.* at 178, 662 *A.*2d 442. This calculation permits us to "compare the blameworthiness of different defendants by the statistically-relevant measures of culpability found in the circumstances of their cases." *Martini II, supra,* 139 *N.J.* at 42, 651 *A.*2d 949 (citing *Bey IV, supra,* 137 *N.J.* at 362, 645 *A.*2d 685).

In the *Loftin Report,* the AOC has prepared tables listing death-sentencing rates that measure deathworthiness based on case characteristics deemed important by prosecutors and jurors. *Loftin Report,* technical app. 9, at 1. The tables sort the cases into five levels of culpability which reflect predicted probabilities of the return of a death sentence, "cut[ting] the cases at each 20–percentage points of increasing probability of a death sentence." *Id.* at 5. "From those groups, we derive the actual probabilities of death sentencing for cases in the various levels of culpability." *Martini II, supra,* 139 *N.J.* at 43, 651 *A.*2d 949.

The AOC once again urges us to exercise caution in relying on the results of its regression analyses because, given the small pool of cases and the large number of factors assessed, "the culpability estimate ... is often still too soft" to permit "substantive reliance." *McCarthy Memorandum, supra,* at 3–4. A significant difficulty is that the confidence intervals we have seen so far are extremely broad. When a quantity in a population is being

estimated on the basis of a sample drawn from that population, the estimate is sometimes expressed in a range, called a confidence interval or probability range. Suppose for example that we wished to estimate the average height for the American adult male population on the basis of a random sample. Suppose that this results in a ninety-five percent confidence interval [range] of 69–75 inches. This means that we can be ninety-five percent certain that the true population average lies within that range. Conley & Peterson, *supra*, at 1223. In Loftin's case, "we are ninety-five percent certain that all defendants with characteristics similar to [Loftin] will have a predicted probability of receiving a death sentence" within the range. *DiFrisco III, supra*, 142 *N.J.* at 180, 662 *A*.2d 442. The problem is that when a defendant's probability of receiving a death sentence ranges from zero to ninety-five percent, as does Loftin's predicted probability, we are ninety-five percent certain that he could have a zero percent, or a ninety-five percent, or an anywhere in-between probability of being sentenced to death. Coincidentally, this is the widest possible range for a confidence interval. Such numbers have little usefulness. We treat the results accordingly. *Id.* at 179, 662 *A*.2d 442; *Martini II, supra*, 139 *N.J.* at 43, 651 *A*.2d 949.

The model results indicate that, considering both statutory and nonstatutory factors in penalty-trial cases, Loftin has a predicted probability of fourteen percent of receiving a death penalty, with a probability range that has a lower limit of zero and an upper limit of ninety-five percent. Defendant's case falls within culpability level one (0–<20% culpability), which contains seventy-four cases, and has an overall death-sentencing rate of seven percent (5/74). *Loftin Report*, tbls.21, 22.

Using the same tables, a comparison between Loftin and our prior proportionality review defendants reveals that Loftin's rates are quite low, *see* Table, *infra*, at 113–14, but this alone does not compel a finding of disproportionality. As in all four of our prior cases, the expansive confidence interval in Loftin's case, from zero to ninety-five percent, tells us that we can vest Loftin's numbers

with little significance. *See DiFrisco III, supra,* 142 *N.J.* at 180, 662 *A.*2d 442 ("[T]he smaller the confidence interval, the more reliable the predicted probability.").

Considering both statutory and nonstatutory factors in all death-eligible cases, the predicted probability of a death sentence in Loftin's case is thirty-eight percent, with a probability range that has a lower limit of nine percent and an upper limit of eighty-one percent. Defendant's predicted probability places him in culpability level two (20–<40% culpability), which contains thirty-seven cases, and has an overall death-sentencing rate of thirty-eight percent (14/37). *Loftin Report,* tbls.13, 14.

Once again, a comparison to prior proportionality review defendants is helpful. *See* Table, *infra,* at 113–14. While Loftin's rates are only slightly higher than Bey's and DiFrisco's, they are far higher than those of Martini and Marshall. Because the confidence intervals are still very large, we are also unable to rely on these figures; they do not, however, demonstrate disproportionality.

Restricting the analysis to statutory factors in penalty-trial cases, Loftin has a predicted probability of sixty-seven percent of receiving a death sentence, within a probability range extending from twenty-two to ninety-three percent. Defendant's case falls within culpability level four (60–<80% culpability), which contains twenty cases. The overall death-sentencing rate for these cases is seventy percent (14/20). *Loftin Report,* tbl.23, 24.

Turning once more to our prior proportionality review defendants, *see* Table, *infra,* at 113–14, we see that Loftin's figures are slightly lower than Bey's and greater than those of DiFrisco, Martini and Marshall. This portion of the index-of-outcomes test also does not demonstrate disproportionality.

Considering statutory factors in all death-eligible cases, the predicted probability of a death sentence in Loftin's case is forty-seven percent, with a lower limit of fourteen percent and an upper limit of eighty-three percent. This places defendant in culpability

level three, (40–<60% culpability) which includes fourteen cases and has a death-sentencing rate of fifty-seven percent (8/14). *Loftin Report,* tbls.23, 25.

In this final group, *see* Table, *infra,* at 113–14, Loftin's figures exceed those generated for each of our prior proportionality review defendants and fail to demonstrate disproportionality.

Index-of-Outcomes Test Results
(data from *Loftin Report,* tbls. 13–14, 21–25)

| | Statutory & Nonstatutory Factors | | Statutory Factors Only | |
|---|---|---|---|---|
| | Penalty Trial | Death–Eligible | Penalty Trial | Death–Eligible |
| **Loftin** | | | | |
| Predicted Probability of Death Sentence | .14 | .38 | .67 | .47 |
| Range | (.00 to .95) | (.09 to .81) | (.22 to .93) | (.14 to .82) |
| Culpability Level | 1 | 2 | 4 | 3 |
| Death–Sentencing Rate | .07 (5/74) | .38 (14/37) | .70 (14/20) | .57 (8/14) |
| **DiFrisco** | | | | |
| Predicted Probability of Death Sentence | .64 | .22 | .46 | .20 |
| Range | (.19 to .93) | (.02 to .79) | (.08 to .89) | (.01 to .84) |
| Culpability Level | 4 | 2 | 3 | 1 |
| Death–Sentencing Rate | .53 (9/17) | .38 (14/37) | .64 (14/22) | .05 (14/287) |
| **Martini** | | | | |
| Predicted Probability of Death Sentence | .80 | .09 | .26 | .12 |
| Range | (.34 to .97) | (.02 to .34) | (.08 to .57) | (.04 to .32) |
| Culpability Level | 5 | 1 | 2 | 1 |
| Death–Sentencing Rate | .81 (21/26) | .05 (14/299) | .24 (8/33) | .05 (14/287) |
| **Bey** | | | | |
| Predicted Probability of Death Sentence | .59 | .37 | .71 | .36 |
| Range | (.17 to .91) | (.11 to .74) | (.37 to .91) | (.15 to .65) |
| Culpability Level | 3 | 2 | 4 | 2 |
| Death–Sentencing Rate | .54 (7/13) | .38 (14/37) | .70 (14/20) | .26 (13/50) |

Marshall

| | | | | |
|---|---|---|---|---|
| Predicted Probability of Death Sentence | .65 | .17 | .56 | .31 |
| Range | (.16 to .95) | (.01 to .89) | (.11 to .93) | (.04 to .84) |
| Culpability Level | 4 | 1 | 3 | 2 |
| Death–Sentencing (13/50) Rate | .53 (9/17) | .05 (14/299) | .64 (14/22) | .26 |

The index-of-outcomes results in defendant's case are not consistently higher or lower than results generated for prior cases and "do not indicate disproportionality or any aberration" in Loftin's death sentence. *Martini II, supra,* 139 *N.J.* at 45, 651 *A.*2d 949. As we observed in our review of the first table in this test and thereafter, however, "the small sample size of cases with similar levels of blameworthiness and the great ranges in the confidence intervals," *DiFrisco III, supra,* 142 *N.J.* at 182, 662 *A.*2d 442, substantially limits the usefulness of those results. That the dissent finds a comparison of the defendant with prior proportionality review defendants unjustified does not surprise us.[17] *Post* at 423, 724 *A.*2d at 216.

As before, we must continue to rely on precedent-seeking review. *DiFrisco III, supra,* 142 *N.J.* at 183, 662 *A.*2d 442.

---

[17] The dissent also suggests that "[t]he death-sentencing rate statistic ... should primarily guide this Court's interpretation of the index-of-outcomes test results." *Post* at 423, 724 *A.*2d at 216. But unless it is independently verified that a defendant's case is actually similar to other cases in his culpability level, there is no reason to focus on the death-sentencing rate for that culpability level. Indeed, as the dissent recognizes, there are "deficiencies in the methodology behind the death-sentencing rate statistic; for instance, defendants in culpability level one with a culpability rating of .05 may differ substantially in death-sentencing rate, despite being in the same level, from those defendants on the upper end of culpability level one, who have culpability level ratings such as .19." *Id.* at 422–423, 724 *A.*2d at 216. Most important, the death sentencing rates are generated by the defendants' culpability ratings and suffer from the same infirmities found in the statistics predicting the probability of a death sentence. *See supra* at 330–331, 724 *A.*2d at 167–168.

### c. *Frequency Analysis Conclusion*

Compared to other penalty-trial cases, Loftin's case shows a death sentencing rate of forty percent under the salient-factors test and, under the index-of-outcomes test, predicted probabilities of receiving a death sentence of sixty-seven percent considering only statutory factors and fourteen percent considering statutory and nonstatutory factors. *Loftin Report*, tbls.7A, 22, 24. In comparison to all death-eligible cases, Loftin's salient-factors rate is twenty-nine percent, and his index-of-outcomes probabilities are forty-seven percent considering only statutory factors and thirty-eight percent considering both statutory and nonstatutory factors. *Id.*, tbls.7A, 14, 25. On balance, we find that defendant has not offered, through frequency analysis, evidence of disproportionality and "we do not find that for cases such as his a sentence other than death is generally imposed." *Martini II, supra,* 139 *N.J.* at 46, 651 *A.*2d 949.

### 3. *Precedent–Seeking Review*

The precedent-seeking approach, also referred to as comparative-culpability review, is the second component of proportionality review. *DiFrisco III, supra,* 142 *N.J.* at 183, 662 *A.*2d 442; *Martini II, supra,* 139 *N.J.* at 46, 651 *A.*2d 949. "Here we engage in traditional case-by-case review in which we compare similar death-eligible cases, considering the cases individually." *DiFrisco III, supra,* 142 *N.J.* at 183, 662 *A.*2d 442. In specific, "we examine defendant's criminal culpability to determine whether it exceeds that of similar life-sentenced defendants and whether it equals or exceeds that of other death-sentenced defendants." *Id.* at 184, 662 *A.*2d 442. Our primary concern is whether "defendant's culpability justifies the capital sentence" or whether it "requires a reduction of sentence to a life term." *Martini II, supra,* 139 *N.J.* at 47, 651 *A.*2d 949. Although identical sentences are not required even in like cases, the defendant must not have been "singled out unfairly for capital punishment." *Ibid.* (citing *Marshall II, supra,* 130 *N.J.* at 159, 181, 613 *A.*2d 1059).

### a. *Assessment of Defendant's Culpability*

The first step in comparing defendant's case to the similar cases is an evaluation of defendant's own culpability. This assessment requires us to examine three elements: (1) defendant's moral blameworthiness; (2) the degree of victimization; and (3) defendant's character. *See DiFrisco III, supra,* 142 *N.J.* at 203, 662 *A.*2d 442; *Martini II, supra,* 139 *N.J.* at 74–75, 651 *A.*2d 949; *Bey IV, supra,* 137 *N.J.* at 366, 645 *A.*2d 685. In determining defendant's culpability, we consider objective criteria derived from both statutory and nonstatutory aggravating and mitigating factors. *Marshall II, supra,* 130 *N.J.* at 159, 613 *A.*2d 1059. These criteria are "rooted in traditional sentencing guidelines, were clearly presented to the sentencing jury, and are likely to influence a jury's sentencing decision," *Bey IV, supra,* 137 *N.J.* at 368, 645 *A.*2d 685. Also, when considering the catch-all mitigating factor, we recognize that defendant's jury may have rejected a specific mitigating factor, but nevertheless been influenced by the evidence presented in support of that mitigating factor. *DiFrisco III, supra,* 142 *N.J.* at 185, 662 *A.*2d 442; *Bey IV, supra,* 137 *N.J.* at 368, 645 *A.*2d 685.

### i. *Moral Blameworthiness*

To determine defendant's moral blameworthiness, we examine such characteristics as motive, premeditation, justification or excuse, evidence of mental defect or disturbance, knowledge of helplessness of the victim, defendant's age or maturity level, and defendant's involvement in planning the murder. *Marshall II, supra,* 130 *N.J.* at 155, 613 *A.*2d 1059. Defendant's motive for his murder of Gary Marsh is clear: to steal money from the gas station and, as the jury found, to escape detection and punishment for his crime. Whether the murder of Gary Marsh was premeditated for any length of time is less clear. Although the Public Defender admits that the robbery was carefully planned and premeditated, the fact that a face mask was found in defendant's car and that defendant drove many miles from home to commit

the crime may suggest that he originally intended to disguise his identity and thus escape detection in that way. There is no evidence of any justification or excuse for defendant's crime, nor is there any evidence of provocation on the part of the victim. As we noted in *Loftin I*, "defendant presented no evidence of a struggle or an accidental discharge .... [or] that Marsh might have done something to provoke defendant." 146 *N.J.* at 353, 680 *A*.2d 677.

Evidence was presented by the defense psychologist that defendant had a "borderline personality disorder," and one juror found that the c(5)(a) mitigating factor (extreme mental or emotional disturbance) was present. In addition, three jurors found the catch-all mitigating circumstance that defendant was under the influence of mental and emotional pressure at the time the crime was committed. However, the State's expert concluded that defendant exhibited narcissistic and antisocial personality traits and not a borderline personality disorder.

Defendant was clearly aware of the helplessness of the victim. Defendant was armed, there was no indication Gary Marsh had any weapon, and they were in an isolated area very late at night. However, because defendant did not know Marsh, and there were no other persons present during the murder, defendant cannot be presumed to have specific knowledge of the effects of the murder on any nondecedent victims. *But see State v. Muhammad*, 145 *N.J.* 23, 46, 678 *A*.2d 164 (1996) ("While a defendant might be unaware of the specific characteristics of his victim or of the particular survivors that the victim will leave behind, it is completely foreseeable that the killing will eliminate a unique person and destroy a web of familial relationships."). Although defendant was only twenty-six at the time of the murder, and two jurors found that his age should be considered a mitigating factor, the State correctly points out that defendant lived as an adult with adult responsibilities, *i.e.*, he was married with two children, owned a home, and had served in the United States Navy. Finally, it is clear that defendant was alone in planning the murder and

that, whether or not the murder itself was premeditated, the underlying felony, the robbery, was meticulously planned ahead of time.

### ii. *Degree of Victimization*

The characteristics to be examined in determining the degree of victimization include the violence and brutality of the murder and the injury to nondecedent victims. *Marshall II, supra*, 130 *N.J.* at 155, 613 *A.*2d 1059. In comparison to other murder cases we have examined, this was not a particularly violent or brutal killing. Aside from the gunshot wound that killed him, there is no evidence of any other type of assault on Marsh by defendant. Indeed, as we noted in *Loftin I*, the killing was performed almost "execution-style," 146 *N.J.* at 387, 680 *A.*2d 677, in that Marsh was shot in the head "at close range," *id.* at 353, 680 *A.*2d 677. Marsh was, however, undoubtedly terrorized by defendant and in fear for his life from the time he was confronted by defendant until the time he was shot.

### iii. *Character of Defendant*

Finally, in determining the character of defendant we examine defendant's prior record, whether defendant has committed other unrelated acts of violence, whether defendant cooperated with authorities, defendant's remorse, and his capacity for rehabilitation. Although, as three jurors found, defendant led a crime-free existence for the first twenty-five years of his life, defendant had committed a prior murder only five weeks before the murder of Gary Marsh. Thus, the jury unanimously found that the c(4)(a) prior murder aggravating factor was present. As we have noted, "a two-time murderer is among the most blameworthy of defendants." *Bey IV, supra*, 137 *N.J.* at 367, 645 *A.*2d 685.

In addition, the jury heard evidence that defendant had struck his wife and their young children. There is no evidence that defendant cooperated in any way with authorities, although the defense psychologist testified that defendant has the capacity for rehabilitation within a prison setting. Finally, although defendant

expressed remorse for his crime when he spoke with the defense and the state psychologists, and when he addressed the jury during his allocution, he also wrote that his "mistake" was being incarcerated, not that he had killed two human beings. The jury unanimously rejected the catch-all mitigating circumstance that defendant "has sincere and heartfelt remorse."

### b. *Comparison of Defendant's Case to the B Cases* [18]

Whether defendant's sentence is disproportionate in comparison with the culpability levels of the comparison group must be determined by comparing the facts of those cases to the facts of defendant's case. As discussed above, *supra* at 324, 724 *A.*2d at 164, in conducting this comparison, "we identify in the comparison group all relevant aggravating and mitigating factors, both statutory and non-statutory, that are 'rooted in traditional sentencing guidelines,'" *DiFrisco III, supra,* 142 *N.J.* at 184–85, 662 *A.*2d 442. In comparing defendant's case to the other category B cases, we find that defendant's culpability level is high, and that his death sentence is not disproportionate. Defendant contends that his "case is more like the life-sentenced cases than the death-sentenced cases." We disagree.

We compare first the B(1) prior murderers. Each of the four cases in this category has the c(4)(a) (prior murder) aggravating factor, plus two or more additional aggravating factors. And, like Loftin, these four prior murderers have as an additional aggravating factor the c(4)(g) (felony murder) factor. Additionally, Booker, Fauntenberry and Koedatich have the c(4)(f) (escape detection) aggravating factor. In this respect, at least, Loftin shares with these B(1) defendants a similar level of culpability. Yet, of the four defendants in the B(1) comparison group, only Koedatich received a death sentence for his crime, a sentence which was later reduced to life on retrial of the penalty phase. This apparent disparity compels us to take a closer look at the factors which set defendant apart from these B(1) defendants.

---

[18] Summaries of the B cases are provided in Appendix C.

The greatest distinguishing factor between Loftin and the B(1) defendants is that, with the exception of Fauntenberry, each B(1) defendant presented uncontroverted evidence that he suffered from some mental disease or defect. Bookers's psychiatrist testified that Booker had an I.Q. of 80 and suspected brain damage, and that he was experiencing a drug-and alcohol-enhanced psychotic episode at the time he committed his murder. Feaster had encephalopathy, an injury to the left frontal lobe region making him more violence-prone. Koedatich suffered untreated personality disorders as a child as well as untreated suicidal and homicidal tendencies as a teenager, and was diagnosed in prison as a sociopathic personality. In defendant's case, however, the State disputed defense evidence that Loftin suffered from a borderline personality disorder and introduced evidence that Loftin had a narcissistic or antisocial personality that did not impair his ability to act purposefully. Therefore, even though one juror found the c(5)(a) mitigating factor to exist in Loftin's case, uncontroverted evidence that other B(1) defendants suffered from a mental disease or defect "could explain why their juries did not deem them to be deathworthy." *Bey IV, supra,* 137 *N.J.* at 384, 645 *A.*2d 685.

Loftin did present evidence in mitigation that he was deprived of a nurturing mother and a male role model, and that he was traumatized by the fire he set as a child that burned his family home to the ground. This evidence, however, is not as compelling as the evidence of chronic child abuse presented by the B(1) defendants. Booker was regularly beaten by his father and was forced to watch helplessly as his father beat his mother and ten siblings. Fauntenberry was mentally and physically abused by his many step-fathers and witnessed the physical abuse of his mother and the sexual abuse of his sister, acts that ultimately led to Fauntenberry's own sexual abuse of his sister. Feaster's parents were both alcoholics and his father was also abusive. Koedatich suffered severe, physical harm from his parents and was abandoned by them to his grandparents who neglected him. The absence of such evidence in Loftin's case, together with the fact

that his claim of mental disease or defect was disputed, distinguishes his case from the B(1) comparison cases.

Moreover, other considerations serve to distinguish Loftin from the life-sentenced B(1) defendants, Booker, Fauntenberry and Feaster.[19] Booker and Fauntenberry confessed, a fact that very well may have led to the jury's decision to sentence Booker to life and the prosecutor's decision to accept Fauntenberry's plea to noncapital murder. Loftin did not confess; he offered a confession in exchange for the promise of a lesser sentence. Feaster, also, did not confess, but he was only twenty-two-years old at the time of his offense, living with his parents and unemployed. Although Loftin was only twenty-six at the time of his murder, and two jurors found the c(5)(c) mitigating factor to exist, because Loftin was living an adult life—he had trained to serve in the Navy, was married with two children, and owned a home—the jury may have reasonably chosen to hold Loftin to a higher, adult standard.

We turn to the B(2) and B(3) defendants. Of the nine defendants in the B(2) category, seven received a death sentence from their first penalty-phase jury or, in *Biegenwald* (1), from his first two penalty-phase juries. Of these seven death sentences, only Bey's was ultimately upheld and found to be proportionate. Two B(2) defendants, Godette and Vasquez, were permitted to plead to felony murder and received life sentences. The four B(3) defendants were all sentenced to life. The following discussion reveals that Loftin's culpability equals or exceeds that of Bey, if not that of the B(2) defendants whose death sentences were later reduced to life, and exceeds that of the life-sentenced B(2) and B(3) defendants.

We note that the B(2) and B(3) defendants as a group are less culpable than the B(1) defendants because, in addition to having a

---

[19] Feaster, after pleading guilty to noncapital murder, received a life sentence in Feaster (2). *See* Appendix C, at 7a. One month earlier, he had been sentenced to death for a prior murder in Feaster (1).

prior murder conviction, their cases present one or no additional aggravating factor. For this reason alone, Loftin, a B(1) defendant himself, is more culpable than the B(2) and particularly the B(3) defendants.

We first consider Bey, the only defendant currently on death row for a B(2) murder. Bey's murder of Carol Peniston was intensely violent, including sexual assault, beating, stomping and strangulation. In this respect, at least, his culpability exceeds that of Loftin whose only assault on Gary Marsh was a single gun shot to the head. In other respects, however, Loftin is more culpable than Bey. Bey testified that he was drunk and high on marijuana at the time of the Peniston murder; Loftin offered no justification or excuse for his crime. Bey offered uncontroverted evidence that he had an antisocial personality disorder and lacked the ability to control his anger; although Loftin claimed that he suffered from a borderline personality disorder, that claim was sharply contested by the State. And, finally, Bey offered evidence that his mother, an alcoholic, severely abused him and that his dependence on alcohol and drugs began as early as age nine; Loftin offered no comparable evidence of childhood or substance abuse. Based on these factors, we are convinced that Loftin's culpability is equal to or greater than that of Bey.

We next consider the B(2) defendants who were initially sentenced to death: Biegenwald, Coyle, Erazo, Pennington, Purnell and Ramseur. Biegenwald's "thrill" motive was horrific; Coyle, Erazo, Purnell and Ramseur committed violent murders in great excess of what was necessary to end life; and Pennington killed a woman in front of her daughter. When compared to these aspects of the B(2) defendants' murders, Loftin's pecuniary-motive, execution-style murder, which created no risk to third persons, appears less deathworthy. This limited comparison, however, fails to take into account the aspects of these defendants' cases, absent from Loftin's case, suggesting that Loftin's death sentence was not an aberration. In particular, all but one of these cases involved

provocation, to varying degrees, uncontroverted evidence of mental disease or defect, and/or evidence of severe childhood abuse.

Biegenwald was abused as a child by his father, who was an alcoholic mental patient, and was institutionalized at age five, when he was diagnosed as a child schizophrenic and given some twenty electro-convulsive shock treatments. Expert testimony also established that he had an antisocial personality with paranoid traits and that he lacked the emotional capacity to conform his behavior to law. The penalty-phase jury in Coyle's case found that his victim had participated in the conduct which resulted in his death. Although the jury discarded the c(5)(a) mitigating factor, evidence was also presented that Coyle suffered from latent schizophrenia and substance-dependency, and was laboring under an extreme mental and emotional disturbance at the time of the murder. Both of Erazo's penalty-phase juries found that he suffered from an extreme mental and emotional disturbance, that he was under unusual and substantial duress at the time of the murder, and that his victim participated in the conduct which resulted in her death. Moreover, evidence at his retrial established that he suffered from a fractured skull caused by child abuse, seizures, and chronic low-level depression. Pennington produced compelling evidence that he was expelled from a school for emotionally disturbed children for being too disturbed. He was honorably discharged from his Vietnam duty with the Marines due to his mental condition and diagnosed with post-traumatic stress syndrome, subsequently acquitted of murder by reason of insanity, and diagnosed with a personality disorder and schizophrenia. Ramseur presented evidence of alcoholism, as well as paranoia and psychomotor seizures that combined could lead to violence under provoking circumstances; this evidence no doubt persuaded the jury to find the c(5)(a) and c(5)(d) mitigating factors in his case. When compared to these aspects of the defendants' cases, Loftin appears more deathworthy. In sum, *Loftin* is at least as culpable as this group of B(2) defendants who were initially sentenced to death.

This analysis, however, does not account for *Purnell* (1A and 1B), who, like Loftin had a monetary motive. The fact that Purnell's penalty-phase jury, unlike Loftin's, failed to find the c(4)(f) (escape detection) aggravating factor differentiates Purnell from Loftin. More important, the jury in Purnell's case found that Purnell's victim solicited the conduct that resulted in his death—a mitigating factor clearly missing in Loftin's case.

Turning to the life-sentenced B(2) and B(3) cases, unusual circumstances in the B(2) *Godette* and *Vasquez* cases help explain why their prosecutors accepted pleas. Godette can be distinguished from *Loftin* in that he volunteered a confession and was sentenced to life imprisonment with a minimum term of thirty years, to run concurrently with the term of life imprisonment plus forty years that he was already serving for murder in North Carolina. In Vasquez's case, as pointed out by the State, the prosecutor reached an agreement to spare the thirteen-year-old victim's family the trauma of returning from their native Puerto Rico to relive the incident. Further, Vasquez agreed that the sentences on the charges of felony murder and aggravated sexual assault would be the maximum allowed and would be consecutively served, and that any merger argument would be waived. As such, the plea assured that the forty-five-year-old Vasquez would not be eligible for parole until age eighty-five.

The B(3) defendants, all of whom were sentenced to life, are distinguishable for a variety of reasons. Unlike Loftin, none of the B(3) defendants killed for money but, rather, out of fear, anger or both. Biegenwald, Nieves and Williams each presented some evidence of provocation. Biegenwald broke up a struggle between his friend and the victim, Ward, who was clutching a gun, by shooting Ward. The penalty-phase jury in Nieves's case found that the victim solicited the conduct which led to his death. And it appears that Williams killed his mother after an argument over money and his girlfriend. Loftin presented no such evidence of provocation. *See Loftin I, supra,* 146 *N.J.* at 353, 680 *A.*2d 677. Biegenwald, Muhammed and Nieves also presented uncontrovert-

ed testimony of mental disease or defect and/or substantial mitigating circumstances. Biegenwald suffered child abuse, childhood institutionalization with shock treatments, and schizophrenia as a child, and antisocial personality with paranoid traits as an adult. Muhummed was diagnosed as a sociopath. Nieves and his seventeen siblings grew up in abject poverty, he was beaten by his alcoholic father, one of his brothers was murdered, and another brother went to prison for avenging that murder. As discussed above, Loftin failed to produce uncontroverted evidence of mental disease or defect or comparable evidence of child abuse. These distinctions, in the aggregate, support the juries' determinations, or the prosecutor's in Muhummed's case, that the B(3) defendants, as compared to Loftin, were not deathworthy.

As in *Marshall II* and *Bey IV*, "we do not [here] find a pattern of life sentencing or the taint of an invidious factor that would require us to reverse [defendant's] death sentence." *Ibid.*

### D. *Other Arguments*

Defendant argues that because death sentences are not generally imposed for the crime of capital murder, imposing the death penalty upon him violates the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Paragraphs 1 and 12 of the New Jersey Constitution, and that the geographic distribution of capital charging and sentencing decisions reveals inconsistent, unfair and arbitrary application of the death penalty, again in violation of the federal and state constitutions. We have previously considered and rejected these arguments and we continue to do so here. *See DiFrisco III, supra,* 142 *N.J.* at 210, 662 *A.*2d 442; *Martini II, supra,* 139 *N.J.* at 79–80, 651 *A.*2d 949; *Bey IV, supra,* 137 *N.J.* at 396, 645 *A.*2d 685; *Marshall II, supra,* 130 *N.J.* at 188–215, 613 *A.*2d 1059.

## IV

### Conclusion

We have in our prior proportionality review cases repeatedly concluded by acknowledging the limitations of our statistical com-

parisons. Today we have moved to reexamine the methods we use in order to improve and simplify the review process, and to better understand the effect of the legislative restriction on the proportionality review universe. We seek to carry out our appellate review function in capital causes in such manner that every defendant will be ensured a rigorous and complete review of his or her sentence of death.

We conclude that Loftin has not met his burden of proving that his death sentence is disproportionate or that race has operated as an impermissible factor in the imposition of the death penalty. Accordingly, defendant's sentence of death is affirmed.

APPENDIX A

## Graph B

*Death Sentences as a % of Penalty Trials for selected Defendant/Victim Racial Groupings*

*Penalty Trials as a % of Death Eligible Cases for selected Defendant/Victim Racial Groupings*

| Defendant/Victim Racial Grouping | Death Sentences as % of Penalty Trials | Penalty Trials as % of Death Eligible Cases |
|---|---|---|
| Black Def't, White Victim | 40% 12/30 | 55% 30/55 |
| Non-Black Def't, White Victim | 33% 19/58 | 50% 58/117 |
| Black Def't, Non-White Victim | 37% 16/43 | 29% 43/148 |
| Non-Black Def't, Non-White Victim | 19% 3/16 | 38% 16/42 |
| Non-White Victim | 32% 19/59 | 31% 59/190 |
| White Victim | 35% 31/88 | 51% 88/172 |

100%   50%   0%   50%   100%

1-a

## Graph B-2

*Death Sentences as a % of Penalty Trials for selected Defendant/Victim Racial Groupings*

*Penalty Trials as a % of Death Eligible Cases for selected Defendant/Victim Racial Groupings*

| | | |
|---|---|---|
| Black Def't, Non-Black Victim | 36% 12/33 | 49% 33/68 |
| Non-Black Def't, Non-Black Victim | 30% 22/74 | 48% 74/153 |
| Black Def't, Black Victim | 40% 16/40 | 30% 40/135 |
| Non-Black Def't, Black Victim | 0% 0/0 | 0% 0/6 |
| Black Victim | 40% 16/40 | 28% 40/141 |
| Non-Black Victim | 32% 34/107 | 48% 107/221 |

100%   50%   0%   50%   100%

2~a

## APPENDIX B

Table G (3)

## Culpability Ratings
## 147 Penalty Trial Cases
## Judges' Survey

### Judges' Survey (Black Defendants)

# of Defendants

Culpability Level

| | 1 (1 - 1.4) | 2 (1.5 - 2.4) | 3 (2.5 - 3.4) | 4 (3.5 - 4.4) | 5 (4.5 - 5.0) |
|---|---|---|---|---|---|
| Black D | 3 | 12 | 24 | 29 | 5 |
| Death | 0 | 2 | 8 | 15 | 3 |

= Death

1-a

## *APPENDIX C*

### *Comparison Case Summaries*

### I. *Prior Murderers with Two Additional Aggravating Factors or Particular Violence/Terror: B(1)*

### A) George Booker (1 and 2)

On September 11, 1985, George Booker was asked to leave the home of friends, a married couple with whom he had been living. He had been having an affair with the wife. Booker went to the home of a female friend where he sexually assaulted her at knife point. He then took her car and ran down a male pedestrian, stopped to steal the ailing pedestrian's wallet, and drove away. On September 13, 1985, police officers responded to a suspicious-

person call and canvassed the neighborhood. They entered the home of an elderly woman when they discovered the door to the home ajar, and saw Booker heading down the stairs toward them with a knife in hand. After refusing to drop the knife and attempting to grab one of the officer's guns, Booker was wrestled to the ground and arrested.

In response to questioning, Booker told police that he had killed two women, but that it might have been just a dream. On September 14, 1985, however, the bodies of two women were discovered in their home. One victim was tied up and gagged, and had a cord around her neck. Her mouth and forehead had been bashed in. The cause of death was suffocation, strangulation, or head injuries. The other victim was also gagged and suffered knife cuts on her chest, abdomen, throat and over her left eye. There was a defense wound on her right hand. The cause of death was multiple stabbings, twice in the throat and once in the back. The State theorized that Booker had raped, sodomized and killed the first victim before the second victim got home. When the second victim arrived, Booker forced her to undress and lie next to the first victim's body on the bed. He then handcuffed the second victim to the first victim's body before stabbing the second victim to death.

Booker claimed diminished capacity at trial, asserting that he was drunk and high on numerous narcotics. At the time of his crime spree, Booker was thirty-six years old, an alcoholic and a high school drop-out. One of eleven children born to sharecropper parents, Booker's father regularly beat him, his siblings and his mother. Although Booker never received psychiatric care, such care had been recommended for him in the past and a psychiatrist for the defense testified that Booker was experiencing a psychotic episode, exacerbated by his consumption of alcohol and drugs, at the time of the offenses. The psychiatrist also testified that Booker had an I.Q. of eighty and that mental tests suggested brain damage. His extensive criminal record includes a conviction

for murder in 1972, two robberies, and terroristic threats, aggravated assault, and disorderly persons offenses.

The jury convicted Booker of two counts of knowing murder, aggravated sexual assault and possession of a weapon for an unlawful purpose. For the murder of the first victim, the jury found four aggravating factors: c(4)(a) (prior murder), c(4)(c) (extreme suffering/torture), c(4)(g) (felony murder). For the murder of the second victim, the jury found three aggravating factors: c(4)(a) (prior murder), c(4)(c) (extreme suffering), and c(4)(f) (escape detection). For both murders, at least one juror found the c(5)(a) (extreme mental and emotional disturbance) and c(5)(h) (catch-all) mitigating factors. Because the jury could not reach a unanimous decision regarding the weighing of the factors for either murder, Booker was sentenced to two life terms, each with a mandatory minimum of thirty years, to run consecutively. The aggravated sexual assault merged with the murders and, on the weapons offense, Booker was sentenced to a concurrent ten-year term.

### B) John Fauntenberry

On February 1, 1991, John Fauntenberry found himself at a New Jersey truck stop without money. While trying to sell some of his personal belongings to finance his trip home to Ohio, he met a male truck driver who solicited him for sex. Fauntenberry accompanied the driver back to his truck, shot him once in the head with a .22 caliber pistol, stole some of his money and property, and left the truck stop. In March 1991, Fauntenberry was arrested in Juneau, Alaska for murder. While in custody, he confessed to five other murders: three in Oregon, one in Ohio, and the truck stop murder in New Jersey. In his confession, Fauntenberry admitted that he killed his victims so as not to leave witnesses.

Fauntenberry was twenty-seven years old at the time of the offense, had graduated from high school, and was living with his aunt in Ohio. He had been employed as a truck driver but was

unemployed when he committed the murders. He had also previously served in the Navy and was discharged due to heavy drinking. In addition to alcohol, Fauntenberry admitted abusing cocaine and LSD. As a child, he was mentally and physically abused by a string of step-fathers, witnessed the physical abuse of his mother and sister, and witnessed the sexual abuse of his sister. Fauntenberry himself sexually abused his sister. Prior convictions included aggravated assault, carrying a concealed weapon and theft. At the time of the disposition in this case, Fauntenberry had prior murder convictions in Alaska, for which he received a life sentence, and Ohio, for which he was sentenced to death. Charges were also pending for two of the three murders he admitted committing in Oregon.

Fauntenberry was charged with capital murder, felony murder, robbery, possession of a weapon for an unlawful purpose and unlawful possession of a weapon. The state served a notice of factors, including three aggravating factors: c(4)(a) (prior murder), c(4)(f) (escape detection), and c(4)(g) (felony murder). Thereafter, on September 8, 1993, Fauntenberry pled guilty to noncapital murder, for which he was sentenced to life with a mandatory minimum of thirty years, and robbery, for which he received a concurrent twenty-year sentence, both terms to run consecutively to the sentence he was already serving in Alaska.

### C) Richard Feaster (2)

On November 1, 1993, the telephone company received a call from a man claiming to have been stabbed. Central dispatch determined the number and location of the caller and notified the police. Police officers arrived at a local gas station to find a male, dead and lying in a pool of blood just outside the station's office door. The victim's front pocket had been turned inside out and blood-stained money was found on the floor. An autopsy later determined that the victim had been stabbed and slashed in excess of forty times about the head, neck and hands.

On November 3, 1993, a woman contacted the Prosecutor's office and identified Richard Feaster as the person responsible for two area homicides. She claimed to have heard him confess to the first murder in a bar. A male informant also reported that on October 31, 1993, Feaster had asked the informant to accompany him to pick up his pay-check. While at an intersection, Feaster looked at a gas station and said, "Good, there's only one." Feaster then parked the car and told the man to sit in the driver's seat. About twenty minutes later, when Feaster returned, he was covered with blood, his hand was bleeding, and he was holding a bloody knife and some cash. The man drove to his home with Feaster where Feaster put his bloody clothes and boots in a plastic bag and threw the knife behind the house.

Based on this information, the police executed a search warrant at the informant's home and recovered the bloody clothes and knife. The police also executed a warrant at Feaster's home, where they recovered a butcher block knife set with one knife missing. Further investigation revealed that an area hospital treated Feaster for lacerations on his hand on November 1, 1993. A jailhouse informant later reported that Feaster told him that he had killed to feel the thrill.

At the time of the offense, Feaster was twenty-two years old and lived with his parents and older sister. He had graduated from high school and had previously worked in construction, but was unemployed at the time of the murder. Feaster had no physical, mental or drug dependency problems although he had prior convictions for possession of marijuana and simple assault.

Feaster was charged with capital murder, felony murder, robbery and possession of a weapon for an unlawful purpose. On April 1, 1996, he pled guilty to noncapital murder, for which he was later sentenced to life imprisonment with a minimum term of thirty years, and robbery, for which he received a consecutive twenty-year sentence with a minimum term of ten years, both terms to run consecutive to his sentence for the other murder.

The AOC coded the following aggravating factors: c(4)(a) (prior murder) and c(4)(g) (felony murder); and mitigating factor c(5)(h) (catch-all).

Before the disposition in this case, Feaster was convicted of capital murder, felony murder, robbery, possession of a weapon for an unlawful purpose and possession of a sawed-off shotgun. In Feaster (1) he was sentenced to death for the October 6, 1993, murder of a gas station attendant, classified by the AOC as E(5). The following mitigating evidence was presented: both of Feaster's parents were alcoholics; his father was abusive; he had a history of alcohol and cocaine abuse; he was using alcohol before and after the murder; and he suffers from encephalopathy, an injury to the left frontal lobe region, making him more·violent than people who do not have this condition.

### D) James Koedatich (1A)

On November 23, 1982, James Koedatich kidnapped eighteen-year-old Amie Hoffman from the shopping mall where she was employed. He sexually assaulted and stabbed her several times. Defensive wounds were found on Hoffman's hands and her left ear had been severed. Hoffman bled to death several hours after the abduction. Her body was found floating face down in a water-retention tank in a wooded and secluded area. Almost two months later, Koedatich was arrested. He was convicted when evidence was discovered linking him to the murder after he reported to the police that he had been stabbed by a person pretending to be a police officer.[20]

At the time of the offense, Koedatich was thirty-four years old and lived with his mother. Having dropped out of high school, he had achieved a GED while in a Florida prison and had held jobs as a superintendent and as a gas station attendant. In 1971, he was

---

[20] Koedatich was also arrested and convicted for the murder of twenty-five-year-old Deirdre O'Brien for which he received a life sentence. That murder occurred shortly after the Hoffman murder.

involved in an armed robbery in Florida and, before the case went to trial, he and a friend choked a man to death. For these two crimes, he was sentenced to serve concurrent twenty-year terms, of which he served approximately ten years. Psychological evaluations performed while Koedatich was in prison indicated that he had a sociopathic personality.

Koedatich was charged with capital murder, felony murder, kidnapping, aggravated sexual assault, unlawful possession of a weapon and possession of a weapon for an unlawful purpose. He was convicted on all counts. Although he did not permit his counsel to present any mitigating evidence at the penalty phase trial, the court submitted the c(5)(h) (catch-all) mitigating factor to the jury. The jury found two aggravating factors present: c(4)(a) (prior murder) and c(4)(g) (felony murder). No mitigating factors were found and the jury sentenced defendant to death. On the other counts, the court sentenced him to serve a consecutive, aggregate term of thirty years with a minimum term of fifteen years. The Court reversed Koedatich's death sentence because of improper instructions. *State v. Koedatich*, 112 *N.J.* 225, 548 *A.*2d 939 (1988), *cert. denied*, 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L.Ed.*2d 803 (1989).

### E) James Koedatich (1B)

On retrial of the penalty phase, a psychologist for the defense testified that, as a child, Koedatich suffered severe physical abuse at the hands of his parents, was abandoned by his parents, and forced to sleep nightly in a car by his grandparents. He developed severe personality problems that were left untreated. As a teenager, he had suicidal and homicidal tendencies that were also untreated.

The jury found all four aggravating factors, c(4)(a) (prior murder), c(4)(c) (outrageously and wantonly vile), c(4)(f) (escape detection) and c(4)(g) (felony murder), as well as the c(5)(h) (catch-all) mitigating factor. Because the jury could not unanimously agree

on the weighing of the factors, Koedatich was sentenced to life in prison.

## II. *Prior Murderers with One Additional Aggravating Factor or Particular Violence/Terror: B(2)*

### A) Marko Bey (2B)

On April 26, 1983, Marko Bey accosted Carol Peniston in front of her apartment building intending to rob her. When he heard someone else approaching, he pulled Peniston into a nearby shed, sexually assaulted her, beat her, stomped on her chest, and strangled her. Bey stole eight dollars and her car keys from Peniston. He crashed and abandoned Peniston's car in his flight from the scene.

After his arrest, Bey confessed and was charged with murder, felony murder, kidnapping, aggravated assault, aggravated sexual assault, robbery and theft. At trial, he testified that he was drunk and high on marijuana at the time of the murder. He explained that he had killed Peniston because he had become scared when he saw her looking at him as he rifled through her pocketbook. Bey expressed some remorse by acknowledging that the murder should never have happened.

Bey was convicted and sentenced to death. The penalty phase jury found two aggravating factors, c(4)(c) (outrageously and wantonly vile) and c(4)(g) (felony murder), and no mitigating factors. This Court affirmed the conviction, but reversed the death sentence because the trial judge erred in charging the jury that mitigating factors must be found unanimously. *State v. Bey*, 112 *N.J.* 123, 548 *A.*2d 887 (1988) (*Bey II*).

On retrial of the penalty phase, the State alleged two aggravating factors: c(4)(a) (prior murder), and c(4)(g) (felony murder). As to the prior murder factor, defendant had been sentenced to death for the rape-murder of Cheryl Alston, which occurred approximately three weeks before the Peniston murder. The Court reversed his death sentence after concluding that the death-

penalty statute does not permit the execution of minors. *State v. Bey*, 112 *N.J.* 45, 548 *A.*2d 846 (1988) (*Bey I*). Defendant had turned eighteen in the interim between the Alston and Peniston murders.

Bey alleged the existence of four mitigating factors: c(5)(a) (extreme mental or emotional disturbance), c(5)(c)(age), c(5)(d) (mental disease or defect or intoxication), and c(5)(h) (catch-all). In support of the mitigating factors, Bey produced fresh evidence. His mother drank excessively, and severely abused and neglected Bey and his siblings. His father rejected him. Bey began drinking at age nine and using drugs, particularly marijuana, at age eleven. He had been hospitalized twice for overdosing. Eighteen-years-old at the time of the murder, Bey had dropped out of school in junior high and was unemployed. Medical experts testified that Bey suffered from organic brain damage, a frontal lobe impairment caused by in utero exposure to alcohol, preadolescent consumption of drugs and alcohol, and head injuries. Bey also suffered from an organic personality disorder and lacked the ability to control his anger.

The jury found two aggravating factors, c(4)(a) (prior murder) and c(4)(g) (felony murder), and at least one juror found two mitigating factors, c(5)(a) (extreme mental or emotional disturbance) and c(5)(h) (catch-all). The jury unanimously determined that the aggravating factors outweighed the mitigating factors and sentenced Bey to death. The Court affirmed the death sentence, *State v. Bey*, 129 *N.J.* 557, 610 *A.*2d 814 (1992), *cert. denied*, 513 *U.S.* 1164, 115 *S.Ct.* 1131, 130 *L.Ed.*2d 1093 (1995) (*Bey III*), and found it to be proportionate, *Bey IV, supra*, 137 *N.J.* at 339, 645 *A.*2d 685.

### B) Richard Biegenwald (1A)

On August 27, 1982, Richard Biegenwald approached eighteen-year-old Anna Olesiewicz on the Asbury Park Boardwalk and offered her marijuana. Olesiewicz accompanied Biegenwald to his house. Biegenwald intended to have his roommate and protégé,

Theresa Smith, kill Olesiewicz so that she could understand the thrill of killing. However, when he was unable to rouse Smith, Biegenwald shot Olesiewicz four times in the head. The next day, after coaxing Smith to touch the victim's body and tell him how it felt, Biegenwald and another friend dumped the body in a vacant lot behind a fast food restaurant. On January 14, 1983, Olesiewicz's skeleton was discovered. One week later, Smith went to the police and implicated Biegenwald in the murder. Police subsequently recovered several guns, narcotics, and a ring belonging to Olesiewicz from Biegenwald's house. Biegenwald was arrested and charged in four different murders, including the murder of Olesiewicz.

Biegenwald was verbally and physically abused as a child. He was institutionalized at the age of eight, diagnosed as schizophrenic, and given at least twenty electro-convulsive shock treatments. He later entered a state hospital after trying to set himself on fire. On his release, he was beaten again by his father, stole from his mother, and frequently ran away from home for days at a time. At age eighteen, Biegenwald was convicted of a murder committed while robbing a store, for which he served seventeen or eighteen years in prison. At the time of the Olesiewicz murder, he had been married for two years, had a five-month-old daughter and was employed as a construction worker. He denied abusing alcohol but admitted smoking marijuana.

A forensic psychiatrist for the defense testified that Biegenwald suffered from a severe personality disorder known as antisocial personality with paranoid traits. Although he did not find Biegenwald to be legally insane, the psychiatrist testified that Biegenwald lacked the emotional capacity to appreciate the wrongfulness of his act or to conform his behavior to the law.

The jury found two aggravating factors, c(4)(a) (prior murder) and c(4)(c) (outrageously and wantonly vile), and two mitigating factors, c(5)(d) (mental disease or defect) and c(5)(h) (catch-all). The jury determined that the mitigating factors did not outweigh

the aggravating factors and sentenced Biegenwald to death. On appeal, the Court reversed the death sentence because of the inadequacy of the jury charge regarding the weighing of aggravating and mitigating factors. *State v. Biegenwald,* 106 *N.J.* 13, 524 *A.*2d 130 (1987) (*Biegenwald I* ).

### C) Richard Biegenwald (1B)

On retrial of the penalty phase of the above offense, a jury again found the c(4)(a) and c(4)(c) aggravating factors and the c(5)(d) and c(5)(h) mitigating factors. Defendant was again sentenced to death, and this Court reversed that sentence because of inadequate *voir dire. State v. Biegenwald,* 126 *N.J.* 1, 594 *A.*2d 172 (1991) (*Biegenwald III* ).

### D) Richard Biegenwald (1C)

On the second retrial of the penalty phase, Biegenwald presented additional testimony from his mother, a forensic social worker, and his prison doctor, who testified that Biegenwald had been treated for high cholesterol, diabetes and lung cancer. The jury found two aggravating factors, c(4)(a) (prior murder) and c(4)(c) (depravity), and three separate c(5)(h) mitigating factors. The jury determined that the aggravating factors did not outweigh the mitigating factors and sentenced Biegenwald to life imprisonment.

### E) Bryan Coyle (1A)

Brian Coyle became friendly with his neighbors, Rhonda and Seth Lemberg, and began having an affair with Mrs. Lemberg. On July 28, 1993, as was customary, the three sat drinking on the Lemberg porch until the early hours of the morning. After Coyle returned home, the Lembergs got into an argument. Mrs. Lemberg went to Coyle's house. Soon after, Mr. Lemberg went to Coyle's house and broke the front window when no one answered the door. Coyle, who had taken mescaline prior to Mrs. Lemberg's arrival, retrieved his gun and fired a warning shot into the floor. Mr. Lemberg fled and called the police.

Coyle and Mrs. Lemberg then attempted to drive off. Mr. Lemberg, who may have had a gun, blocked the way. Mrs.

Lemberg got out of Coyle's car and ran, and Mr. Lemberg chased her. After he caught up with her and after another argument, Mr. Lemberg went back into his house. However, he soon reappeared and started chasing his wife again. Coyle opened fire on Mr. Lemberg, firing several times as Mr. Lemberg ran away. Coyle chased Mr. Lemberg behind a tree and fired three more shots. Two hit Mr. Lemberg in the shoulder and head, killing him. Coyle fled to South Carolina but was later apprehended.

Coyle pled *non vult* to a murder charge in 1975, received a ten-to-fifteen-year sentence, and was paroled in 1983. He also had two prior convictions for robbery. Although he claimed to have no drug or alcohol problems, Coyle had been diagnosed in the past as being dependent on marijuana, barbiturates and alcohol. He was also diagnosed as being a latent schizophrenic and as having an extreme mental and emotional disturbance.

Coyle was charged with capital murder and convicted. The jury found two aggravating factors, c(4)(a) (prior murder) and c(4)(c) (outrageously or wantonly vile), to be present. Although the jury found the c(5)(b) (victim participated in conduct that resulted in his death) mitigating factor, it determined that the aggravating factors outweighed the mitigating factor and sentenced Coyle to death. The Court reversed defendant's death sentence and conviction based on the absence of a jury instruction on Coyle's intent to cause death, *State v. Gerald*, 113 *N.J.* 40, 69, 549 *A.*2d 792 (1988), deficiencies in the jury instructions, and improper admission of evidence in the guilt phase. *State v. Coyle*, 119 *N.J.* 194, 574 *A.*2d 951 (1990).

### F) Bryan Coyle (1B)

On October 7, 1991, after the reversal of his conviction and death sentence, Coyle pleaded guilty to noncapital murder and was sentenced to life, with a minimum term of thirty years.

### G) Samuel Erazo (1A)

On July 20, 1986, Samuel Erazo stabbed his wife to death after an evening of drinking and quarreling. Erazo and the victim were

married when he was incarcerated at Rahway State Prison for killing the daughter of the woman with whom he had been living in 1974. On the night of the murder, Erazo and his wife were both intoxicated; the victim's blood alcohol level was found to be .195. At some point that evening, Erazo drove some friends home and his wife went out for a walk. When she returned home sometime after midnight, Erazo stabbed her eight times. The State theorized that Erazo's wife had purposefully cut her hand during her walk and then threatened to call the police to tell them that Erazo had inflicted the wound and thereby violated his parole. Erazo maintained that he killed his wife in the heat of passion.

Erazo was charged with capital murder. At the penalty phase, Erazo offered testimony from his sister, and from a corrections officer who said that he was a "model inmate." In addition, he offered into evidence a letter he had written in which he said that he had proven capable of leading a useful and productive life in prison. While previously imprisoned, Erazo acquired a GED, took vocational courses, completed a three-year correspondence course, and received recognition for his work on a toy drive for underprivileged children and on the prison representative committee.

The jury found the c(4)(a) (prior murder) and c(4)(c) (extreme suffering/torture) aggravating factors as well as the c(5)(a) (extreme mental or emotional disturbance), c(5)(b) (victim participated in offense), c(5)(d) (intoxication), and c(5)(e) (duress) mitigating factors. The jury found that the aggravating factors outweighed the mitigating factors and sentenced defendant to death. On appeal, the Court reversed defendant's conviction and death sentence based on improper jury instructions at the guilt phase. *State v. Erazo*, 126 *N.J.* 112, 594 *A.*2d 232 (1991). The Court also held that the c(4)(c) factor could not be considered on remand. *Id.* at 137–39, 594 *A.*2d 232.

### H) Samuel Erazo (1B)

On retrial, Erazo was again convicted of capital murder. The State served notice of the c(4)(a) (prior murder) aggravating factor

and Erazo served notice of the following mitigating factors: c(5)(a) (extreme mental or emotional disturbance), c(5)(b) (victim solicited, participated in, or consented to conduct resulting in her death), c(5)(e) (duress), and thirteen separate factors falling under c(5)(h) (catch-all).

In addition to the mitigating evidence supplied during the first penalty trial, an expert testified that Erazo had a fractured skull due to child abuse by his grandmother. He had been treated for seizures and may have been brain damaged as a result of his multiple suicide attempts. Erazo also suffered from chronic low-level depression. The sum of these factors, the expert opined, led to Erazo's loss of control at the time of the offense.

The jury found the c(4)(a) aggravating factor and each of the submitted mitigating factors, including twelve of the thirteen c(5)(h) factors, but was unable to reach a verdict on sentencing. The court sentenced Erazo to life imprisonment with a minimum term of thirty years.

### I) William Godette

William Godette worked as a handyman for the victim, a seventy-nine-year-old man. On November 14, 1990, when Godette went to the victim's home and demanded payment for work he had done, the victim refused to pay him. That night, at approximately 6:30 p.m., Godette returned to the victim's home, knocked on his door and demanded payment. When the victim again refused to pay, Godette forced his way into the home, knocking the victim to the ground. The victim then called Godette a name. According to Godette, the name-calling caused him to "panic." Godette first tried to strangle the victim and then struck him six times in the head with a hammer. Godette took some money, jewelry and a VCR from the home and fled. The victim's body was discovered the next day by fire department personnel who had been notified by coworkers concerned because the victim did not show up for work.

On August 8, 1991, Godette was arrested in North Carolina and charged with robbery and the murder of his step-father. On February 14, 1992, he volunteered a confession detailing his involvement in that murder. Godette was later convicted of both robbery and murder in connection with his step-father's death, and was sentenced to a term of life imprisonment plus forty years.

At the time of the murder of the elderly New Jersey man, Godette was thirty-seven-years old. He had dropped out of high school and had held a variety of unskilled jobs. He was separated from his wife and was the father of three children. He admitted using "all drugs" and claimed to have spent two weeks in a hospital detoxification program. His only other prior conviction was for the possession of controlled dangerous substances.

Godette was charged with capital murder, felony murder, unlawful possession of a weapon and possession of a weapon for an unlawful purpose. On February 11, 1993, he pled guilty to robbery and felony murder. The robbery conviction merged for sentencing purposes and he was sentenced to life imprisonment, with a minimum term of thirty years, to be served concurrent with the term he was serving in North Carolina. Although the AOC codes only the c(4)(a) (prior murder) aggravating factor as being present, the State served notice of the following additional aggravating factors: c(4)(c) (depravity), c(4)(f) (escape detection), and c(4)(g) (felony murder). The AOC also codes mitigating factors c(5)(a) (emotional disturbance), c(5)(b) (victim participation), and c(5)(h) (any other relevant factor).

### J) Frank Pennington (1A)

Frank Pennington arrived at an East Rutherford bar at about 11:30 p.m. on September 2, 1986. About one-half hour later, Arlene Connors, the victim and owner of the bar, arrived to help her daughter Pam close up. When Arlene announced that it was closing time, Pennington asked for and was served a fourth beer before leaving. At this point, the parties' versions vary. According to Pam, she heard her mother say to Pennington, "It's the

bewitching hour," followed by Pennington's response, "Bewitch this." Thereafter, Pam heard a lot of commotion and breaking glass, and turned to see her mother leaning on the bar. In his sworn statement to the police, however, Pennington claimed that he pulled a gun out with the sole intention of robbing the bar. He ducked to avoid a glass thrown by Ms. Connors "and as he straightened up, he pulled the trigger of his gun." It is undisputed that Pennington fired a single shot, striking Ms. Connors in the heart and killing her instantly.

Pennington was born out of wedlock and had no relationship with his father. His mother was promiscuous, mentally-challenged, bad-tempered, and had married six times. One of his stepfathers was an abusive alcoholic. Pennington attended a school for emotionally-disturbed children, but was expelled after trying to kill a teacher who had slapped him. He committed ten juvenile offenses and was incarcerated at a juvenile institution at least once. At age nineteen, Pennington enlisted in the Marines and served in Vietnam disarming mines. In 1970, he was honorably discharged after having been diagnosed as an emotionally unstable personality with secondary depressed reaction. A year later, he was admitted to a psychiatric hospital and diagnosed as suffering from post-traumatic stress syndrome. Pennington was acquitted by reason of insanity for armed robbery in 1972 and pled guilty to first-degree murder in 1974. He has since attempted suicide, been diagnosed as suffering from a personality disorder, schizophrenia and depression, and has become an alcoholic.

Pennington was charged with capital murder, felony murder and a weapons offense, and convicted on all counts. The jury found two aggravating factors, c(4)(a) (prior murder) and c(4)(g) (felony murder), and the c(5)(d) (mental disease or defect) mitigating factor. The aggravating factors were found to outweigh the mitigating factors and Pennington was sentenced to death. The Court reversed the capital murder conviction and death sentence because the trial court failed to give a *Gerald* charge to the jury, *see Gerald, supra,* 113 *N.J.* 40, 549 *A.*2d 792, but affirmed the

felony murder conviction, *State v. Pennington*, 119 *N.J.* 547, 575 *A.*2d 816 (1990).

### K) Frank Pennington (1B)

After the reversal, the State decided not to retry Pennington for capital murder and, on October 25, 1991, he was sentenced on the felony murder count to life imprisonment with a minimum term of thirty years.

### L) Braynard Purnell (1A)

On August 26, 1988, Braynard Purnell killed Lawrence Talley during the course of an attempted drug transaction. Purnell and the State's key witness, Marie Simmons, frequently used drugs together. On the day of the murder, Purnell went to Simmons's house to buy a small amount of cocaine. Simmons went to a neighborhood playground and met Talley to negotiate the drug purchase. They could not agree on a price and Talley later sent a confederate, Jeffrey Davis, to Simmons's house to sell a $20 bag of cocaine. Purnell refused to buy the drugs because he wanted a larger quantity. Purnell then went to the playground himself to talk with Talley. Purnell and Talley walked back to Purnell's house where they argued about the drugs and eventually started to fight. Defendant stabbed the victim fifteen times in the neck, chest and abdomen, stole his drugs, and hid the body.

At the time of the offense, Purnell lived with his daughter from his first marriage, his fiancé and her two children. He had dropped out of high school and served in the army for one year. He was employed and had held multiple unskilled positions in the past. According to his mother, various other relatives, and his fiancé, he had substantially improved upon release from his first prison term. They testified that he was religious and active in the church, and that he not only avoided drugs, but took pains to warn others about the dangers of drug use. He had previous convictions for second-degree murder and shoplifting.

Defendant was charged with capital murder, two counts of hindering apprehension or prosecution, possession of a weapon for

an unlawful purpose, and perjury, and was convicted on all counts, save one count of hindering apprehension. The jury found two aggravating factors, c(4)(a) (prior murder) and c(4)(g) (felony murder), and two mitigating factors, c(5)(b) (victim participated in conduct that resulted in his death) and c(5)(h) (catch-all). The aggravating factors were found to outweigh the mitigating factors and Purnell was sentenced to death. On the remaining charges, he was sentenced to a consecutive, aggregate term of ten years with a minimum term of two years. This Court affirmed Purnell's murder conviction, but reversed his death sentence because the trial court failed to instruct the jury on the possibility of convicting Purnell of the lesser charge of felony murder. *State v. Purnell,* 126 *N.J.* 518, 601 *A.*2d 175 (1992).

### M) Braynard Purnell (1B)

The State chose not to retry the guilt phase, which would have been necessary in order to seek the death penalty on remand, and Purnell was sentenced to life imprisonment with a minimum term of thirty years.

### N) Thomas Ramseur

Thomas Ramseur and Asaline Stokes, his former girlfriend, had a history of arguments and violent encounters. Stokes lived with her grandchild across the street from Ramseur's aunt's home. Ramseur physically attacked Stokes and frequently threatened to kill her, her children and her grandchildren. On August 24, 1982, Ramseur and Stokes had a heated argument, which ended with Ramseur threatening, "You'll be sorry," taking a knife from Stokes's kitchen, and leaving.

The next day, Stokes was speaking with a mechanic who was working on a truck near her home when Ramseur, who had watched the exchange, came out of his aunt's house. He approached Stokes, patted her on the shoulder, and then repeatedly stabbed her. He began to walk away but returned to inflict more wounds and to taunt the dying woman by saying, "If I see your kids again I'm going to kill them too."

A police officer who was driving through the area came on the scene and arrested Ramseur. Stokes did not die immediately; she dropped into unconsciousness only after reaching the hospital and died shortly thereafter. She had major stab wounds in the face and chest, including several defensive wounds on her hands and two chest wounds about eight and one-half inches deep that pierced the lung.

At the time of the murder, Ramseur was forty-three-years old. He had graduated from high school and, although unemployed at the time of the offense, had worked as a laborer, assembly-line worker and welder. He was an alcoholic and admitted having had two drinks directly prior to killing Stokes. Ramseur had previously suffered four severe head injuries and had experienced memory loss, migraine headaches, and bleeding in the brain. He also suffered from paranoia and psychomotor seizures, a form of epilepsy, that combined could lead to violence under provoking circumstances. Ramseur had prior convictions for the 1966 murder of his wife, for which he served six-and-one-half years, and for weapon possession and shoplifting.

Ramseur was charged with capital murder, unlawful possession of a weapon and possession of a weapon for an unlawful purpose. He was convicted on all counts. At the penalty phase, the jury found two aggravating factors, c(4)(a) (prior murder) and c(4)(c) (outrageously and wantonly vile), and two mitigating factors, c(5)(a) (extreme mental or emotional disturbance) and c(5)(d) (mental disease or defect). The jury determined that the aggravating factors outweighed the mitigating factors and sentenced Ramseur to death. The Court reversed defendant's death sentence and imposed a life sentence because of the trial court's coercive instructions after the jurors had announced they were deadlocked. *Ramseur, supra,* 106 *N.J.* 123, 524 *A.*2d 188.

### O) Carlos Vasquez

On June 3, 1988, at approximately 8:00 a.m., Carlos Vasquez enticed a thirteen-year-old girl into his apartment with a discus-

sion of religious matters. Once inside, Vasquez bound the girl's hands, raped her, and asphyxiated her using a towel. The victim's hands and feet were then tied together behind her back with electrical cord and clothesline. Vasquez placed the body into yellow plastic garbage bags and then into a cardboard box, and put the box out to be collected with the trash. The cause of death was asphyxia caused by gagging, ligature strangulation, and fracture of the cervical spine.

Vasquez had a 1975 conviction for murder in Puerto Rico for which he served seven years before being paroled in 1982. After moving to the United States from Puerto Rico in 1987, he was employed as a construction worker. He denied any physical or mental health problems or substance dependency.

Vasquez was charged with capital murder, felony murder, kidnapping, aggravated sexual assault and sexual assault, and pled guilty to felony murder and aggravated sexual assault. On the felony murder charge, he was sentenced to life imprisonment with a minimum term of thirty years and, on the sexual assault charge, he was sentenced to serve a consecutive term of twenty years with a minimum term of ten years. The AOC coded the case as having two aggravating factors, c(4)(a) (prior murder) and c(4)(g) (felony murder), and the c(5)(h) (catch-all) mitigating factor present.

### III. *Prior Murderers with No Other Aggravating Circumstances or Particular Violence/Terror: B(3)*

#### A) Richard Biegenwald (2)

On September 21, 1982, Biegenwald and the State's principal witness, Dherren Fitzgerald, met with William Ward to arrange the terms of a "hit" which Ward wanted Fitzgerald to perform for $25,000. According to Fitzgerald, he joined Ward in Ward's car and Biegenwald followed them in Fitzgerald's car to Fitzgerald's home. Before Biegenwald arrived, Fitzgerald and Ward discussed the terms of the "hit." Fitzgerald refused Ward's request to be present for the murder and an argument ensued, during

which Ward displayed his revolver. The men wrestled over the gun and the gun went off, striking Ward in either the shoulder or neck. Fitzgerald reached for his Luger .22 caliber pistol but was unable to cock the gun with one hand and instead struck Ward on the head with its barrel, causing Ward to bleed and rendering the gun inoperable. The struggle spilled onto the porch, ending with Fitzgerald on top of Ward, who was on his back and still clutching his gun. Then, Biegenwald appeared and shot Ward five times in the head with a .22 caliber Beretta.

Biegenwald and Fitzgerald loaded the body into Ward's car, which Fitzgerald then drove to a nearby mall. Later, Biegenwald reported that the police had not come to the scene. Fitzgerald drove back to his home, where he stored Ward's body until that night when he buried Ward at Mount Calvary Cemetery in Sea View Square. The two men later abandoned Ward's car in Brooklyn.

Biegenwald was convicted of capital murder. The jury found one aggravating factor, c(4)(a) (prior murder), and two mitigating factors, c(5)(d) (mental disease of defect) and c(5)(h) (catch-all), but was unable to reach a verdict on sentencing. Therefore, the court sentenced Biegenwald to life with a minimum term of thirty years. He was also convicted of theft, possession of a weapon for an unlawful purpose, and unlicensed possession of a handgun, for which he was sentenced to serve a consecutive, aggregate term of five-and-one-half years. In an unreported opinion, the Appellate Division affirmed.

### B) Jihad Muhammed

On August 3, 1984, at approximately 1:00 p.m., Jihad Muhammed, thirty-two-years old, approached an eighteen-year-old male and his girlfriend standing outside the girl's home, and offered to sell them some speed. The girl went inside and told her mother, who instructed her to tell Muhammed that she was not interested. When the girl returned, Muhammed yelled to someone across the street, "Come on, this guy don't want nobody

messin' around with his lady," and left. He reappeared about twenty minutes later, with a friend, Forrest Boyer, and a handgun. Muhammed pointed the gun at the couple and warned the girl, "Don't move—you move and I'll shoot you first." He then fired a shot into the ground. Muhammed tried to force the male to buy drugs from him but the male refused. Meanwhile, Boyer took the girl's pocketbook, rifled through it, and emptied its contents into a car. When the girl's boyfriend told Boyer to return the pocketbook, an argument ensued and Muhammed took out a sawed-off shotgun and shot the male. Having heard the shots, the girl's father came outside and asked Muhammed why he had shot the boy. Muhammed responded, "I didn't like his attitude. You'd better get in the house or I'll shoot you too.... I want to shoot me a white boy." More than three weeks later, the boy died in the hospital trauma unit from the gunshot wound.

At the time of the offense, Muhammed lived with his wife and had, for the previous four years, worked as a houseman at a hotel. He had only a fifth grade education and was institutionalized as a juvenile and diagnosed as a sociopath. At age ten he was convicted of larceny and put on probation. Since then, he was arrested six additional times and convicted four, including a 1971 conviction for murder and a 1975 murder charge that was pleaded out to atrocious assault.

Muhammed was charged with, among other things, murder and felony murder. He pled guilty to felony murder and was sentenced to life imprisonment with a minimum term of thirty-six years. He also pled guilty to possession of a weapon for an unlawful purpose, possession of a rifle or shotgun, and certain persons not to have weapons, for which he was sentenced to a consecutive, aggregate term of twelve years. The AOC coded the case as having the c(4)(a) (prior murder) aggravating factor and the c(5)(h) (catch-all) mitigating factor.

### C) Alberto Nieves

On March 25, 1987, Alberto Nieves was exiting a grocery store when he heard Hector Rentas, Sr., sound his automobile horn at Nieves's wife who was seated outside in the Nieves's car. Rentas stopped his car to speak to Nieves, whereupon Nieves proceeded to his car, reached for a gun under his car seat, and approached Rentas. Nieves pointed the gun at Rentas's head and told him that if he "wanted the girl to come in and get the girl and keep her." He held the gun to Rentas's head for about thirty seconds, lowered it, and returned to his car.

Three days later, on March 28, 1987, Rentas drove his six-year-old son to the grocery store and was parking nearby when Nieves approached the automobile. Nieves again told Rentas to "Stop messing around with my girl," whereupon Rentas replied, "I'm not messing with your girl." Nieves then raised his gun, shot Rentas once in the head, and fled the scene. The bullet passed through Rentas's head, killing him, and lodged in the seat between him and his son.

At the time of the offense, Nieves was twenty-six-years old. He was separated from his wife, had three children by three different mothers, had dropped out of school upon completing seventh grade, and had previously worked as a packer. One of eighteen children, he had grown up in poverty, without adequate food or clothing, and had been beaten by his alcoholic father. One of his siblings had been murdered and another was serving jail time for avenging that murder. Nieves was not substance-dependent or mentally ill. In 1980, he was convicted of murder, aggravated assault and possession of a weapon for an unlawful purpose, for which he served six years of a twenty-five-year sentence; he was on parole at the time of the Rentas murder.

Nieves was convicted of capital murder, possession of a handgun, possession of a weapon for an unlawful purpose, and hindering apprehension or prosecution. In the penalty phase, the jury found the c(4)(a) (prior murder) aggravating factor and two miti-

gating factors, c(5)(b) (provocation) and c(5)(h) (catch-all). The jury was unable to reach a decision regarding the weighing of the factors and the court sentenced Nieves to an aggregate term of life imprisonment with a minimum term of thirty-two-and-one-half years.

### D) Thomas Williams

Thomas Williams and his mother got into an argument because Williams was living on her resources and wanted his girlfriend to spend the night. His mother may also have learned that he was renting a basement apartment to neighborhood prostitutes. During this argument or soon thereafter, Williams stabbed his mother nine times in the chest and heart and then left her body beneath a blanket in the basement of her apartment building. Some weeks later, on August 20, 1993, Williams notified the police that he had found his mother murdered. When the officers arrived, Williams was calm and unconcerned. The police soon discovered that Williams had attempted to cash some of his mother's checks and that he had filed a false report claiming that his mother's car had been stolen. He had actually given the car to a juvenile in exchange for a twenty-dollar bag of cocaine.

At the time of the offense, Williams was thirty-eight-years old and lived with his mother. He had a ninth-grade education and was self-employed. He admitted using cocaine and has since sought treatment. He claimed to be in otherwise good physical and mental health. Williams had prior convictions for murder, atrocious assault and battery, unlawful possession of a weapon and possession of a controlled dangerous substance. The prior murder conviction stemmed from an altercation with his girlfriend and her landlord in which Williams shot both, killing the landlord.

Williams was convicted of noncapital murder and sentenced to serve a life sentence, with a minimum term of thirty years.

HANDLER, J., dissenting.

Gary Marsh, a night clerk at a gas station in Lawrenceville, was fatally shot at work during an apparent robbery. When found, he

was laying among coins on the floor in the small office of the gas station, his keys were in the door, and the cash drawer was empty on the counter. Approximately ninety dollars was missing, but otherwise nothing in the small office was disturbed.

Defendant, twenty-six years old at the time, was arrested four days after the killing. Charged and prosecuted for capital murder, he was found guilty, on July 8, 1994, of purposeful or knowing murder by his own conduct, with the requisite intent to kill the victim. On December 6, 1994, a separate jury returned a death sentence. The penalty-phase jury determined that the State had proven beyond a reasonable doubt three statutory aggravating factors: *N.J.S.A.* 2C:11–3c(4)(a) (conviction for prior murder); *N.J.S.A.* 2C:11–3c(4)(f) (murder committed to escape apprehension for another offense); and *N.J.S.A.* 2C:11–3c(4)(g) (murder committed during the course of a robbery). All of the jurors concluded that the aggravating factors outweighed the mitigating factors, and defendant was sentenced to death. On direct appeal, defendant's conviction and death sentence were affirmed. *State v. Loftin*, 146 *N.J.* 295, 680 *A.*2d 677 (1996) (*Loftin I* ).

The present appeal concerns the proportionality of defendant's death sentence. The Court holds that defendant's sentence is not disproportionate under the current standards and methodology for determining proportionality in capital cases. In reaching that determination, it eliminates one component of that methodology, namely, a statistical analysis based on the numerical preponderance of aggravating and mitigating factors. The Court rules further that proportionality review should be studied to determine whether its methodology should be revised. Anticipating such a revision, the Court also decides that a statutory amendment to the capital murder statute, which drastically changed the universe of cases that constitutes the basis for comparisons of defendants, need not be applied in this case; its constitutionality, therefore, need not be determined. Finally, the Court acknowledges that proportionality review and the evidence adduced in its implementation are material in determining whether racial discrimination

exists in the administration and application of the death penalty. The signs of discrimination are undeniable, so the Court rules that racial discrimination should be the subject of continuing study. Nevertheless, the Court concludes that the evidential findings do not demonstrate discrimination sufficiently pervasive to establish constitutional violations.

I disagree with the Court's disposition of each of the important issues in this case. First, because the Court has acknowledged that our current method of proportionality review requires further revisions, I take issue with the application of proportionality review to defendant's case at this time. Given that the Court has chosen to review defendant's sentence, I conclude that the evidence considered within the framework of current proportionality review standards indicates that defendant's death sentence is disproportionate. Further, consideration of the constitutionality of the 1992 amendment should not be avoided or postponed on the assumption that a determination of its constitutionality may be obviated by any changes in proportionality review contemplated by this Court: the amendment, which changes and drastically limits the analysis required for meaningful proportionality review, is blatantly unconstitutional. Finally, and most importantly, the evidence presented by defendant demonstrates strongly and inescapably that a constitutionally impermissible risk of racial discrimination exists in the imposition of the death penalty in this State. We should declare the capital-murder statute unconstitutional because it discriminatorily singles out black persons for death.

I, therefore, dissent.

I

Rejecting the notion that "[a]pparent disparities in sentencing are an inevitable part of our criminal justice system," *McCleskey v. Kemp,* 481 *U.S.* 279, 312, 107 *S.Ct.* 1756, 1778, 95 *L.Ed.*2d 262, 291 (1987), this Court has proclaimed that "our history and traditions would *never* countenance racial disparity in capital sentencing." *State v. Marshall,* 130 *N.J.* 109, 207, 613 *A.*2d 1059

(1992) (*Marshall II* ), *cert. denied,* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed* 2d 694 (1993) (emphasis added). The Court made this studied observation:

> New Jersey would not tolerate a system that condones disparate treatment for black and white defendants or a system that would debase the value of a black victim's life. Whether in the exercise of statutory proportionality review or our constitutional duty to assure the equal protection and due process of law, we cannot escape the responsibility to review any effects of race in capital sentencing.
>
> [*Id.* at 214, 613 *A.*2d 1059 (citations omitted).]

In this case, the Court is confronted with extensive evidence indicating that racial discrimination infects this State's capital punishment regime. The statistical record before us extends the evidence of racial discrimination from our earliest proportionality reviews, and takes into account subsequent capital cases, the current case, and several others pending. The evidence demonstrates that penalty-phase juries sentence a disproportionate number of black defendants to death, and that prosecutors capitally try a disproportionate number of cases involving white victims. The probability of being sentenced to death is thus positively correlated with whether the defendant is black and whether the victim is white.

The Court rules that the evidence is not sufficient to offend the constitution. *See ante* at 316, 724 *A.*2d at 160. I believe, to the contrary, that the statistics strongly indicate an impermissible risk of racial discrimination. A reliable determination of whether imposition of the death penalty is infected with racial discrimination need not, and indeed should not, be made solely on the basis of findings of statistical significance. The death-worthiness of a capital defendant as measured by culpability, the central and ultimate inquiry in a capital prosecution, is an inquiry that is inherently moral. Determinations of death-worthiness serve as the crucial indicators of whether or not invidious discrimination has been a likely factor in the decision to impose the penalty of death. The criminal penalty in capital cases is the execution of the defendant, and the heart of the inquiry is whether persons most likely to be put to death are executed because they are black.

Accordingly, the judgments that we reach as to whether individual defendants deserve to die cannot rest solely on pure scientific abstractions. Rather, the evaluation of the evidence that informs those judgments should be based on reasonable standards of knowledge that appropriately reflect real-life understanding. That knowledge must be extrapolated from an appraisal of the scientific material that not only draws on acceptable social scientific methodology, but also on common sense and human experience informed by the history that chronicles invidious discrimination in criminal prosecutions in this country.

While the statistics alone may not make the case with scientific certainty, the totality of the evidence before this Court, measured by reasonable standards of knowledge appropriate for reaching sound judgments that assure ultimate fairness in capital-murder prosecutions, documents the risk of racial discrimination in the application of this State's death penalty. So imposed, the death penalty violates the New Jersey Constitution and must be invalidated.

### A.

This Court has consistently recognized that proportionality review is the tool by which to monitor whether capital-murder death penalty "proceedings are vulnerable to the influence of impermissible considerations." *State v. Ramseur,* 106 *N.J.* 123, 326, 524 *A.*2d 188 (1987). "The prevention of 'any impermissible discrimination in imposing the death penalty' " is one of the core purposes of proportionality review. *Marshall II, supra,* 130 *N.J.* at 135, 613 *A.*2d 1059 (quoting *Ramseur, supra,* 106 *N.J.* at 327, 524 *A.*2d 188). Uncovering racial discrimination is perhaps proportionality review's most significant role. *State v. Bey,* 137 *N.J.* 334, 418, 645 *A.*2d 685 (1994) (*Bey IV*), *cert. denied,* 513 *U.S.* 1164, 115 *S.Ct.* 1131, 130 *L.Ed.*2d 1093 (1995).

Eleven years ago, this Court confronted empirical evidence indicating that New Jersey's capital punishment system was racially discriminatory. The Court recognized the constitutional

threat posed by that evidence and particularly acknowledged the relevance of the history of racial discrimination in capital punishment. Nevertheless, the Court refrained from finding invidious discrimination, promising instead that it would continue to accept evidence on this issue and "attempt to monitor the racial aspects of the application of the [Death Penalty] Act." *Ramseur, supra,* 106 *N.J.* at 182, 524 *A.*2d 188.

Five years later, this Court, in its first proportionality review of a death sentence, was again faced with evidence indicating "that there may be a discrepancy in capital-sentencing rates that correlate to the race of the defendant or the race of the victim." *Marshall II, supra,* 130 *N.J.* at 207, 613 *A.*2d 1059; *see also* David C. Baldus, *State v. Robert Marshall: Death Penalty Proportionality Review Project, A Report to the New Jersey Supreme Court* (Sept. 24, 1991) (*Baldus Report* ). In response, the Court rejected the United States Supreme Court's suggestion that " '[a]pparent disparities in sentencing are an inevitable part of our criminal justice system.' " *Marshall II, supra,* 130 *N.J.* at 207, 613 *A.*2d 1059 (quoting *McCleskey, supra,* 481 *U.S.* at 312, 107 *S.Ct.* at 1778, 95 *L.Ed.*2d at 291). "[W]ere we to believe that the race of the victim and race of the defendant played a significant part in capital-sentencing decisions in New Jersey," the Court iterated, "we would seek corrective measures, and if that failed we could not, consistent with our State's policy, tolerate discrimination that threatened the foundation of our system of law." *Id.* at 209, 613 *A.*2d 1059.

In 1994, a second proportionality review case presented new statistics that, yet again, indicated that prosecutors and juries impermissibly considered the race of defendants and victims when imposing the death penalty. *Bey IV, supra,* 137 *N.J.* 334, 645 *A.*2d 685. The Court stressed that uncovering racial discrimination is perhaps proportionality review's most significant role, *id.* at 418, 645 *A.*2d 685, and stated that it remained committed to eliminating any racial disparity either by seeking corrective measures or, if that failed, by taking more drastic steps, *id.* at 389, 645

A.2d 685 (citing *Marshall II, supra,* 130 *N.J.* at 209, 613 *A.2d* 1059). The Court portended that even though the disparities seen in *McCleskey* were not significant under the Federal Constitution, they "could be significant under the New Jersey Constitution." *Ibid.* (citing *Marshall II, supra,* 130 *N.J.* at 210, 613 *A.2d* 1059).

Since then, the Court has considered two more proportionality review cases that included claims of racial discrimination, and, while acknowledging the real threat posed by discrimination, has nevertheless perceived the underlying statistical evidence as insufficient to demonstrate invidious racial disparities. *State v. DiFrisco,* 142 *N.J.* 148, 662 *A.2d* 442 (1995) (*DiFrisco III*); *State v. Martini,* 139 *N.J.* 3, 651 *A.2d* 949 (1994) (*Martini II*), *cert. denied,* 516 *U.S.* 875, 116 *S.Ct.* 203, 133 *L.Ed.2d* 137 (1995).

In this case, the Administrative Office of the Courts ("AOC") and defendant produced statistical data demonstrating for the first time that the race of the defendant and the race of the victim statistically significantly affect the likelihood of the imposition of a death sentence. In response to that evidence, the Court appointed a Special Master, Richard S. Cohen, who was given several tasks: (i) to examine the reliability of the AOC's data regarding racial discrimination presented in the *Harris Report* and the *Loftin Report;* (ii) to utilize trial judges experienced in New Jersey's death-penalty system to assess and rank by culpability all penalty-phase cases; and (iii) to undertake precedent-seeking review of those death-penalty cases falling within the mid-range of culpability (the range at which defendants had claimed and the AOC's data had shown the most profound racial effect). The Special Master then issued findings and recommendations. *See* Richard S. Cohen, *Report to the Supreme Court of New Jersey* (Jan. 27, 1997) (*Special Master Report*).

The studies undertaken by the AOC and defendant, together with those of the Special Master, provide evidence that racial disparities in the imposition of death sentences have not merely persisted, they have grown starker. All the data point toward the highest risk of the imposition of a death sentence when a black

defendant kills a white victim, as was the case with Donald Loftin. This risk is sufficiently great that it can no longer be discounted.

1.

In the *Loftin Report*, and more recently in the *Chew/Cooper/ Harvey Report*, the AOC undertook analyses to measure the effects of race on the probability of the imposition of a death sentence. The reports reflect three logistic regressions that are designed to control for other pertinent variables impacting on deathworthiness, thereby producing results that can compare the sentences of defendants of different races who are equally culpable.

In the three models used by the AOC in its *Loftin* and *Chew/Cooper/Harvey* Reports (labeled Schedules 2, 5 and 8),[1] the racial effect on capital sentencing is statistically significant with regard to several variables. A statistically significant black-defendant effect is reflected in Schedules 2 and 5 in both Reports and in Schedule 8 of the *Loftin Report*. This result strongly supports the conclusion that juries are more likely to sentence a black defendant to death than an equally culpable nonblack defendant. Although the black-defendant effect in *Loftin* Schedule 8, which uses the death-eligible universe, is not statistically significant (according to conventional standards), the observed significance is 0.0834, indicating that there is only an 8.34 percent chance that the black-defendant effect is caused by mere mathematical ran-

---

[1] Schedules 2 and 5 use the penalty-trial universe, which consists of all death-eligible cases that proceeded to a penalty phase. They include variables for all the statutory aggravating and mitigating factors, the defendant's and the victim's socio-economic status, the defendant's sex, and the defendant's and victim's race. Schedule 5 also includes nonstatutory aggravating factors, such as the source of the victim's suffering or whether the defendant mutilated the victim during the murder.

Schedules 2 and 5 are the two regressions that measure jury sentencing decisions only. Schedule 8, the third regression, comprises the same variables as Schedule 2. But, Schedule 8 uses the death-eligible universe, which consists of capital cases that proceeded to a penalty phase as well as death-eligible cases for which prosecutors chose not to seek a death sentence.

domness. Consequently, the black-defendant effect in Schedule 8 cannot be ignored.

A statistically significant white-victim effect is reflected in Schedules 2 and 8 of both the *Loftin* and *Chew/Cooper/Harvey* Reports. The effect's statistical significance is strongest in Schedule 8, the only schedule that encompasses prosecutors' charging decisions.

Table 1

AOC Statistical Significance Reports

Loftin Report

| Variable | Coefficient [2] | Observed Significance [3] |
|---|---|---|
| Schedule 2 | | |
| White Victim | 1.3555 | 0.0412 |
| Black Defendant | 1.4522 | 0.0171 |
| Schedule 5 | | |
| White Victim | 0.5157 | 0.5535 |
| Black Defendant | 2.3796 | 0.0066 |

---

[2] The regressors use a coefficient that represents the strength of the variable. A coefficient greater than zero illustrates the positive correlation between the variable, whether the victim is white or the defendant is black, and the outcome, whether a death sentence is imposed. The higher the coefficient, the stronger the white-victim or black-defendant effect.

[3] The observed significance, which is also called a p-value, measures the extent of the variable's statistical significance. A positive correlation may be the product of mathematical randomness rather than actual cause and effect. However, the lower the observed significance, the lower the likelihood that the correlation is the product of randomness. In social science, the standard level of statistical significance is 0.05, at which point the probability that the correlation is random is five percent. When the p-value is at or below 0.05, the effect is considered to be statistically significant. For example, in Schedule 5, the regression that takes nonstatutory aggravating factors into account, the p-value is 0.0066, *i.e.*, the probability that the black-defendant effect is random is 66 in 10,000.

| Schedule 8 | | |
|---|---|---|
| White Victim | 1.0699 | 0.0240 |
| Black Defendant | 0.9520 | 0.0418 |

### Chew/Cooper/Harvey Report

| Variable | Coefficient | Observed Significance |
|---|---|---|
| Schedule 2 | | |
| White Victim | 1.2922 | 0.0434 |
| Black Defendant | 1.1758 | 0.0376 |
| Schedule 5 | | |
| White Victim | 0.9114 | 0.2490 |
| Black Defendant | 1.8423 | 0.0169 |
| Schedule 8 | | |
| White Victim | 1.0517 | 0.0234 |
| Black Defendant | 0.7791 | 0.0834 |

The Special Master concludes that the raw data presented in these reports are a "mixed bag," and that the AOC's statistics are not dependable or accurate. *Special Master Report, supra,* at 43–45. In his view, "the Court is no closer than it was in the past to statistical evidence of a race effect," and should continue to study the issue. *Ibid.* The Court accepts this evaluation of the evidence, and adopts the recommendation that the matter be subject to further study. *See ante* at 303, 315, 724 *A.*2d at 154, 160.

It is important to note that the Special Master does not conclude that the statistical evidence fails to indicate racial discrimination. Accordingly, while in his view the evidence does not prove the existence of racial bias, it also does not prove "that the system operates without bias." *Special Master Report, supra,* at 34. Although the results showing a race effect "are not individually vivid," the Special Master acknowledges that they do "seem to trend, to a degree not revealed by the statistical evidence, toward showing a race effect." *Ibid.* In particular, he recognizes that the statistics regarding transracial cases reflect "disturbing trends

... that may describe a troublesome racial imbalance, and clearly deserve intensified attention." *Id.* at 44.

I believe the Court misjudges the strength of the evidence of invidious discrimination in capital prosecuting and sentencing decisions. The *Loftin Report,* updated with the data from the *Chew/Cooper/Harvey Report,* confirms earlier trends indicating that both the defendant's and the victim's race have a statistically significant effect on whether a person who commits a capital murder is sentenced to death.

a.

I begin with an examination of the raw numbers as analyzed by the Special Master. Referring to the *Loftin Report,* the Special Master points out that prosecutors selected almost equal numbers of black defendants and nonblack defendants for prosecution (seventy-three and seventy-four, respectively), although there were more death-eligible black defendants than nonblack (203 and 159, respectively). *Special Master Report, supra,* at 8. The Special Master then claims that reverse race discrimination occurs at the front end of the process, cancelling out the discrimination against black defendants at the back end of the system. He goes so far as to assert that "[t]he numbers could hardly have come out more race-neutral...." *Id.* at 9. The conclusion, or implication, that the numbers indicate that capital-murder prosecution is "race-neutral" is unsound and untenable.

The figures do not negate the presence of discrimination. The Special Master's contention that discrimination of one sort in prosecutorial decision making and discrimination of the opposite sort in jury sentencing cancel out, creating a race-neutral outcome, is correct only as a matter of arithmetic; it could not be more amiss as a matter of law. The Special Master opines that "[i]f racial imbalance in penalty trial death verdicts occurred as an historical phenomenon, it followed, and might have been associated with, a reverse racial imbalance in capital prosecutions." *Id.* at 11. Even if the most culpable defendants regardless of race were charged capitally and a higher percentage of those were nonblack

defendants, that result could in no way "offset" any improper and discriminatory decision made by penalty-phase juries to sentence black defendants to death. Alternatively, if defendants' race improperly influenced the decision to prosecute, discrimination against nonblack defendants in an effort to "offset" racial discrimination occurring in the penalty-phase is equally intolerable. Such a result can never be characterized as a "neutral outcome."

Notwithstanding the expressed proposition that two different, potentially offsetting forms of race discrimination cause little need for concern, I agree with the Special Master's conclusion that "[t]he limited scope and significance of these findings should be made clear." *Id.* at 9. The Special Master and the Court are correct to point out that the findings show only that "nonblacks were 30% brought to penalty trial more frequently than blacks, and black penalty trial defendants received death sentences 27% more often than nonblack defendants." *Ante* at 307, 724 A.2d at 156 (quoting *Special Master Report, supra,* at 9 (footnote omitted)). Although I find these discrepancies troubling on their own, the reason for the limitations of the findings is that they fail to take into account the race of the victims and the culpability of the defendants. When these two factors are considered, the statistics regarding both prosecutorial and sentencing decisions become even more troubling, demonstrating anything but a neutral or benign outcome.

Prosecutors selected over forty-eight percent of death-eligible black defendants who killed nonblack victims (33/68) for capital prosecution, while none of the nonblack defendants who killed black victims (0/6) proceeded to a penalty trial. *See* tbl. 2, *infra,* at 383, 724 A.2d at 196. Prosecutors capitally tried forty-eight percent of nonblack-victim cases, but only twenty-eight percent of black-victim cases. *Ibid.* Overall, eighteen percent of black-defendant, nonblack-victim cases resulted in death sentences compared with zero percent of nonblack-defendant, black-victim cases. *Ibid.*

The disparity is even more troubling when the raw numbers are examined in light of the average culpability levels of each group provided by the AOC. Black killers of nonblack victims have an average culpability rating of 1.34, while nonblack killers of black victims have an average culpability rating of 1.67—yet none of the defendants in the latter category were capitally prosecuted. *Ibid.*

Table 2

Special Master's Findings 4

Racial Effect on Capital Prosecution and Sentencing by Culpability Average

| | Death–Eligible Cases Capitally Prosecuted | Penalty Trial Cases Sentenced to Death | Death–Eligible Cases Sentenced to Death | Avg. Culpability 5 |
|---|---|---|---|---|
| All cases | 41% (147/362) | 34% (50/147) | 14% (50/362) | 1.36 |
| Black Defendants | 36% (73/203) | 38% (28/73) | 14% (28/203) | 1.32 |
| Nonblack Defendants | 47% (74/159) | 30% (22/74) | 14% (22/159) | 1.43 |
| Black Victims | 28% (40/141) | 40% (16/40) | 11% (16/141) | 1.32 |
| Nonblack Victims | 48% (107/221) | 32% (34/107) | 15% (34/221) | 1.39 |
| Black Defendants, Black Victims | 30% (40/135) | 40% (16/40) | 12% (16/135) | 1.30 |
| Black Defendants, Nonblack Victims | 49% (33/68) | 36% (12/33) | 18% (12/68) | 1.34 |
| Nonblack Defendants, Black Victims | 0% (0/6) | 0% (0/0) | 0% (0/6) | 1.67 |
| Nonblack Defendants, Nonblack Victims | 48% (74/153) | 30% (22/74) | 14% (22/153) | 1.42 |

In addition, contrary to the Special Master's conclusion, the eight percent disparity between black- and nonblack-defendant death sentences, *see ibid.,* is worrisome. Although an eight percent discrepancy may seem facially mild, the figure becomes more significant when considered in context. The Special Master erroneously assumes that picking defendants for a death sentence

---

4 These data were taken from the Special Master's Table A–2 (a revised version of Table A from the *Special Master Report* ).

5 The culpability level for these cases was estimated from Model 12 in the *Loftin Report* using 215 non-penalty and 147 penalty-trial cases.

is analogous to picking balls at random out of a sack stocked equally with two balls of different colors, and that the eight percent racial disparity in sentencing is no greater than one would get by randomly picking balls since it is not statistically significant. However, the analogy fails to account for culpability, the factor that should dictate a jury's decision to sentence someone to death. One would not expect the fifty defendants selected for death necessarily to include twenty-five black defendants and twenty-five nonblack defendants, even if the pool of defendants were equally split between black and nonblack defendants, and even if no racial discrimination occurred. Rather, the expectation is that the fifty defendants picked would be the fifty most culpable defendants, regardless of their race.

Overall, nonblack defendants are more culpable than black defendants. *See ibid.* This finding is supported by the AOC culpability measurements broken down by level as well. Using the Special Master's universe, the AOC analysis shows significant disparities with nonblack defendants tending to be more culpable in all five culpability levels. *See* Appendices (Apps.) A–1 to –3, *infra*, at 446–447, 724 *A.*2d at 228. These disparities appear in greater significance at the higher culpability levels. In light of this fact, the eight percent disparity between black and nonblack defendant death sentences appears more significant and more ominous than the Special Master suggests.

The majority contends that "the Special Master understood the importance of the culpability rankings but found them to be unsound." *Ante* at 307, 724 *A.*2d at 156. The recognition, however, that reliable culpability rankings do not exist, and can therefore not be used to test the hypothesis that the racial disparity is not statistically significant, does not render the Special Master's ball analogy any more appropriate. The analogy fails unless we know something more about the balls than simply their color.

Further, even if one accepts the Special Master's contention that the AOC's culpability rankings are methodologically unrelia-

ble, *Special Master Report, supra,* at 19–20, the judges' culpability ratings also indicate that nonblack defendants are, on average, more culpable than black defendants.[6]

The Special Master concludes that the statistical evidence is not adequate to demonstrate systemic racial discrimination. In doing so, he fails to give adequate recognition not only to the current statistics, but also to the constant nature of the disparity in death sentences between the races. Although the annual rate of death sentencing for black and nonblack defendants tends to fluctuate within any one year, the cumulative rates of death sentencing show a disparity between the races from 1984 on, and a rather constant, nonfluctuating disparity from 1986 to the present. In fact, over the last eight years, the disparity in death-sentencing rates has remained between six and eight percent.

In sum, the raw data reveal tangible and frightening disparities between black and nonblack defendants in the likelihood that prosecutors will seek, and in the rate that penalty-phase juries will impose, the death penalty. The disparities adversely affect black defendants, killers of white victims, and black defendants who kill white victims. Seen against the backdrop of prolonged racial discrimination that has historically and persistently plagued our nation, *see infra,* at 296–301, 724 A.2d at 150–153, we cannot trust that capital defendants are being selected to die by a system as benign as the one posited by the Special Master.

b.

Discrimination is also evident in the results of the multiregression analyses conducted by the AOC, which allow for examination of the race factor while controlling for culpability. The multiregression analysis reveals that race is a more important factor than most details of the crime, defendants' backgrounds or records.

---

[6] Nonblack defendants have an average culpability rating of 3.38 and black defendants have an average culpability rating of 3.30. The Special Master found these judges' culpability ratings to be more reliable than those of the AOC. *Id.* at 23.

*See* App. A–2, *infra,* at 447, 724 *A.*2d at 228.[7]  Differences in percentages of black and nonblack defendants sentenced to death are as high as thirty-three percent when the culpability levels are divided into five categories with equal ranges, *see* App. A–2, *infra,* at 447, 724 *A.*2d at 228, and thirty-six percent when the culpability levels are divided into levels with equal numbers of cases.  *Compare* App. A–3, *infra,* at 447, 724 *A.*2d at 228 *with* App. A–1, *infra,* at 446, 724 *A.*2d at 228.

While these findings, as construed by the Special Master, are not statistically significant by themselves, the results comport with historical realities and the discrepancies continue over time with no sign of abatement.  *See infra* at 296–302, 724 *A.*2d at 150–153.  The Special Master recognizes that the AOC's models are, despite shortcomings, both informative and useful.  *Special Master Report, supra,* at 42–44.  The AOC's models indicate that a defendant's race likely plays a very important role in penalty-phase juries' decisions to impose death sentences instead of life sentences.  In fact, defendants' race is more important than almost every other variable in the models, including the presence or absence of almost every aggravating and mitigating factor.[8]  When viewed in light of the AOC's findings that race plays a statistically significant role in capital sentencing, the Court's decision to reject the contention that our system of capital punishment is in all likelihood discriminatory is unacceptable.

---

[7] As noted, App. A is based on AOC Table 18.1 (App.24–27).  Although the odds ratio is flawed, that ratio calculated by the AOC ranges from 4.3 to 10.8, *Loftin Report,* tech. app. 10, schs. 2 & 5 *(logistics),* suggesting that the odds of a black defendant receiving a death sentence versus a nonblack defendant are 10.8 to 1 (or 4.3 to 1).

[8] The AOC found, for example, in Schedule 2 (logistics), that the race variable ("blackd") was statistically more significant than all aggravating factors except c(4)(a) (prior murder), c(4)(c) (torture/depravity), and c(4)(d) (pecuniary gain), and than all statutory mitigating factors except c(5)(d) (capacity to appreciate wrongfulness).  In Schedule 5 (logistics), the AOC found the race variable to be more significant than every other aggravating factor.  *See Loftin Report,* tech. app. 10.

By way of explanation for his conclusion that there is not adequate evidence of racial discrimination in capital prosecution and sentencing, the Special Master criticizes the AOC's culpability models, finding several methodological "defects that repel ultimate reliance." *Id.* at 44. He believes the AOC's statistical methodology is flawed because of the excess of factors compared to the number of death verdicts in the universe (a problem known as "overfitting"), and because of the "ambiguities" in some of the data selections and codings made by the AOC. The Special Master contends that the small size of the raw data pool renders a theoretically sound statistical methodology unsuited to the purpose for which it is being used. *Id.* at 20. Finally, the Special Master criticizes the process used by the AOC, known as "purging," to correct the impermissible effects of certain variables on culpability determinations. *Id.* at 30. In my opinion, these criticisms, while not without merit, do not justify rejection of the AOC's statistical evidence.

The Special Master's assertion that the small size of the universe renders the AOC results unreliable is an important one. *Id.* at 20. The database contains only 147 penalty-trial cases and only fifty death-sentenced cases. On the other hand, an almost limitless number of variables may account for why different juries decided to impose death sentences in those fifty cases. The difficulty in creating a model to account for the historical occurrences is that the model may become so detailed as to have no predictive ability. *Id.* at 27–28. Although this is indeed a valid concern, the paucity of cases cannot, under the circumstances, become dispositive in the Court's decision to ignore tangible evidence of systemic racial discrimination. The black man executed purely because of his race finds no solace and gains no redemption from the argument that had his case been examined ten years later—confirming what we reasonably now know—when the pool of comparison cases was larger, he would have been spared. This Court cannot, on the ground that the population size is too small, continue to ignore the risk that racial discrimination is infecting this State's imposition of the death penalty.

Given his concerns regarding the validity of the AOC's models, the Special Master appointed Dr. John Tukey as a statistical consultant to examine the AOC's methodology and to develop some alternative models. *Id.* at 2. Dr. Tukey created three "parsimonious" models of his own in an attempt to limit the number of variables used by the AOC from thirty-two (used in Schedule 5) to a more acceptable number (between five and ten). Two of these models do not show a statistically significant race effect. For that reason, Dr. Tukey concludes that defendant has not relentlessly documented racial discrimination in this State's imposition of the death penalty. John W. Tukey, *Report to the Special Master* 10 (Jan. 27, 1997) (*Tukey Report*).

However, Dr. Tukey's third model, which appears to be the most methodologically sound,[9] reveals a statistically significant effect of the black-defendant variable on the likelihood that a defendant will be sentenced to death. The Special Master not only discounts Dr. Tukey's results indicating a possible racial effect in two of three parsimonious models, but then also fails to give any recognition to the statistically significant racial effect in the third. His criticism, therefore, that the AOC models fail because of overfitting, seems purely technical: when provided with models that solve the overfitting dilemma, the Special Master still refuses to recognize compelling evidence of race discrimination.

---

[9] The third model is the only one (according the AOC) that, in the process of paring down the total numbers of variables, combines strong variables together in one group and weak variables together in another. Dr. Tukey gives no explanation for his decisions regarding pooling of variables; but his first two models, which group factors of varying strengths together in one variable, do not appear to be consistent with fundamental methodological guidelines.

Dr. Tukey's own statistical print-outs seem to confirm the common sense conclusion that Model 3 is stronger than the other two. One method of testing reliability is to look at the percentage of concordant and discordant pairs within a model. The higher the concordant percentage, the better the model. Model 3 has the highest concordant percentage and the lowest discordant percentage of any of the three models, indicating that it is capable of accurately predicting the highest percentage of outcomes (over 90%, in this case). *Tukey Report, supra,* at 26.

Dr. Paul Allison, hired by the Public Defender's Office, reconfigured Dr. Tukey's parsimonious models slightly, maintaining their parsimonious quality, but adding the white-victim variable to the analysis. *Appendix to Defendant's Supplemental Brief in Answer to State's Response to Report of the Special Master* 8, 10 (Mar. 11, 1997) (*Appendix to Defendant's Supplemental Brief*). The results were quite significant. Not only did Dr. Allison find a statistically significant racial effect on death penalty sentencing (correlating to the race of the defendant) in Model 3, as Dr. Tukey did, but the data also showed a statistically significant black-defendant effect in Dr. Tukey's Model 2: that is, the percentage of black-defendant penalty-trial cases resulting in a death sentence was statistically significantly greater than that for nonblack-defendant cases. *Ibid.*[10]

The Special Master criticizes the models based on what he considers to be coding problems within the universe.[11] As a result of these coding "inconsistencies," the Special Master revises his initial contention that the consistent trends in the data indicating the presence of race discrimination are worrisome. However, this revision, adopted by the majority, *ante* at 304, 724 A.2d at 154, is largely unexplained.

---

[10] The Public Defender also created a three-variable model, the most parsimonious of any of the models evaluated herein. Using the judges' culpability rankings, which the Special Master found to be more reliable than those of the AOC, *see Special Master Report, supra,* at 25, and the black-defendant and white-victim variables, this model also indicates a strong racial effect: the p-value for the black defendant variable is 0.13. *Appendix to Defendant's Supplemental Brief, supra,* at 4. While not statistically significant, this racial effect is strong enough to cause concern.

[11] The Special Master suggests the following coding changes to the universe: add life-sentenced defendants and reversed death-sentenced cases; count retrials of reversed cases separately within the universe; exclude fifteen cases where no aggravating factors were found; count multiple-victim cases as single cases; and consider black-Hispanics as blacks and all other Hispanics as nonblacks. *Special Master Report, supra,* at 30–42.

The Special Master himself states that while he finds some of the AOC coding decisions to be inconsistent, he does "not mean to equate 'inconsistent' with erroneous, or 'consistent' with preferable. These are alternate ways of sorting and neither one is 'true' or 'false.'" Richard S. Cohen & Dr. John W. Tukey, *A Study of Statistical Evidence of Race Bias in Penalty Trials* (May 4, 1997) (*Supplemental Report*).

In the *Supplemental Report*, the Special Master recodes the data to make the racial and ethnic groupings more consistent. The results of these recodings do not undermine the conclusion that the indications of race discrimination are very real given the consistency of the results across models. On the contrary, if anything, the *Supplemental Report* supports the contention that the risk of race discrimination is profound and has infected our system of capital punishment. When the Special Master recodes the data to account for apparent inconsistencies in the AOC groupings, *more*, rather than less, significant disparities in sentencing between the races are revealed.[12]

The majority points out that these stark differences in the findings resulting from the recoding of the raw data are responsible for the Special Master's reluctance to reiterate his concerns about the consistency of trends across models. *See ante* at 304–306, 724 A.2d at 154–155 (citing *Supplemental Report, supra*, at 10) (noting that "the modification of the *Supplemental Report* highlights the dangers inherent in the improper use of statistics" because trends are irrelevant when "separate analyses operate on the same data"). The further implication of that observation is that it may never be possible to create a statistical model that is satisfactory. The Special Master never identifies the coding deci-

---

[12] The new coding leads to some major differences: (1) a thirty-six percent racial disparity for death-sentenced defendants as a percentage of death-eligible cases, as compared to a twenty-one percent disparity before recoding; and (2) an eighteen percent racial disparity for death-sentenced defendants as a percentage of death-eligible cases as compared to a fifteen percent disparity before recoding. *Letter from Richard S. Cohen* (Feb. 7, 1997).

sions as flawed. However, even if he had, his recoding would presumably have been constructed to correct these flaws or, as he calls them, inconsistencies. Therefore, even if the AOC trend data are all based on the same flaw, these trends are not refuted by the "corrected" analysis—they are, rather, enhanced. The majority's contention that the trends may not be trusted would rest on solid ground only if the Special Master's recodings were considered methodologically superior to the original ones and refuted the trends. Neither is the case here.

Coding decisions must be made in every model—if the mere fact that the results will be different if the coding decisions are reworked is ample evidence that we cannot give credence to our results (even when the various coding schemes are equally legitimate), no model will ever meet the Court's approval. The majority's standard for reliability, therefore, is untenable. I find it compelling that the Public Defender's, Dr. Tukey's and, indeed, the Special Master's recoded models, all fail to challenge the notion that racial discrimination is playing a role in this State's imposition of the death penalty.

Finally, both Dr. Tukey and the Special Master raise questions about the propriety of the purging process which was used here to attempt to correct the effects of impermissible factors such as race on determinations of culpability. *Special Master Report, supra,* at 30. The purging process is a sound one. As initially recommended by Professor Baldus, the models from which the AOC computed culpability scores initially contained variables for the races of the defendant and the victim. After computing the black-defendant and white-victim effects, those variables were dropped from the equation. If the AOC had not purged the race-based variables, the culpability scores might have been tainted by racial discrimination. If the models never took race into account, the effects of racial discrimination, which are statistically significant in those models controlling for culpability, would be inaccurately attributed to other variables. Thus, the purging process is both

sensible and necessary to compute accurate culpability scores that are not tainted by racial discrimination.

Even, however, if one rejects the validity of the purging process, the AOC's models that show race to have a statistically significant effect were *not* purged; only the models that were used to provide culpability estimates were purged. Further, de-purging the models, while lowering the racial discrepancies evident in the culpability models (because, in effect, one is leaving in race as an impermissible aggravator), still indicates a substantial race effect. *See id.*, tbl. D (revised) (showing non-purged as well as purged results). Thus, the purging process does not explain why the AOC's culpability measurements show a marked race effect with a disparate impact on black defendants.

### c.

In finding insufficient evidence of racial bias, the Special Master also examines the results derived from culpability measurements undertaken by judges. *Special Master Report, supra*, at 45. The judges' culpability ratings were based on summaries of the cases prepared by the AOC, from which the race of the victim and the defendant were omitted. The Special Master concludes that the "judges' raceblind culpability ratings were completely race-neutral," *id.* at 23–24, and that the judges' study shows no racial effect, *id.* at 43–45; *see also* App. B–1, *infra* at 447, 724 *A.*2d at 228.

The Special Master finds that the judges' culpability measurements differ from the AOC's statistically-generated culpability scores of death-eligible defendants' culpability, and he therefore concludes that the AOC's statistical analyses are inaccurate. "Unless one believes that the ratings produced by the panel of 50 judges were distorted by faulty methodology or are unworthy of weight for some other reason," he concludes, "one has to view the judges' ratings as challenging the accuracy of the computer outputs, and as undermining the significance of their purported showing that nonblack defendant[s] were on average more culpable...." *Id.* at 25.

The Court gives significant weight to this part of the Special Master's study to prop up the position that the current evidence of discrimination is not persuasive. *See ante* at 309–310, 724 *A*.2d at 157–158. I believe that the judges' culpability ratings neither detract materially from the AOC's data nor justify disregarding the AOC's statistical findings. In my opinion, the judges' culpability ratings support defendant's racial discrimination claim, albeit less strongly than the AOC's data. Moreover, the methodology used in the Judges' Survey is not flawless.

The existence of disparities between the culpability of black and nonblack defendants is essential to the claim that the death penalty is disproportionately imposed on black individuals. The AOC's culpability measurements support the position that, overall, black defendants are less culpable than other defendants and that for defendants of equal culpability, regardless of the level of culpability, a black defendant is more likely to be sentenced to death than a nonblack defendant. For all defendants in the penalty-trial universe, the average culpability was 3.30 for a black defendant and 3.38 for a nonblack defendant. For defendants sentenced to death, the average culpability was 3.68 for a black defendant and 3.77 for a nonblack defendant. *Special Master Report, supra,* at 23.

In addition, the Special Master's analysis of the judges' culpability ratings may not reveal the true level of disparity in culpability between the races. The analysis is problematic because it focuses only on *average* ratings.[13] When broken down by culpability level,

---

[13] The Special Master's decision to average the judges' culpability ratings is suspect. If nonblack defendants tended towards the extreme culpability rankings, while black defendants tended towards the mid-range, the Special Master would find the averages to be similar. For example, if there were nine nonblack defendants with culpability levels of 1, 1, 1, 3, 3, 3, 5, 5 and 5, and only the three most culpable defendants were sentenced to death, the average culpability level rating for the nonblacks would be level 3 and the death sentencing rate would be thirty-three percent (3/9). Assume, also, that there were nine black defendants, all in culpability level 3, three of whom were sentenced to death. They too would have an average culpability rating of level 3 and a death-sentencing rate

the judges' results are disturbing. *See* Apps. B–1 to –4, *infra,* at 447–448, 724 *A.*2d at 228–229. Specifically, they demonstrate marked disparities between black and nonblack defendants at the higher culpability levels, with the greatest disparity evident in level five (which is defendant's culpability level). Although slight reverse disparities appear at the lower culpability levels, the disparities are small and are due at most to a *single* additional death sentence at those levels. *See* App. B–4, *infra,* at 448, 724

---

of thirty-three percent (3/9). Despite the seeming equality between the races, there is great disparity when the cases are examined by culpability level. For equally culpable black and nonblack defendants in level 3, blacks were sentenced to death thirty-three percent of the time and nonblacks were never sentenced to death. This example, though overly simplified, seems to reflect the reality of New Jersey's capital sentencing scheme. The Special Master's reluctance to dispose of any outliers before averaging the ratings was, as the majority points out, due to a legitimate concern that the number of judges were so few that disposing of any of their results would lend even less credibility to the findings. *See ante* at 309, 724 *A.*2d at 157 (quoting *Supplemental Report, supra,* at 8). However, the legitimacy of this concern does not render the averages reliable, it merely explains that averages computed without outliers may be just as flawed as those computed with outliers. The Court also justifies the Special Master's methodology by quoting his contention that "there is no reason to believe that the outliers leaned more in one direction than the other, and therefore no indication that the course we took had any effect on the accuracy of the results." *Ibid.* The Special Master presents no evidence, however, that the outliers do *not* lean more in one direction than the other (in fact, he does not even contend that he examined them for the purpose of uncovering such trends).

The Special Master's averaging of culpability ratings also fails to pick up the huge range in ratings exhibited by the judges. For example, the judges collectively gave Booker, a defendant whom the AOC considers to be one of the most culpable in the universe of death-eligible cases, a low average culpability rating of 2.75; the four judges, however, individually gave the defendant ratings of 1, 3, 3, and 4. Again, by way of example, *Harvey (1A)* and *Harvey (1B)* are two cases that have nearly identical summaries. Nevertheless, the culpability ratings (each made by a different set of judges) are quite different. In *Kise,* even though the summaries for the two trials are almost identical, the case with the greater list of mitigating evidence was ranked by the judges much higher in terms of culpability. These unexpected results and the Special Master's averaging of the scores make it impossible to uncover underlying inconsistencies and attach meaning to them. While we do not know for sure if an examination of the judges' findings without the use of averages would affect the results significantly, the Special Master's approach is certainly problematic.

*A.*2d at 229. In any case, the AOC culpability levels suitably reflect juries' determinations of death-worthiness[14] and the findings should therefore be given appropriate weight.

d.

At the very least, all of the findings indicate that the statistical disparity (thirty-eight percent of blacks (n=28) compared with thirty percent of nonblacks (n=22) sentenced to die) is utterly unexplainable when viewed in terms of relative culpabilities. The Special Master's conclusion that a raw number of disparities between black and nonblack defendants sentenced to death can be explained by randomness fails to take into account the culpability levels of defendants in each racial category. Although the differences in culpability are not statistically significant, they buttress, rather than contradict, the AOC's findings of race discrimination.

Unquestionably, the models created by the AOC, Dr. Tukey, and the Public Defender are all flawed in some very important ways, as are the judges' culpability rankings. Nevertheless, they have residual probative worth and are useful indicators of the types of variables that have an impact on decision-making regarding the death penalty at various stages in the process. The fact that every single one of them indicates that race impacts capital sentencing cannot be shrugged off as a meaningless coincidence.

The significance of the racial effect becomes even clearer and more compelling when it is compared to the findings in *McCleskey,*

---

[14] The Special Master, while soundly excluding the actual sentences from the summaries, made a value judgment to include a list of what mitigating and aggravating circumstances were found by the penalty-phase juries (as opposed to merely listing which factors were *alleged* by the State and the defendant). If racial discrimination infects the ultimate verdict of life or death, the same prejudice would presumably also infect the finding of mitigating and aggravating circumstances. For example, in one case judges were told that the c(4)(h) (murder of a public servant) factor was not present because the penalty jury sentenced the defendant to life, refusing to find the c(4)(h) aggravating factor, despite unequivocal evidence that the victim was a uniformed police officer operating a marked police cruiser with lights flashing while engaged in the performance of his official duties.

which, as this Court earlier sensed, could serve to demonstrate racial bias in the imposition of the death penalty under the State Constitution. *See Marshall II, supra,* 130 *N.J.* at 210, 613 *A.*2d 1059.

In *McCleskey,* the statistical evidence strongly bore out the impact of the race of victims (but not the race of defendants), as a significant factor in determining who had received death sentences. The race of the victim was found to be a more important factor than most of the details of the offense or the defendant's past criminal conduct. *McCleskey, supra,* 481 *U.S.* at 321, 107 *S.Ct.* at 1782, 95 *L.Ed.*2d at 297 (Brennan, J., dissenting). At the front end of the system, the data revealed that prosecutors sought the death penalty in seventy percent of cases in which a black killed a white, but in only nineteen percent of cases in which a white killed a black. On the other end, only one percent of defendants who killed black victims received a death sentence, while eleven percent of defendants who killed white victims were sentenced to death. *Id.* at 286, 107 *S.Ct.* at 1764, 95 *L.Ed.*2d at 274–75; *id.* at 326–27, 107 *S.Ct.* at 1785, 95 *L.Ed.*2d at 300–01 (Brennan, J., dissenting).

An examination of the defendant's race alone revealed a higher rate of sentencing for white defendants (seven percent) when compared to that of black defendants (four percent). *Id.* at 286, 107 *S.Ct.* at 1764, 95 *L.Ed.*2d at 275. Overall, twenty-two percent of black killers of white victims received death sentences while only three percent of white killers of blacks were sentenced to death. *Id.* at 286–87, 107 *S.Ct.* at 1764, 95 *L.Ed.*2d at 275. In the mid-range of culpability, where the largest disparities were seen, in one model fourteen percent of defendants in black victim cases were sentenced to death, while thirty-four percent of white victim cases resulted in death sentences. *Id.* at 287 n. 5, 107 *S.Ct.* at 1764 n. 5, 95 *L.Ed.*2d at 275 n. 5; *id.* at 325, 107 *S.Ct.* at 1785, 95 *L.Ed.*2d at 300 (Brennan, J., dissenting). These data revealed that killers of white victims were 4.3 times as likely to receive the death penalty as equally culpable killers of blacks. *Id.* at 287, 107

*S.Ct.* at 1764, 95 *L.Ed.*2d at 275; *id.* at 321, 107 *S.Ct.* at 1782, 95 *L.Ed.*2d at 297 (Brennan, J., dissenting).

The data presented in *Loftin* reveal racial effects driven by the race of the victim and the defendant similar in degree to disparities in *McCleskey*. The data show a forty-nine percent disparity between the percentage of death-eligible black defendants capitally prosecuted for killing nonblack victims and that of nonblack defendants prosecuted for killing black victims. *See* Tbl. 2, *supra*, at 383, 724 *A.*2d at 196 (comparing forty-eight percent to zero percent). In *McCleskey*, the disparity was fifty-one percent. *McCleskey, supra*, 481 *U.S.* at 286, 107 *S.Ct.* at 1764, 95 *L.Ed.*2d at 274–75; *id.* at 326–27, 107 *S.Ct.* at 1785, 95 *L.Ed.*2d at 300–01 (Brennan, J., dissenting) (comparing seventy percent to nineteen percent). Overall, the disparity between the percentage of black defendant, nonblack victim cases sentenced to death and that of nonblack defendant, black victim cases was eighteen percent, *see* tbl. 2, *supra*, at 383, 724 *A.*2d at 196 (comparing eighteen percent to zero percent); in *McCleskey*, the corresponding disparity was nineteen percent, *id.* at 286–87, 107 *S.Ct.* at 1764, 95 *L.Ed.*2d at 275 (comparing twenty-two percent to three percent).

The comparison is justified further when one examines the results of the multiregression analyses to those in *McCleskey*. Differences in percentages of black and nonblack defendants sentenced to death are as high as thirty-three percent when the culpability levels are divided equally, *see* App. A–2, *infra*, at 447, 724 *A.*2d at 228, and thirty-six percent when the culpability levels include equal numbers of cases, *see* App. A–3, *infra*, at 447, 724 *A.*2d at 228; App. A–1, *infra*, at 446, 724 *A.*2d at 228. In *McCleskey*, the greatest disparity was twenty percent when defendants were examined by race and with probability level. *Id.* at 287 n. 5, 107 *S.Ct.* at 1764 n. 5, 95 *L.Ed.*2d at 275 n. 5; *id.* at 325, 107 *S.Ct.* at 1785, 95 *L.Ed.*2d at 300 (Brennan, J., dissenting).

In fact, in some instances, the AOC data reveal a significant defendant-race effect on the imposition of the death penalty that exceeds that found in *McCleskey.* In *McCleskey,* the most compelling statistic was that killers of white victims were 4.3 times more likely to be sentenced to death than equally culpable killers of black victims. *Id.* at 287, 107 *S.Ct.* at 1764, 95 *L.Ed.*2d at 275; *id.* at 321, 107 *S.Ct.* at 1782, 95 *L.Ed.*2d at 297 (Brennan, J., dissenting). Here there is evidence that black defendants are 6.1 times more likely to be sentenced to death than equally culpable nonblack defendants (comparing forty-three percent to seven percent). *See* App. A–3, *infra,* at 447, 724 *A.*2d at 228.

Given this Court's prior avowal that racial disparities in capital sentencing comparable to those demonstrated in *McCleskey* will not be tolerated, its present unwillingness to acknowledge the strength of the evidence before it is deeply distressing. The Court blinks in the face of the truth: discrimination based on race maintains a persistent presence in the administration of the death penalty.

### B.

The predicament this case presents is profound: To discover the existence and extent of the risk of invidious discrimination in the administration of capital punishment, the Court's need for facts surpasses the capacity of the scientific community to furnish them. *See* Alan B. Handler, *The Judicial Pursuit of Knowledge: Truth and/or Justice,* 41 *Rutgers L.Rev.* 1, 26 (1988). To acknowledge that dilemma is not a concession that reliable facts are not available and cannot be gathered. Nor does it require that we rely on factual determinations steeped in ignorance or speculation. The singular danger posed by this daunting intellectual challenge is acceptance of the premise that only punctilious and pristine statistical analyses can be the basis for factfinding.

The path to decisions soundly based on reliable and usable facts must necessarily be determined by our destination, by what we

are seeking to learn and trying to accomplish. Here, the fundamental matter to be learned is whether a risk of pernicious systemic discrimination inheres in the administration of the death penalty; we are striving to avoid the execution of persons in the presence of that risk. The determination that discrimination exists, and that persons may be executed notwithstanding that risk, is legal, not scientific. The insistence on scientific perfection and statistical nicety to a degree that obscures the obvious and forces the rejection of facts that are at hand misperceives the nature of the judicial inquiry and, because life itself hangs in the balance, fundamentally disserves the cause of justice.

Nowhere in the law is more at stake or is there a greater need for positing a definitive resolution on a sound and understandable basis than in a capital case, even if that resolution errs by falling on the side of fairness rather than accuracy. *See, e.g., Woodson v. North Carolina,* 428 *U.S.* 280, 303–04, 96 *S.Ct.* 2978, 2991, 49 *L.Ed.*2d 944, 961 (1976) ("[D]eath is a punishment different from all other sanctions."); *Furman v. Georgia,* 408 *U.S.* 238, 286, 92 *S.Ct.* 2726, 2750, 33 *L.Ed.*2d 346, 376 (1972) (Brennan, J., concurring) ("Death is a unique punishment in the United States."); *Loftin, supra,* 146 *N.J.* at 368, 680 *A.*2d 677 (recognizing "unique nature of the death penalty"). "Because of the range of discretion entrusted to a jury in a capital sentencing hearing, there is a unique opportunity for racial prejudice to operate but remain undetected." *Turner v. Murray,* 476 *U.S.* 28, 35, 106 *S.Ct.* 1683, 1687, 90 *L.Ed.*2d 27, 36 (1986). "The heightened concern in a capital case for whether a sentence is disproportionate ... derives from the finality of the result and the risk that the proceedings are vulnerable to the influence of impermissible considerations." *Ramseur, supra,* 106 *N.J.* at 326, 524 *A.*2d 188. "[T]he fact that we must always act without the illumination of complete knowledge cannot induce paralysis when we confront what is literally an issue of life and death." *McCleskey, supra,* 481 *U.S.* at 335, 107 *S.Ct.* at 1789, 95 *L.Ed.*2d at 306 (Brennan, J., dissenting).

The intellectual difficulties in scientifically proving the existence of racism and the extent of the risk of discrimination should not defeat our search for the truth. Those difficulties cannot obscure wrongs that appear undeniable, and that, as a matter of law, policy and justice, demand acknowledgement. In *Rubanick v. Witco Chemical Corp.*, 125 *N.J.* 421, 593 *A.*2d 733 (1991), for example, this Court recognized "the extraordinary and unique burdens facing plaintiffs who seek to prove causation in toxic tort litigation," *id.* at 433, 593 *A.*2d 733, and concluded that in certain settings, "[t]he scientific method ... fails to address or accommodate the needs and goals" to be achieved by a judicial determination, *id.* at 436–37, 593 *A.*2d 733. Because "plaintiffs in toxic-tort litigation, despite strong and indeed compelling indicators that they have been tortiously harmed by toxic exposure, may never recover if required to await general acceptance by the scientific community of a reasonable, but as of yet uncertain, theory of causation," *id.* at 434, 593 *A.*2d 733, we held that strict scientific standards may be loosened in this arena, *id.* at 449, 593 *A.*2d 733.

As with environmental pollutant cases, there are strong statistical indications here that an impermissible factor—racism—is inextricably linked to the imposition of the death penalty in our criminal justice system. Due to the finality of the death sentence and the concern that capital punishment is infected with racial discrimination, this Court should not hesitate to find support from the AOC's data and logistic regressions, despite the imperfections. Our toxic-tort holdings have always insisted on an assessment of the soundness of the methodology employed to demonstrate causation. *See ibid.* (holding that sound methodology can demonstrate facts even though result may not be generally-accepted by scientific community); *see also Landrigan v. Celotex Corp.*, 127 *N.J.* 404, 420, 605 *A.*2d 1079 (1992) (holding in toxic-tort context that scientifically accepted methodology that included a review of the scientific literature by the expert to "establish both the ability of [the toxin] to cause [the harm] and the magnitude of the risk that it would cause that result" provides adequate basis for expert's

"conclu[sion] that decedent's exposure more likely than not had been the cause of his colon cancer.").

The majority takes issue with the conclusion that the methodology employed in the statistical models at our disposal is adequate to meet the standard of reliability established in our toxic-tort cases. *See ante* at 313–314, 724 *A*.2d at 159 ("[H]ere the statistical models we use for proportionality review do not even meet the more lenient standard accepted by the Court in toxic-tort cases."). The Court, however, takes the tort analogy too literally. Our acceptance of a level of proof in toxic-tort cases that is less than a scientific certainty is relevant to show that, in contexts in which actual scientific proof is difficult to harness with any reliable degree of certainty, we may apply a flexible standard when determining causation. The extent to which that standard is adjusted, however, must necessarily depend on the specific circumstances of the proof at issue. Unlike in the toxic-tort cases, the statistical models here are not being used to demonstrate that defendant was the actual victim of race discrimination; nor are they being used to pinpoint one or more specific actors who caused the harm. Rather, the models are used to determine the presence of general trends, indicating an unconstitutional risk that the system, in its entirety, operates in a racially discriminatory manner. Accordingly, whether or not the proof of racial discrimination presented by defendant meets the standard used in toxic-tort cases is not the point.

We must ask ourselves what level of statistical certainty is required before we decide the risk of discrimination is too great. The Court has followed the widely accepted rule of ninety-five percent certainty—that is, until our models demonstrate only a five percent possibility that the result achieved is due to chance rather than to the race of the defendant and/or the victim, the Court will not halt executions on the basis of race discrimination. In effect, the Court has turned the convenient measure of "statistical significance" into a talismanic rule. Despite its widespread

acceptance in social science research, this cut-off point is, for the most part, arbitrary:

> 'Statistical significance' is a good example of something that looks to many people like simple fact. Statistical significance—the cut-off point scientists use to say 'more than this much evidence counts as proof, and less than that much doesn't'—when you get right down to it is arbitrary. Scientists use that cut-off line because it has worked pretty well. But that does not mean someone ... cannot or should not question a particular conclusion that something is or is not proved.
>
> [Alice Dreger, *A Call for Passion in the Realm of Discovery,* N.Y. Times, Jan. 12, 1999, at F4.]

*Accord* Robert J. Levine, *Ethics and Regulation of Clinical Research* 933 (2d Ed.1986) ("We have chosen arbitrarily to say that something is true when probability is less than 0.05 that it could have occurred by chance ..."); Michael D. Maltz, *Deviating from the Mean: The Declining Significance of Significance,* 31 *J. Res. Crime & Delinq.* 434, 440 (1994) ("Statistical significance does not imply substantive significance, and most researchers know this—but this does not stop them from implying that it does"); Joseph Sanders, *From Science to Evidence: The Testimony on Causation in the Benediction Cases,* 46 *Stan. L.Rev.* 1, 15 (1993) ("There is nothing magic about an Alpha of .05 ... An Alpha of .10 is not inappropriate, nor is an Alpha of .01").

Legal scholars, judges and practitioners have been quick to accept the stringent standards set by scientists, perhaps with good reason, in order to avoid claiming causal relationships that do not exist, and thereby avoid holding innocent parties responsible for harms they did not commit. Other disciplines, ones that have traditionally relied more on scientific certainty than law does, question the value of arbitrary line-drawing and the use of science to the exclusion of common-sense observations in circumstances less troubling than ones of life and death. *E.g.,* Patrick E. Shrout, *Should Significance Tests Be Banned?  Introduction to a Special Section Exploring the Pros and Cons,* 8 Psychological Science 1 (1997) (noting the high rate of error in making predictions about the efficacy of a treatment based on "significance testing"); Louis Uchitelle, *A Challenge to Scientific Economics, An Older School Looks At Broad, More Intuitive Picture While Modernists See*

*Just the Numbers and Facts*, N.Y. Times, Jan. 23, 1999, at B7 (quoting Alfred Marshall, the 19th Century British economist: " '[E]conomics cannot be compared with the exact physical sciences, for it deals with the ever changing subtle forces of human nature.' "). In certain instances, we should be prepared to question whether the level of certainty demanded by the scientists should not be modified.[15] "The law may be less interested [than science] in avoiding [false positives ] and may thus be more willing to accept a less stringent standard for statistical significance." Sanders, *supra*, 46 *Stan. L.Rev.* at 15. Would it be so radical to decide that a ninety percent certainty that race is playing an impermissible role in capital sentencing violates the Constitution?

Even if we were to alter the level of significance at which we acknowledge an unacceptable risk of race discrimination in capital sentencing, methodology must, of course, remain important; but the number of studies we now have that employ different methodologies—all of which indicate the same, impermissible trends— should be examined in light of what we know about our nation's history of race discrimination. When a defendant's life is at stake, I believe we should be more certain that race is *not* playing a role in capital sentencing decisions than the generally accepted level of statistical significance allows.

---

[15] Some statisticians argue that the use of "statistical significance" in the context of models involving "apparent populations," which are the basis for proportionality review of capital prosecution sentencing, (in contrast to a sample randomly drawn from a true population), is erroneous. Statistical significance is a value used to measure sampling error. However, "[f]or apparent populations, there is no sampling and, therefore, no clue about whether the data were generated to some sampling plan. To proceed as if the data were generated by random sampling or random assignment is to embrace a fiction." Richard A. Berk, Bruce Western & Robert E. Weiss, *Statistical Inference About Apparent Populations*, 25 *Soc. Methodology* 421, 430 (1995). Professor Berk suggests alternative approaches, but notes that none of these methods is wholly satisfactory. *Id.* at 452–53. The Special Master should explore the various deficiencies in each approach (including our use of statistical significance) in his examination of our methodologies for proportionality review.

As the Court noted in *Landrigan, supra,* in the toxic-tort context, once expert testimony has been admitted regarding causation,

> two criteria, among others, ... are crucial in determining whether a statistical association will give rise to an inference that a particular substance causes a certain disease in people who are exposed to it. The two criteria are the strength of the association and the consistency of any such association with other knowledge.
> [127 *N.J.* at 416, 605 *A.*2d 1079.]

The studies with which we are confronted show a strong association between race and the imposition of a death sentence. The consistency of this association with our general knowledge is equally riveting. The relevant literature reveals a long and relentless history of racism that has not only the capacity to cause a disproportionate impact on blacks in the administration of the death penalty, but has indeed done so from the era of slavery in this country, and, many argue, to the present. If we look at the AOC studies in light of a presumption that racism exists in our prosecutorial and jury decision making process in death penalty cases, the statistics lead us to the obvious conclusion; when controlling for other risk factors such as culpability, race is playing a constitutionally impermissible role in our State's administration of the death penalty.

"Evaluation of [defendant's] evidence cannot rest solely on the numbers themselves. We must also ask whether the conclusion suggested by those numbers is consonant with our understanding of history and human experience." *McCleskey, supra,* 481 *U.S.* at 328, 107 *S.Ct.* at 1786, 95 *L.Ed.*2d at 302 (Brennan, J., dissenting); *see* Theodore M. Porter, *Trust In Numbers: The Pursuit of Objectivity in Science and Public Life* 7 (1995) ("Even with regard to purely scientific matters, the importance of tacit knowledge is widely recognized. In efforts to solve problems posed from outside the scientific community, informed intuition is all the more crucial."). Even the majority acknowledges a need to look beyond the numbers, noting that "[w]e have never believed that statistics can replace the process of judging; we do believe that statistical results, properly used and understood, can alert us to the need for

increased vigilance in our quest for impartial justice." *Ante* at 323, 724 *A.*2d at 164. That monition, expressed as a consideration in examining the methodology for individual proportionality review, applies even more cogently to the determination of the extent of the risk of systemic racial discrimination in capital punishment. In this case, the Court should recognize that the history and legacy of racism confirm the statistical evidence that racial discrimination influences the imposition of capital punishment. *Accord McCleskey, supra,* 481 *U.S.* at 328–30, 107 *S.Ct.* at 1786–87, 95 *L.Ed.*2d at 302 (Brennan, J., dissenting) ("Georgia's legacy of a race-conscious criminal justice system, as well as this Court's own recognition of the persistent danger that racial attitudes may affect criminal proceedings, indicates that McCleskey's claim is not a fanciful product of mere statistical artifice.") (footnote omitted).

The statistics presented by this case indicate discrimination that comports with this Nation's and this State's history of racial discrimination in criminal law and capital punishment. "[O]nly those oblivious to the brutal history of racial discrimination in American law would deny the danger of racial prejudice entering the decisions which lead to the imposition of a death sentence." Stephen B. Bright, *Discrimination, Death and Denial: The Tolerance of Racial Discrimination in the Infliction of the Death Penalty,* 35 *Santa Clara L.Rev.* 433, 438 (1995) (footnote omitted). It is crucial in this setting to recount this tragic history.

"From colonial times to the Civil War, the criminal law in many states expressly differentiated between crimes committed by and against blacks and whites." *Id.* at 439. Most of the formal racial distinctions in the law afflicted slaves most severely. Slaves were proscribed from certain activities in which whites were permitted to participate. Randall Kennedy, *Race, Crime, and the Law* 76 (1997).

Governed by a separate law of crimes, slaves were also subjected to a separate brand of punishment. Slaves, for example, were subject to capital punishment for a wider range of crimes than any other sector of the population. Virginia, for

instance, defined seventy-three capital crimes applicable to slaves but only one—first degree murder—applicable to whites.

[*Id.* at 76–77.]

In colonial Georgia, the criminal code provided for an automatic death sentence for blacks who committed murder, while others committing murder could receive a life sentence. *McCleskey, supra,* 481 *U.S.* at 329, 107 *S.Ct.* at 1786, 95 *L.Ed.*2d at 302 (Brennan, J., dissenting).

Free blacks, like slaves, were also targets of racist criminal laws and faced more severe criminal penalties than whites. Ursula Bentele, *Race and Capital Punishment in the United States and Africa,* 19 *Brook. J. Int'l L.* 235, 255 (1993). Several states, including Kansas and Virginia, castrated blacks convicted of raping or attempting to rape a white woman but merely imprisoned whites convicted of similar offenses. *Id.* at 254 & n. 70. Georgia went one step farther. While white men convicted of rape were merely imprisoned or fined, black men convicted of raping or attempting to rape a white woman were executed. *McCleskey, supra,* 481 *U.S.* at 329–30, 107 *S.Ct.* at 1786, 95 *L.Ed.*2d at 302 (Brennan, J., dissenting); Bentele, *supra,* 19 *Brook. J. Int'l L.* at 254–55.

These antebellum formal racial distinctions in the law were not limited to the South. In the colonial era, New Jersey laws also facially discriminated against slaves and free blacks. Leigh B. Bienen et al., *The Reimposition of Capital Punishment in New Jersey: The Role of Prosecutorial Discretion,* 41 *Rutgers L.Rev.* 27, 49 (1988) (recounting New Jersey's history of executing slaves for crimes for which whites were not capitally prosecuted). In addition, blacks were subject to the death penalty for a wider range of crimes than whites. *Id.* at 48. Even after the elimination of separate slave courts, only slaves could be sentenced to death for manslaughter, grand larceny and any other felony or burglary. *Id.* at 49. The racist distinctions carried over into the manner of executions as well. While whites were merely hanged, slaves often had their hands cut off prior to being hanged or burned alive. *Ibid.; see* Rev. Edwin F. Hatfield, *History of*

*Elizabeth New Jersey; Including The Early History of Union County* 363–64 (1868) (detailing New York reports in 1741 of "Negro Conspiracy to burn the city and to murder the white population," noting that 154 blacks were imprisoned, fourteen burned at the stake, and eighteen hanged; and that "these [horrible] transactions were [ ] not confined to New York" but extended to New Jersey where two fleeing blacks were "condemned to the same inhuman fate").

The abolition of slavery did not end the overt racial discrimination in this Nation's criminal law. Immediately after the conclusion of the Civil War, Southern states enacted the Black Codes, which reinstated a dual system of criminal prosecution. Kennedy, *supra*, at 84–85; Bentele, *supra*, 19 *Brook. J. Int'l L.* at 255. South Carolina devised a separate court system for criminal trials of black defendants. Kennedy, *supra*, at 85. As was the case under antebellum laws, blacks were forbidden from engaging in activities in which whites could partake. *Id.* at 84–85. They were given harsher punishments than whites for committing similar offenses. Bentele, *supra*, 19 *Brook. J. Int'l L.* at 255. In Alabama, Mississippi, and South Carolina, only blacks could be executed for raping a white woman. Kennedy, *supra*, at 85.

Despite the abolition of the Black Codes during Reconstruction, racial discrimination in the administration of criminal justice remained. Several states "expanded the capital offenses in existing law, declared the death penalty discretionary, and then applied it almost exclusively to blacks. The institutionalized discrimination had not altered; equality was no closer." Kendra Meinert, *Criminal Injustice: Continuing Racial Inequities in Death Penalty Sentencing*, 22 *Sw. U.L.Rev.* 1177, 1184 (1993). Accordingly, the death penalty was applied disproportionately against black defendants long after the annulment of *de jure* racial discrimination in criminal law. *See* Stan Robin Gregory, *Capital Punishment and Equal Protection: Constitutional Problems, Race, and the Death Penalty*, 5 *St. Thomas L.Rev.* 257, 257–58 (1992).

New Jersey's experience with capital punishment is rife with evidence of racial discrimination. It parallels the national experience. *See* Bienen, *supra*, 41 *Rutgers L.Rev.* at 49; Hugo A. Bedau, *Death Sentences in New Jersey 1907–1960*, 19 *Rutgers L.Rev.* 1 (1964) (finding that race of the offender was a significant factor in determining the verdicts of death penalty cases in the first half of the twentieth century).

The proven existence of racial discrimination in contemporary capital punishment regimes throughout the century bolsters the conclusion that racial bias infects the administration of capital punishment. The presence of statistical evidence of racial disparities in other states shows that the AOC's data indicating discrimination in this State are neither unexpected nor isolated. Rather, the discrimination in this State comprises a part of a nationwide pattern of racial discrimination in the administration of the death penalty since *Gregg v. Georgia*, 428 *U.S.* 153, 96 *S.Ct.* 2909, 49 *L.Ed.*2d 859 (1976), the United States Supreme Court decision that marks the inception of the modern era of capital punishment in this country.

In 1990, the General Accounting Office (GAO) compiled a report on racial discrimination in capital sentencing. The GAO examined twenty-eight studies from various states, including New Jersey, regarding racial disparities in the death penalty. United States General Accounting Office, *Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities* (Feb.1990), *reprinted in* 136 *Cong. Rec.* S6889–90 (daily ed. May 24, 1990). The GAO found that a white-victim effect existed in eighty-two percent of the studies. *Ibid.* The GAO noted that "[t]his finding was remarkably consistent across data sets, states, data collection methods, and analytic techniques." *Ibid.*

Many other studies have found that black defendants and killers of white victims are more likely to be sentenced to death than other similarly culpable defendants. *See* Bentele, *supra*, 19 *Brook. L. Int'l L.* at 256–57 ("[C]omprehensive studies have shown that the death penalty is more likely to be imposed and

carried out if the offender is black, particularly if the victim is white."); Erwin Chemerinsky, *Eliminating Discrimination in Administering the Death Penalty: The Need for the Racial Justice Act,* 35 *Santa Clara L.Rev.* 519, 522 (1995) ("Many other studies confirm [the] discriminatory pattern in capital decision-making."); Meinert, *supra,* 22 *Sw. U.L.Rev.* at 1194 ("A variety of studies has indicated that blacks are sentenced to death at higher proportions than whites, and for less serious crimes.").

> For example, an analysis of 11,425 capital murders from 1977 to 1984, in the thirty-two states where capital punishment was imposed, reveals that the killer of a white victim is nearly three times more likely to be sentenced to death than the killer of an African–American. An analysis of capital sentencing in twenty-three states between 1976 and 1994 found that while African–Americans constitute fifty percent of the murder victims, they constitute only fifteen percent of the victims in death penalty cases.
>
>> [Stewart F. Hancock, Jr. et al., *Race, Unbridled Discretion, and the State Constitutional Validity of New York's Death Penalty Statute—Two Questions,* 59 *Alb. L.Rev.* 1545, 1560 (1996) (footnote omitted).]

Referring to the plethora of evidence of racial discrimination, a United Nations report determined that race is a "key determinant[ ] of who will, and who will not, receive a sentence of death." U.N. ESCOR, 44th Sess., Provisional Agenda Item 10, ¶ 148, U.N. Doc. E/CN.4/1998/68/Add.3 (1998). Consequently, we can safely conclude that racial discrimination infects the administration of the death penalty throughout the Nation. *See Blair v. Armontrout,* 916 *F.*2d 1310, 1351 (8th Cir.1990) (Heaney, J., concurring and dissenting) ("Race plays an especially influential role in capital sentencing decisions."); Bright, *supra,* 35 *Santa Clara L.Rev.* at 461 ("Sentencing patterns confirm that racial prejudice plays a role in imposition of the death penalty."). That conclusion comports with our Nation's history and legacy of racial discrimination. "Indeed, given the past and present realities of racial conflict in the United States, it would be surprising if racial bias did not affect ... capital sentencing." Kennedy, *supra,* at 348.

The existence of statistical evidence of racial discrimination in the imposition of capital punishment in foreign jurisdictions should deflate the suspicion that the statistical evidence of racial discrimi-

nation in New Jersey is either inaccurate or the product of mathematical randomness. The experience in other states suggests that the statistical data, revealing that the races of the defendant and victim reflect the reality of racial discrimination in this State's application of the death penalty, are accurate.

### C.

When reviewing defendant's claim that the administration of the death penalty is tainted by racial discrimination, we must not view the statistics showing such discrimination in isolation. To minimize the impact of indications of race discrimination in light of "this State's strong and steadfast public policy against [such] invidious discrimination ... would be blind and impervious to the lessons of history." *Taylor v. Metzger,* 152 *N.J.* 490, 510, 706 *A.*2d 685 (1998). The Special Master notes: "Most of [the statistical data] trend toward showing an unquantifiable race effect, ... [t]he statistical results now before the Court are not comforting, and do not refute claims of race bias," *Special Master Report, supra,* at 44; and "[d]espite the undependability of the statistical evidence," it is "troubling that so much of it tends in the same direction.... What one person thinks he sees in the dusk may be disregarded. What ten people independently think they see may really be there." *Id.* at 43.

We should stop questioning our senses and admit, at the very least, that what we see is, in all likelihood, an administration of the death penalty that is racist and unequal. Certainly, these data "relentlessly" suggest a *risk* of racial discrimination. *See McCleskey, supra,* 481 *U.S.* at 314, 107 *S.Ct.* at 1778, 95 *L.Ed.*2d at 292 (holding that the statistics must demonstrate a "constitutionally significant *risk* of racial bias affecting the ... capital sentencing process.") (emphasis added); *see also Turner, supra,* 476 *U.S.* at 36 n. 8, 106 *S.Ct.* at 1688 n. 8, 90 *L.Ed.*2d at 36 n. 8 (holding that "the only question" is at what point the *risk* of racial prejudice influencing a criminal trial becomes constitutionally unacceptable) (emphasis added). Thus, while not all of the results obtained from

the new data when parsed and segregated are statistically significant, they comport with historical experience and they are consistent across studies, even if not to the same degree in each case.

The majority explains away the compelling statistical evidence by finding fault in the methodology of each model presented. According to the Court: (1) the consistent trends across models based on the raw data are to be disregarded because different coding decisions produce different results, thus highlighting the "dangers inherent in the improper use of statistics," *ante* at 305, 724 *A*.2d at 155; (2) the AOC culpability rankings cannot be relied upon because they integrate the AOC raw data coding decisions and because the size of the database renders the models unsuitable for the purpose of determining the presence of race discrimination, *ante* at 308, 724 *A*.2d at 156; (3) the Tukey models, commissioned by the Special Master himself, are flawed because although they cure the parsimony problem, they are not "the most effective means of studying possible racial bias," *ante* at 312, 724 *A*.2d at 158; and (4) Dr. Allison's models are flawed, again, due to the "suspect culpability rankings and the small size of the database," *ante* at 312, 724 *A*.2d at 158.

The majority's absolute unwillingness to recognize any non-statistical indications of race discrimination in the capital sentencing process, combined with its finding that none of the models used by the Court to examine systemic discrimination is methodologically reliable, renders our proportionality review in prior cases, as well as in this case, meaningless. The Court has established a level of statistical proof necessary to prove race discrimination that is, in my view, focused on theoretical perfection; and, in doing so, renders this process one that is academically futile and jurisprudentially defeatist. The problem with an uncritical reliance on statistical perfection is that the Court "assume[s] that science can provide [a] precise answer [to the question we are raising], but science never comes packaged this way. The quality of the methodology and data analysis in scientific studies varies, and the results are often contradictory." Sanders, *supra*, 46 *Stan. L.Rev.*

at 17. To require the level of certainty that we have erected is to annul the reliability of any conclusions. Note, *Easing the Fear of Too Much Justice: A Compromise Proposal to Revise the Racial Justice Act,* 30 *Harv. C.R.-C.L. L.Rev.* 543 (1995) (noting that requiring statistical significance for determining the presence of race discrimination in capital sentencing "will have absolutely no effect in jurisdictions where the number of death sentences is so small as to preclude any statistically reliable conclusions").

Although the majority debunks and denigrates current statistical results indicating the presence of racial discrimination, it is inconceivable that this Court, with the evidence around us, would allow a defendant to be executed. If, as the majority asserts, we have been unable to apply a proper methodology and to construct models that are reliable measures of race discrimination, we should place a moratorium on executions in this State until such models have been created. That said, however, I doubt that the Court will ever be satisfied that "sufficiently reliable," *ante* at 313, 724 *A.*2d at 159 (quoting *Rubanick, supra,* 125 *N.J.* at 449, 593 *A.*2d 733), results have been attained even after its anticipated improvements of proportionality review.

The Court ought not to limit the exercise of its responsibility—its oft-repeated promise to discover and extirpate racial discrimination in capital murder prosecutions—to the most exacting and sterile standards set by academic statisticians. With this State's first execution in over thirty-five years looming on the horizon, it is necessary to turn to other possible indicators of race discrimination to supplement our statistical findings. Tragically, the Court's decision risks the execution of people sentenced to death under a capital-sentencing regime rife with racial discrimination. That is a risk we cannot take.

In my opinion, there is an unavoidable risk that racial discrimination is a potent factor influencing capital prosecutions and death sentences. The State's capital murder statute is unconstitutional, and defendant's death sentence should be vacated.

## II

The Court employs proportionality review in an attempt "to ensure that the death penalty is being administered in a rational, non-arbitrary, and evenhanded manner, fairly and with reasonable consistency." *Marshall II, supra,* 130 *N.J.* at 131, 613 *A.*2d 1059; *see Ramseur, supra,* 106 *N.J.* at 327, 524 *A.*2d 188; *Gregg, supra,* 428 *U.S.* at 206, 96 *S.Ct.* at 2940, 49 *L.Ed.*2d at 893. Proportionality review also plays a part in upholding the constitutional requirement that capital punishment be individualized and imposed only subsequent to a sentencing proceeding at which evidence unique to the defendant can be presented to, and considered by, a jury. *See Ramseur, supra,* 106 *N.J.* at 331, 524 *A.*2d 188; *Lockett v. Ohio,* 438 *U.S.* 586, 605, 98 *S.Ct.* 2954, 2965, 57 *L.Ed.*2d 973, 990 (1978).

In the course of our first reflection on the capital-murder statute and its provisions for proportionality review, this Court recognized that the dual aims of uniformity and individualization created an "inherent paradox in the process." *Ramseur, supra,* 106 *N.J.* at 330, 524 *A.*2d 188. I warned that "the contrary burdens" would be "extraordinarily difficult, if not impossible, to reconcile." *Id.* at 351, 524 *A.*2d 188 (Handler, J., dissenting). They were, I claimed, "fundamentally contradictory—perhaps unattainable...." *Id.* at 347, 524 *A.*2d 188 (Handler, J., dissenting).

Since then, we have continually sought to enhance the reliability of proportionality review, and perhaps quell the competing constitutional aims of uniformity and individualization, by complementing our statistical analysis with a reasoned review of precedent. In the same pursuit, we have determined that "[a] capital sentence is excessive and thus disproportionate if other defendants with characteristics similar to those of the defendant under review generally receive sentences other than death for committing factually-similar crimes in the same jurisdiction." *Martini II, supra,* 139 *N.J.* at 20, 651 *A.*2d 949; *see DiFrisco III, supra,* 142 *N.J.* at 160, 662 *A.*2d 442; *Bey IV, supra,* 137 *N.J.* at 343, 645 *A.*2d 685;

*Marshall II, supra,* 130 *N.J.* at 131, 613 *A.*2d 1059; *see also Gregg, supra,* 428 *U.S.* at 205, 96 *S.Ct.* at 2940, 49 *L.Ed.*2d at 892 ("[N]o death sentence is affirmed unless in similar cases through the State the death penalty has been imposed generally.") (citation omitted).

Yet, statistical frequency analysis and precedent-seeking review each suffer from deficiencies that accentuate the impossibility of ensuring both consistent, non-arbitrary application of the death penalty and individualized decision making. I have discussed the "persistent defects of the Court's proportionality review methodology" on previous occasions. *DiFrisco III, supra,* 142 *N.J.* at 212, 245, 662 *A.*2d 442 (Handler, J., dissenting); *see generally Martini II, supra,* 139 *N.J.* at 82–106, 651 *A.*2d 949 (Handler, J., dissenting) (discussing Court's use of reversed death sentences in proportionality review universe, failure to identify a standard by which to measure general imposition of death penalty, and inherent subjectivity of precedent-seeking review). Those problems remain and affect the soundness of the review in this case. For instance, the universe of cases to which Loftin was compared should not include those in which death sentences were reversed, *accord infra* at 416 n. 16, 724 *A.*2d at 212 n. 16, defendant's designated comparison category does not include all relevant cases, and the database remains too small to provide a reliable review.

Some problems previously present are now more conspicuous. Defendant's proportionality review illustrates that precedent-seeking review as conducted by this Court rests upon distinctions so idiosyncratic to defendants' profiles—is so individualized—that generating a class of defendants by which to accurately measure whether a defendant's sentence was arbitrarily imposed becomes a near impossibility. Statistical frequency analysis, on the other hand, succeeds in assessing defendants according to a defined set of categories, but lacks any formal definition of when the death penalty is "generally" received. As such, the statistical data compiled for frequency analysis by the AOC are less definitive than they are suggestive as to whether or not a defendant's

sentence is proportional. In short, the data merely provide a basis for the Court's unguided determination of what constitutes a general occurrence. Proportionality review, I maintain, is inherently subjective and therefore unable to provide constitutional legitimacy to capital punishment. Nevertheless, if we are to venture toward this illusory goal, the Court must adhere to a proper designation of what it means for a death sentence to be "generally" received and to some definition of "similarly situated defendants." Only then will we truly be able to recognize that a death sentence is disproportionate.

Further, given this Court's decision to appoint a Special Master to evaluate the methods we employ in proportionality review, *see ante* at 265, 724 *A.*2d at 135, I find the application of existing models in defendant's case disconcerting. To question the integrity of the methods, and yet apply them prior to receiving the Special Master's recommendations, disregards the crucial role of previous proportionality determinations in our appellate review of subsequent capital convictions and sentences. If the Court is going to declare that the system of review requires evaluation and perhaps reconfiguration, one must assume that if the Special Master's findings impugn current proportionality review methodology, then any death sentence reviewed by current methods, including Loftin's, will be reconsidered. Otherwise, the Court should halt all proportionality reviews, beginning with defendant's, until such scrutiny has been applied. We must recognize that in the absence of a reliable statistical assessment, precedent-seeking review is unable to provide reasonably meaningful proportionality review on its own.

### A.

The Court undertakes two types of analyses to assess the proportionality of a defendant's sentence. Frequency analysis is a statistical method that compares the rate at which categorically similar defendants have been sentenced to death. The second test, dubbed precedent-seeking review, involves a case-by-case

comparison of defendant's case to other, factually similar, death-eligible cases.

The perimeter of proportionality comparisons is marked by a universe of similar cases. The universe used by the AOC, which the Court used in the first four proportionality review cases, includes all death-eligible homicides committed since the reinstatement of capital punishment in New Jersey. The Court has assigned a Special Master to review the size of the universe of comparable cases, *see id.* at 290–291, 724 *A.*2d at 147–148, but, at present, continues to use a universe comprised of death-eligible defendants, *see id.* at 288, 724 *A.*2d at 146.[16] After the universe is created, the parameters of proportionality review are defined by what the AOC designates as comparison groups. The AOC has established thirteen comparison groups, *see id.* at 326 n. 15, 724 *A.*2d at 165 n. 15, which, for cases that reached the penalty phase, are based on the sentencing jury's findings regarding statutory aggravating factors; for the majority of the cases in the death-eligible universe, the AOC makes a judgment call. These groupings, which are also used by this Court as a basis for comparison in its precedent-seeking review, have previously been challenged as overly limiting. *See, e.g., DiFrisco III, supra,* 142 *N.J.* at 230, 662 *A.*2d 442 (Handler, J., dissenting). The present case provides an additional example.[17]

---

[16] I agree with the Court that the "reasons for choosing the larger universe remain valid today." *Ante* at 289, 724 *A.*2d at 147. Nevertheless, I continue to reserve a limited objection to the chosen universe, namely, that the universe is defective insofar as it includes cases in which a defendant's death sentence was reversed on appeal. *See DiFrisco III, supra,* 142 *N.J.* at 232–33, 662 *A.*2d 442 (Handler, J., dissenting); *Martini II, supra,* 139 *N.J.* at 82–90, 651 *A.*2d 949 (Handler, J., dissenting); *Bey IV, supra,* 137 *N.J.* at 402–07, 645 *A.*2d 685 (Handler, J., dissenting); *Marshall II, supra,* 130 *N.J.* at 253–57, 613 *A.*2d 1059 (Handler, J., dissenting).

[17] As a prior murderer with three aggravating factors, Loftin is placed in AOC category B, for prior murderers, and subcategory B(1), which identifies prior murderers with two or more aggravating factors. There is no intrinsic reason why Loftin's culpability should not, in addition, be compared with that of

### B.

Frequency analysis aims to provide a statistical representation of how often individuals who committed offenses similar to defendant have been sentenced to death. There are three different statistical tests used in frequency analysis: the salient-factors test, the numerical-preponderance-of-aggravating-and-mitigating-factors test, and the index-of-outcomes test. This Court has recognized on more than one occasion that, despite the analytic potential of frequency analysis, the presently small number of sample cases disables the statistical analysis from providing reliable results. *See DiFrisco III, supra,* 142 *N.J.* at 171, 662 *A.*2d 442; *Martini II, supra,* 139 *N.J.* at 28–29, 651 *A.*2d 949; *Bey IV, supra,* 137 *N.J.* at 350, 645 *A.*2d 685; *Marshall II, supra,* 130 *N.J.* at 173–74, 613 *A.*2d 1059. I continue to concur with this view. *Accord DiFrisco III, supra,* 142 *N.J.* at 237, 662 *A.*2d 442 (Handler, J., dissenting).

The greatest deficiency of the Court's frequency analysis is its application of the standard chosen for review. The chronic constitutional infirmity of current proportionality review in large measure emanates from the standards invoked by the Court. This Court's proportionality review is inherently subjective, evidenced by the oscillation of its ostensible controlling substantive principle. Recognizing the complexity and elusiveness of death-sentencing proportionality, this Court has proffered a number of alternative formulations of its basic principle. For instance, the Court has stated that disproportionality is marked by excessiveness, and that "[a] death sentence is comparatively excessive if other *defendants with similar characteristics generally receive sentences other than death* for committing factually similar offenses in the same jurisdiction." *Marshall II,* 130 *N.J.* at 153–54, 613 *A.*2d 1059 (emphasis added) (citation omitted). Hence, a death sentence is not disproportionate if it is generally received by defendants with similar characteristics who have committed factually similar of-

---

multiple-victim murder defendants, classified by the AOC as A(1). *See infra* at 325–327, 724 *A.*2d at 165–166.

fenses in the same jurisdiction. *Id.* at 131, 613 *A.*2d 1059; *Bey IV,* *supra,* 137 *N.J.* at 343, 645 *A.*2d 685; *Martini II, supra,* 139 *N.J.* at 30, 651 *A.*2d 949; *see also DiFrisco III, supra,* 142 *N.J.* at 171, 662 *A.*2d 442 (stating "principal inquiry" is whether a case like defendant's will "generally result in a death sentence").[18]   On other occasions, however, the Court has said that in order for a death sentence to be proportionate, it must be: not "aberrational," *DiFrisco III, supra,* 142 *N.J.* at 166, 662 *A.*2d 442; *Bey IV, supra,* 137 *N.J.* at 352, 369, 645 *A.*2d 685; "not insupportable," *Martini II, supra,* 139 *N.J.* at 22, 651 *A.*2d 949; not "more like that of similar life-sentenced defendants and less like that of death-sentenced defendants," *Id.* at 47, 651 *A.*2d 949; and, applied to a defendant who is "more likely than other killers to receive the death penalty," *DiFrisco III, supra,* 142 *N.J.* at 171, 662 *A.*2d 442.

The only standard that has any promise of ensuring a degree of proportionality that would be both reasonably meaningful and

---

[18] The majority contends that its standard for measuring disproportionality, namely, that a death sentence is disproportionate if similarly situated defendants generally receive sentences other than death, cannot be equated, or used interchangeably, with the concept that a death sentence is only proportionate if death sentences are generally received by similarly situated defendants. *See ante* at 322, 724 *A.*2d at 163. That would mean, according to the Court, that we must "find that death is [a] normal sentence when [it] can never be so." *Ibid.* The Court misperceives the problem and misstates the answer.

There is nothing complicated or exceptional about the proposition that a class of defendants who *do* generally receive sentences other than death is a class of defendants who do *not* generally receive death sentences; this follows from common notions of generality. As such, it is accurate, not disingenuous, to assert that a death sentence is disproportional if similarly situated defendants do not generally receive death sentences.

More fundamentally, the Court must recognize the import of its statement: "[b]ecause New Jersey jurors have been sparing in their imposition of the death sentence, it will never be the case that death would be 'generally received' or 'received in a defined preponderance of cases.'" *Ibid.* If, as the Court claims, death sentences will never be generally received—even by similarly situated defendants—in this State, then all death sentences imposed in New Jersey are, and will be, disproportionate. If death must be "a normal sentence" and, in fact "it can never be so," then we must accept the verdict that death sentencing cannot be constitutionally imposed.

sufficiently protective is the basic standard that requires that death sentences be generally received by defendants within the case profile. To properly apply this standard we must be able to identify a class of "defendants with similar characteristics," who have committed "similar crimes." We must also have a defined notion of when a death sentence is or is not "generally" received. Further, a definition of generality with which the death sentence is imposed must be applied consistently and objectively in proportionality review. Hence, I have previously stressed that the conclusion that a death sentence is "generally" received necessarily requires some acknowledgment of a numerical majority or preponderance that can then be equated with proportionality. *See DiFrisco III, supra,* 142 *N.J.* at 212, 662 *A.*2d 442 (Handler, J., dissenting); *Martini II, supra,* 139 *N.J.* at 90–91, 651 *A.*2d 949 (Handler, J., dissenting); *Bey IV, supra,* 137 *N.J.* at 408, 645 *A.*2d 685 (Handler, J., dissenting). In terms of meeting constitutional demands for basic fairness, consistency, and uniformity that can prevent the imposition of a disproportionate sentence, numerical preponderance in the range of sixty to seventy-five percent would reasonably express when a death sentence is "generally" received.

Without the doctrinal discipline and certainty of a defined numerical majority consistent with the concept of generality to demarcate proportionate sentences, it is inevitable that arbitrary death sentences of individual defendants will be lost in the verbiage that rationalizes a death sentence as proportionate. The Court continues to argue that setting a numerical standard would introduce unacceptable arbitrariness in proportionality review. *See ante* at 322, 724 *A.*2d at 163; *Martini II, supra,* 139 *N.J.* at 20, 651 *A.*2d 949 (declining to set numerical standard for determining when defendants "generally" receive death sentences); *Marshall II, supra,* 130 *N.J* at 152, 613 *A.*2d 1059 (declining to adopt numerical standard finding disproportionality whenever death-sentencing rate was less than eighty percent). Any arbitrariness derived from a defined numerical standard, however, is far less problematic, and more manageable, than that inherent in the unprincipled and unchecked application of a verbal standard.

Failure to equate the chosen standard with a numerical preponderance plagues the Court's analysis of the salient-factor and index-of-outcomes test results in the present case. In defendant's case, the sentencing jury found three aggravating factors: *N.J.S.A.* 2C:11–3c(4)(a) (prior murder); *N.J.S.A.* 2C:1–3c(4)(f) (murdered to escape detection); and *N.J.S.A.* 2C:11–3c(4)(g) (felony murder). As a prior murderer with three aggravating factors, Loftin has been assigned to the B(1) subcategory for purposes of salient-factor analysis. The statistics show that B(1) defendants overall are more likely to be sentenced to death than death-eligible murderers generally. In all death-eligible cases, seventeen percent of B(1) defendants are sentenced to death, whereas twelve and one-half percent of death eligible defendants are generally. *See* Table, *ante* at 329, 724 *A.*2d at 166.[19] But the data manifest no such disparity at the penalty phase, where twenty-five percent of B(1) defendants are sentenced to death, compared with thirty percent of death-eligible defendants generally. *See ibid.* Considering prior murderers as a composite—those in categories B(1), B(2) and B(3)—in comparison to death-eligible defendants,[20] we discern the numbers show that prior murderers are relatively likely to be sentenced to death. At the penalty phase, fifty-six percent of class B defendants are sentenced to death, whereas thirty percent of death-eligible defendants are generally. *See* Table, *ante* at 329, 724 *A.*2d at 167. In all death-eligible cases, thirty-six percent of class B defendants are sentenced to death,

---

[19] Throughout this discussion, I do not consider statistics that include defendant's case among the class of comparison cases. Placing defendant's case on both sides of the comparison, gauging the proportionality of a defendant's sentence by comparing it to a group of which he is a member, skews the analysis. The Court fails to perceive this problem. Of course, defendant's death sentence has relevance to the database overall, and is properly considered in the proportionality review of subsequent death sentences.

[20] Many of the AOC-defined subcategories include very few cases. Accordingly, this Court frequently appeals to the composite category, such as class B, for comparison. In this case, for example, the category of B(1) defendants, not including Loftin, is comprised of only four defendants at penalty trial, and only six overall.

whereas twelve and one-half percent of death eligible defendants are generally. *Ibid.*

Based on the data, the Court reckons that "application of the salient-factors test appears to suggest that prior murderers receive the death penalty more frequently than most defendants in the death-eligible and penalty-trial universes and that they are considered by community consensus to be highly blameworthy. In fact, prior murderers are sentenced to death at a higher rate than any other category of murderers." *Id.* at 329, 724 *A.*2d at 167. So much is supported by the statistics. There can be no doubt that, as a prior murderer, Loftin finds himself in a category where imposition of the death sentence is relatively common; in other words, as a prior murderer Loftin has a heightened chance of being sentenced to death. The Court's conclusion, however, that "the results of this test ... do support a finding of no disproportionality" *ibid.* (citation omitted), does not entirely follow. A heightened chance does not always reflect general imposition. In the present case, the death-sentencing rate for prior murderers with at least two aggravators, class B(1), is twenty-five percent at penalty trial and only seventeen percent for all death-eligible cases. Contrary to the Court's assertion, one cannot reasonably conclude that a class of defendants sentenced to death at most one in four times receives the death penalty "generally." The standard of "generally received" must reflect a numerical preponderance. *See supra* at 308–309, 724 *A.*2d at 156–157.

The same problem appears in the Court's assessment of the statistical results of the index-of-outcomes test. The index-of-outcomes test "compare[s] cases that are factually dissimilar but that are nevertheless comparable from the perspective of the defendants' blameworthiness." *DiFrisco III, supra,* 142 *N.J.* at 179, 662 *A.*2d 442 (quoting *Martini II, supra,* 139 *N.J.* at 42, 651 *A.*2d 949). In order to undertake such a comparison, the Court relies on AOC calculations of culpability. The AOC's calculations are based on a multiple regression technique that, unlike the salient-factor and numerical-preponderance tests, examines rele-

vant nonstatutory, in addition to statutory, aggravating and miti-
gating factors. Four multiple regressions are involved. Two
involve both statutory and nonstatutory factors. Two involve
statutory factors only; of those, one regression considers only
defendants who reached the penalty stage, while the other looks to
the entire universe of death-eligible defendants. After assigning a
weight to each factor, the AOC uses regression analysis to com-
pute a culpability score for defendants, *i.e.*, the defendant's pre-
dicted probability of receiving a death sentence.[21] These scores,
which range from a high of .99 to a low of .00, are broken down
into five culpability levels.[22] At each level, the AOC determines
the actual rate at which the death sentence is imposed on defen-
dants at that culpability level.

The Court errs in the manner in which it weighs the index-of-
outcomes test statistics. The Court, in conclusion, relies solely
upon the predicted probability of death statistics; not at all upon
the death-sentencing rates. *See ante* at 335, 724 *A*.2d at 170. The
death-sentencing rate statistics should primarily guide the deter-
mination because they provide the measure of general imposition
of death sentences. Indeed, the question before this Court on
proportionality review is whether or not death sentences are
generally received by, or imposed upon, similarly situated defen-
dants. The predicted probability of the death sentence statistic
does have some value, if only to compensate for deficiencies in the
methodology behind the death-sentencing rate statistic; for in-
stance, defendants in culpability level one with a culpability rating
of .05 may differ substantially in death-sentencing rate, despite
being in the same level, from those defendants on the upper end of
culpability level one, who have culpability level ratings such as .19.

---

[21] It must be noted that the huge confidence intervals in the measurement of
predicted probability of death detract substantially from the reliability of the test.
*See ante* at 295–296, 331–332, 724 *A*.2d at 150, 168.

[22] Unfortunately, depending on the regression performed, there is great fluctu-
ation among the levels at which defendants are placed. This plainly detracts
from the credibility of the endeavor as well.

The predicted probability statistic can thus help to identify potential problems of disparate effect at the margins of any given culpability level.

Nevertheless, the constitutional mandate of individualized consideration in capital sentencing requires that we rely on actual decisions by sentencing juries, and the characteristics of actual felons and their crimes, to determine when a death sentence is generally imposed upon similarly situated defendants. Certainly, we could not point to our surprise at defendant's death sentence as grounds for reversal; nor should our expectation that a certain defendant will receive the death penalty serve as adequate support for a finding of proportionality. The death-sentencing rate statistic, therefore, should primarily guide this Court's interpretation of the index-of-outcomes test results. Accordingly, the majority errs by failing to do so in reaching its conclusion.

In this case, the Court concludes that none of the index-of-outcomes test regression results demonstrates disproportionality. *See id.* at 334–335, 724 *A.*2d at 170. However, the death-sentencing rate statistics in this case are not so dispositive. Regression results using only statutory factors do show that death sentences are generally imposed—by a numerical preponderance—on defendants sharing Loftin's culpability level: similarly situated defendants whose cases proceed to the penalty phase are death-sentenced seventy percent of the time; for all similarly situated death-eligible defendants, the death-sentenced rate is fifty-seven percent. *See Loftin Report,* tbls. 13–14, 17, 21–24; *see also ante* at 333–334, 724 *A.*2d at 169–170. The results from the statutory and nonstatutory factor regression, however, do *not* show general imposition: the death-sentencing rate for defendants in the same culpability level as Loftin proceeding to penalty trial is only seven percent; for similarly situated death-eligible defendants generally, the rate is thirty-eight percent. *Ibid.*

The Court's analysis of the index-of-outcomes test suffers from yet another deviation: the Court compares Loftin's numbers

indiscriminately to those of previous proportionality review defendants, regardless of whether or not those defendants were similarly situated. *See ante* at 331–334, 724 *A*.2d at 168–170. The question we seek to answer in proportionality review is whether defendants situated similarly to defendant generally receive a sentence other than death. Accordingly, in this case, in assessing the salient-factors test, and on precedent-seeking review, the Court limits comparison to prior murderers. That basis for similarity comparisons is not available or possible in index-of-outcomes analysis; the Court's index-of-outcomes comparison to prior proportionality review defendants cannot be limited to similarities based on material or salient characteristics common among defendants. Perhaps, therefore, this comparison should be confined to those defendants who share the same culpability level (resultant from a particular regression) with defendant. The index-of-outcomes test analysis undertaken by the Court, however, compares Loftin to all prior proportionality review defendants, across culpability levels and without regard of whether of not those defendants share Loftin's culpability level. If the Court deems DiFrisco, Marshall and Martini, all of whom fall outside the B category, unfit for comparison on precedent-seeking and salient-factors analysis, what justifies a comparison to those same defendants (or Bey as well) when they fail to share defendant's culpability level resultant from the index-of-outcomes regression?

Even culpability level, however, may be an inappropriate and insufficient measure or indicator of similarly-situated defendants. For example, one may find it unreasonable to say that Marshall, a contract killer, and Loftin, a prior murderer, are similarly situated even if both were classified as culpability level five; they are both highly culpable, but their crimes were nothing alike. The fact that one may hesitate in describing Marshall and Loftin as similarly situated only emphasizes the point that the singular fact that a defendant was the subject of a prior proportionality review does not justify his comparison with the present defendant.

Admittedly, the death sentencing rates for prior proportionality review defendants become relevant as the Court makes the same error, continuing to venture inappropriately outside the AOC categories in assessing the frequency analysis tests, in successive cases. In a sense, then, it is not only proper but necessary to compare defendant's statistics to those of Marshall, Martini, Di-Frisco and Bey. Theoretically, and ideally, however, such comparisons should be reserved for precedent-seeking review. It makes a mockery of the statistical method to compare defendant's numbers to those of defendants in other categories, just as it distorts the apparently objective standard of disproportionality to conclude that a relatively higher likelihood constitutes general imposition.

All of this suggests that the phrases "generally received" and "defendants with similar characteristics," as used in this Court's proportionality review, have deteriorated into a shibboleth, esoteric terms without clear meaning. It was unfortunate for the Court to use "generally received" as a measure if it did not really envision a numerical preponderance as the standard. The standard measuring disproportionality by general imposition of sentences other than death must require, not that Loftin be more likely than others to receive the death penalty, but rather that, for defendants similarly situated, the death sentence be received in a defined preponderance of cases.

## C.

The second component of proportionality review is precedent-seeking review. As its name suggests, the precedent-seeking approach involves a traditional case-by-case comparison of similar death-eligible cases. *DiFrisco III, supra,* 142 *N.J.* at 183, 662 *A.*2d 442. In contrast to frequency analysis, precedent-seeking review is not statistical. Notably, the standard for precedent-seeking review is more equitable and less quantitative in nature. The majority expresses the standard as follows: "Although identical sentences are not required even in like cases, the defendant must not have been 'singled out unfairly for capital punishment.'"

*Ante* at 335, 724 *A.*2d at 171 (quoting *Martini II, supra,* 139 *N.J.* at 47, 651 *A.*2d 949, additional citation omitted).

Precedent-seeking review also differs from frequency analysis in that it considers, in addition to statutory aggravating and mitigating factors, non-statutory factors "rooted in traditional sentencing guidelines." *DiFrisco III, supra,* 142 *N.J.* at 184, 662 *A.*2d 442. Those traditional factors of criminal culpability fall within three broad categories: defendant's moral blameworthiness, the degree of victimization, and the character of the defendant. *Id.* at 185, 662 *A.*2d 442. The first step of precedent-seeking review is to define defendant's culpability based on these categories. Then, the Court attempts to identify and detail a comparison group of cases.[23] Lastly, the important aspects of defendant's case are compared to the key facts from the identified group of comparison cases.

If this Court's application of frequency analysis is ultimately subjective, precedent-seeking review is inherently so. Precedent-seeking review invokes culpability assessments by the Court, which are, essentially, moral judgments. Further, in employing precedent-seeking review, the Court analyzes individual circumstances in such depth, ultimately distinguishing defendants on terms so discrete, that categories by which to measure whether or not a given sentence is arbitrary remain undefined. As a result, the Court does not so much provide the intended quality check of the death sentence, as it does substantively reconsider the jury's verdict of death.

The subjectivity inherent in the method is evident in the Court's review of Loftin's sentence. Looking at the same facts and circumstances and the same class of comparison cases as the majority, one might reasonably reach a conclusion, contrary to the

---

[23] Precedent-seeking review uses as a starting point the same categories of comparison, *see Loftin Report,* tbl. 7; *see also ante* at 326 n. 15, 724 *A.*2d at 165 n 15, that are used in the salient-factors test. *See, e.g., Bey IV, supra,* 137 *N.J.* at 367, 645 *A.*2d 685.

Court's, that defendant's sentence was indeed disproportionate. If one looks at additional cases similar to defendant's, neither included in the AOC category nor considered by the Court on precedent-seeking review, the disproportionality of defendant's sentence is even more pronounced.

1.

Moral blameworthiness as interpreted by this Court is a composite of factors such as motive, premeditation, justification or excuse, evidence of mental defect or disturbance, knowledge of helplessness of the victim, defendant's age or maturity, and defendant's involvement in planning the murder. *Id.* at 203, 662 *A.*2d 442. The Court finds that Loftin's motive was to steal money and, perhaps, to escape detection; that the robbery, but not necessarily the murder, was premeditated; that there was no evidence of justification or excuse, or of provocation; that defense expert testimony that Loftin had a borderline personality disorder, one juror's finding of the c(5)(a) mitigating factor of mental or emotional disturbance, and three jurors' finding of the catch-all mitigating factor on the ground that defendant was suffering from extreme mental disturbance, were offset by the testimony of a State's expert, who concluded that "defendant exhibited narcissistic and anti-social personality traits and not borderline personality disorder"; that the victim was helpless and defendant knew it; that although two jurors found age to be a mitigating factor, defendant, in fact, "lived as an adult with adult responsibilities"; and that defendant was solely responsible for planning and executing the robbery-murder. *Ante* at 336–338, 724 *A.*2d at 171–172.

The Court's findings are, for the most part, plausible. Different conclusions may be drawn, however, in a certain respect. Given the facts of this case, the claim that defendant murdered to escape detection cannot serve as a reliable basis of distinction on proportionality review. I have previously noted that "every murder committed during the course of a rape, robbery, or other felony listed in c(4)(g) [felony murder aggravating factor], also automati-

cally falls within the scope of the c(4)(f) factor [escape detection] because every criminal hopes to escape detection." *Loftin I, supra,* 146 *N.J.* at 399, 680 *A.2d* 677 (Handler, J., dissenting). If "every c(4)(g) case is also a c(4)(f) case," *id.* at 400, 680 *A.2d* 677 (Handler, J., dissenting) (quoting *State v. Hightower,* 146 *N.J.* 239, 286, 680 *A.2d* 649 (1996) (*Hightower II* ) (Handler, J., dissenting)), the c(4)(f) aggravating factor fails to "genuinely narrow" the class of death-eligible defendants, and is, therefore, unconstitutional. *Id.* at 399, 680 *A.2d* 677 (Handler, J., dissenting) (citing *Zant v. Stephens,* 462 *U.S.* 862, 877, 103 *S.Ct.* 2733, 2742, 77 *L.Ed.2d* 235, 249 (1983)). Accordingly, as this Court has recognized, the "mere fact that a killing takes place in the course of a felony is not enough to invoke [the c(4)(f) aggravating] factor." *Id.* at 377, 680 *A.2d* 677.

Here, there is no direct evidence that Loftin murdered to escape detection. *Cf. State v. DiFrisco,* 137 *N.J.* 434, 500–01, 645 *A.2d* 734 (1994) (*DiFrisco II* ) (finding record sufficient to support c(4)(f) factor where defendant confessed he was hired to kill victim in order to prevent victim from "rat[ting] on" hirer). Nor has the State presented adequate circumstantial evidence to show that one of the motives for the murder was to escape detection. *Cf. State v. Martini,* 131 *N.J.* 176, 282–84, 619 *A.2d* 1208 (1993) (*Martini I* ) (finding record sufficient to support c(4)(f) factor where victim had past knowledge of defendant and was in defendant's presence prior to the murder for extended period of time with defendant undisguised). Therefore, I disagree with this Court's finding that the State presented ample evidence to support a jury finding of the c(4)(f) aggravating factor. Using the c(4)(f) factor as a basis of distinction on proportionality review, *see ante* at 339, 343, 724 *A.2d* at 173, 174, only compounds the error introduced at the sentencing phase.

After reviewing defendant's moral blameworthiness, the Court next examines the degree of victimization of defendant's crime. In this category, the Court assesses the violence and brutality associated with the murder and any injury to non-decedent vic-

tims. *DiFrisco III, supra,* 142 *N.J.* at 205, 662 *A*.2d 442. As the Court properly recognizes, "[Loftin's] was not a particularly violent or brutal killing." *Ante* at 338, 724 *A*.2d at 172. Marsh was killed "execution style," with a single gunshot to the head. There was no other contact. There was no injury to non-decedent victims. Thus, the degree of victimization associated with Loftin's crime is low, and does not contribute to making defendant death-worthy.

The last aspect of culpability that must be examined is defendant's character. When assessing defendant's character, this Court considers prior record, prior acts of violence, cooperation with authorities, remorse, and defendant's capacity for rehabilitation. *DiFrisco III, supra,* 142 *N.J.* at 205, 662 *A*.2d 442. Although it is undisputed that defendant did not cooperate with authorities, the record is equivocal with respect to other aspects of defendant's character. Defendant had a prior record, yet had never been convicted or incarcerated prior to this offense. The Court finds any manifestations of remorse by defendant canceled by defendant's admission that "his 'mistake' was being incarcerated, not that he had killed two human beings." *Ante* at 338–339, 724 *A*.2d at 172. Loftin's expression of remorse in his allocution, however, is significant. In his allocution, defendant stated that he "never tried to deny [his] guilt," and that the events

are a traumatic tragedy for all that are involved, especially for the victim's family and friends. The pain and the hardships that occurred, and still are, are beyond forgiveness. I can only say I truly am remorseful.

\* \* \* \*

I again express my true remorse to the family and friends of Gary Marsh for causing so much pain and hardships throughout this whole ordeal.

Finally, although there is little evidence of defendant's prospects for rehabilitation, there is reason to believe that defendant, who had not undergone psychiatric counseling, would respond positively to treatment. The defense psychiatric expert noted that the symptoms associated with Loftin's mental condition would be eased in structured situations. *See Loftin I, supra,* 146 *N.J.* at

331, 680 *A*.2d 677 (testifying that defendant struggled outside structured environment of the military or auto-mechanic school). In sum, the prior murder is the only factor that contributes to defendant's deathworthiness.

### 2.

#### a.

Defendant's culpability must be compared to that of similarly situated defendants. The Court restricts its review, in accordance with AOC categorization, to prior, or category B, murderers. *See* Appendix C, *ante* at 348–371, 724 *A*.2d at 178–190 (providing case summaries of category B defendants). Besides Loftin, only one defendant classified as B(1), a prior murderer with two or more aggravating factors, has been sentenced to death. The other five B(1) prosecutions all resulted in life sentences (James Koedatich (1B), George Booker (1 and 2), John Fauntenberry, and Richard Feaster (2)). The death-sentenced defendant, James Koedatich, was substantially more culpable than Loftin. Comparing defendant's crime to the other B(1) defendants, it is evident that defendant is clearly less culpable than most of them.

The degree of blameworthiness and victimization associated with Loftin's crime were relatively low. Koedatich, motivated by a desire to commit sexual assault, concocted a detailed plan to murder an eighteen-year-old high school student. He stabbed her multiple times and left her bleeding to death in a water retention tank. Booker's offense was a brutal torture killing of two lovers. Finding the first victim alone, he beat, suffocated and strangled her to death. He then lay in wait for the other. When she arrived, he handcuffed her to her lover before brutally murdering her in a similar fashion. Feaster's crime, like defendant's, was a gas station robbery-murder; however, Feaster assaulted his victim with over forty slashes and stabs. Moreover, Feaster claimed he killed merely for the thrill of it. Fauntenberry is the only B(1) defendant whose culpability approximates Loftin's. Fauntenberry shot a truck driver once in the head, and robbed him. Faunten-

berry, like Feaster, was offered a plea to a life sentence. Loftin also sought to plead guilty to murder in exchange for a life sentence, but the State refused to make an offer.

With respect to defendant's character, his record is more positive than those of the other B(1) defendants. For instance, the other defendants had more extensive criminal, if not murder, records than Loftin, who had no prior record and had never been jailed before this offense. Although Loftin had murdered before, that murder, which occurred shortly before the incident in question, was not particularly violent. In contrast, Koedatich may be considered a serial killer; he apparently raped and killed three women in a two-month period and had murdered someone previously. Booker not only had a prior murder conviction and a more extensive prior criminal record than Loftin, but killed multiple victims during his offense and physically injured third parties. Fauntenberry, notably, confessed to five other murders. Even Feaster, the only B(1) defendant other than Loftin who had killed only one other person, had prior convictions for simple assault and possession of marijuana. Moreover, only defendant, among the B(1) defendants, expressed remorse. Only Loftin presented evidence of capacity for rehabilitation, although one might conclude that the youthfulness of Fauntenberry and Feaster offered them some hope of recovery. Cooperation with law enforcement is the only category in which defendant cannot be considered the least culpable of the B(1) offenders; Booker and Fauntenberry both confessed, while Loftin, like Koedatich and Feaster, did not.

In sum, the individual who committed the sole B(1) death-sentenced crime, Koedatich, is substantially more culpable and blameworthy than Loftin. Defendant's offense is less blameworthy than every B(1) case that was tried capitally, but resulted in a life sentence. In fact, Loftin, who had only one prior murder, is less culpable than the two B(1) cases in which the State accepted a plea to non-capital murder.

Despite these facts, the Court deems defendant's sentence proportionate. "The greatest distinguishing factor between Loftin

and the B(1) defendants," the Court finds, is that "each B(1) defendant presented uncontroverted evidence that he suffered from some mental disease or defect." *Ante* at 340, 724 *A.*2d at 173. The Court also relies on the more general conclusion that defendant's evidence "is not as compelling" as the evidence presented by the other B(1) defendants. *See id.* at 340, 724 *A.*2d at 173.

I disagree with the Court's conclusion. The mere fact that the State chose to present an expert of its own to contradict defendant's evidence of mental illness does not dispel the mitigating effect of defendant's troubled life. Loftin's mental and emotional problems were noticeable as early as the age of six when he burned down his family's home. When his father abandoned the family, defendant was one of seven children raised by his mother in poverty. His adult life was filled with instability in work and personal relationships—defendant never received psychiatric treatment. A defense psychology expert testified that defendant suffered from moderate to severe symptoms of borderline personality disorder at the time of the offense. *Loftin I, supra,* 146 *N.J.* at 330–31, 680 *A.*2d 677. At least one juror presumably credited the defense psychologist's conclusion by finding the c(5)(a) (extreme mental or emotional disturbance) mitigating factor. *Id.* at 322, 680 *A.*2d 677. Moreover, the seventeen reasons jurors found to support the catch-all mitigating factor, *N.J.S.A.* 2C:11–3c(5)(h), included the fact that defendant was upset by the loss of his first son; that he was traumatized by the fire he set as a youth that burned down the family home; and, that he was emotionally impoverished growing up. *Ibid.* The mere fact that the State's psychiatric expert recognized that Loftin had "some signs of emotional distress," and, rather than finding that Loftin suffered from a borderline personality disorder, concluded that Loftin "exhibited narcissistic and antisocial personality traits," *id.* at 332, 680 *A.*2d 677, cannot soundly become a basis for the Court's decision to place defendant's case alongside those generally resulting in the death penalty. It is a dubious distinction on which to rest a death sentence. This chimera aside, a comparison of

Loftin's case to that of all other B(1) cases reveals disproportionality.

In distinguishing Loftin from the B(2) and B(3) defendants, the Court encounters a set of defendants who, by classification alone, should be less culpable than defendant.[24] The Court's conclusion that Loftin "is more culpable than the B(2) and particularly the B(3) defendants" purely because he is classified in a more culpable category, *ante* at 341, 724 *A*.2d at 173, is too hasty. Indeed, distinctions based on class alone dispel all illusions of individualized consideration.

To assess Loftin's sentence in a proper manner, the Court must rely upon distinctions that are less than secure to find his sentence proportionate. With regard to blameworthiness, the Court notes that "aspects" of Loftin's crime, such as his "pecuniary motive, execution-style murder, which presented no risk to third persons, appears less deathworthy." *Id.* at 342, 724 *A*.2d at 174. To be sure, defendant's blameworthiness is about average for B(2) or B(3) defendants. Godette and Pennington had the same pecuniary motivation as Loftin. Several of the other B(2) or B(3) defendants had motives that are clearly more blameworthy than defendant's pecuniary motive. Bey and Vasquez committed their offenses for their own sexual gratification. Muhammad may have been motivated by racial animosity. Purnell and Biegenwald murdered someone after a dispute over drugs; this may have been the case with Muhammad as well. Biegenwald appears to have killed for the mere thrill of it. On the other hand, Coyle, Erazo, Nieves, and Ramseur—all excited by anger stemming from different love affairs—are arguably less culpable. Similarly, Williams

---

24 Eight prior murderers classified as B(2) or B(3) received death sentences. These defendants are: Marko Bey (2B), Richard Biegenwald (1A and 1B), Brian Coyle (1A), Samuel Erazo (1A), Frank Pennington (1A), Braynard Purnell (1A), and Thomas Ramseur. Eleven B(2) and B(3) defendants received life sentences: Biegenwald (1C and 2), Coyle (1B), Erazo (1B), William Godette, Jihad Muhammed, Alerto Nieves, Pennington (1B), Purnell (1B), Carlos Vasquez, and Thomas Williams.

murdered his own mother, presumably after a family dispute; however, he also stole her car and sought to benefit financially from her death. Thus, Loftin appears to fall within the mid-range of culpability in terms of motivation. Although several less culpable defendants received death sentences (Coyle, Erazo, Ramseur and Purnell), all of those death sentences were overturned; some of the sentences, such as Ramseur's, were so grossly defective that they should probably not be accorded much weight.

Loftin suffered from a mental or emotional impairment that affected his conduct. However, this was also true of Bey, Biegenwald, Coyle, Erazo, Godette, Pennington, and Ramseur, most of whom received death sentences. Again, despite substantial evidence of Loftin's mental impairment, the Court finds defendant's case distinguishable from the B(2) death-sentenced defendants and from all B(3) defendants that presented similar evidence of emotional disturbance merely because the evidence in this case was controverted by the State. *See id.* at 342–344, 724 *A*.2d at 174–175 (distinguishing Loftin from B(2) death-sentenced defendants); *id.* at 344, 724 *A*.2d at 175 (distinguishing Loftin from all B(3) defendants). The Court's reliance on uncontroverted evidence of mental illness as the distinguishing factor goes too far. In *State v. Bey,* 129 *N.J.* 557, 588, 610 *A*.2d 814 (1992) (*Bey III* ), the State presented rebuttal evidence by a forensic psychiatrist and forensic psychologist who testified that, contrary to defendant's evidence, he did not suffer from organic brain dysfunction or organic personality disorder, but simply from antisocial personality disorder. The State makes a very similar argument here. *See Loftin I, supra,* 146 *N.J.* at 332, 680 *A*.2d 677. Looking to other measures of blameworthiness, in no other case was the age mitigating factor found, although Bey, Coyle, and Nieves were about the same age as Loftin. The victims of Biegenwald (1), Godette, Muhammed, and Vasquez were clearly helpless, while in Loftin's case the record is silent on the matter. In sum, little difference is evident when comparing defendant's blameworthiness to that of the B(2) and B(3) defendants.

Defendant's character also falls within the mid-range of culpability compared to the B(2) and B(3) defendants. The B(2) and B(3) cases include many defendants no worse than defendant. Only Biegenwald had a far more serious prior record—four or five prior murders, mostly of teenage girls. The other defendants murdered only once, although several had criminal records. *See, e.g.,* Biegenwald (armed robbery); Coyle (multiple robberies); Godette (possession of a controlled dangerous substance); Ramseur (weapon possession); Williams (assault and battery, unlawful possession of a weapon, possession of a controlled dangerous substance). Although Biegenwald, Coyle, Muhammed, and Williams expressed an utter lack of remorse, Bey expressed remorse for his offense, and Nieves and Vasquez confessed. Yet, no other defendant produced evidence demonstrating potential for rehabilitation.

Disproportionality is present, though, in the degree of victimization associated with the defendant's crimes. Several of the B(2) and B(3) cases involved injury or terror to non-decedent victims. Muhammed shot the victim in front of his companion and her father and threatened to kill witnesses. Nieves shot the victim while she was driving with her six-year-old son. Pennington killed a woman in her daughter's presence. Ramseur threatened to kill the victim's children. Further, many of the B(2) and B(3) cases involved a great deal of violence. Bey kidnapped, raped, strangled, and stomped on the victim and then continued to beat her after it was apparent that she was dying. Biegenwald (1) kidnapped the victim, shot them four times, and then drove the body to his house so that his roommate could understand the thrill of killing. Coyle shot his victim four times, three while she was laying prone on the ground. Erazo stabbed his victim eight times as she pleaded for her life. Godette strangled and beat his victim six times with a hammer. Purnell stabbed the victim fifteen times and slashed the victim's throat. Ramseur inflicted thirteen stab wounds on the victim, and may have returned to the scene to inflict more punishment. Vasquez bound, raped, and strangled his victim. Williams stabbed his victim nine times and left the

victim's body to decompose in a laundry room. No other crime, except perhaps Biegenwald's (2), who had a much worse prior record, involved as little victimization as Loftin's.

Thus, comparing Loftin's culpability to the B(2) and B(3) subcategories of defendants, who should theoretically be less culpable, we find that defendant is, in fact, one of the least culpable defendants—if not the least culpable—with respect to victimization, and average with respect to the factors inherent in blameworthiness and character. He is surely the least culpable death-sentenced prior murderer, and one of the least culpable of all class B defendants, whether sentenced to life or death.

b.

In two previous proportionality reviews, the Court has conducted comparisons with defendants that fall outside the defendant's particular salient-factor grouping. *See, e.g., Martini II, supra,* 139 *N.J.* at 50–51, 651 *A.*2d 949 (comparing multiple categories of defendants because facts of case could qualify defendant for more than one group); *Marshall II, supra,* 130 *N.J.* at 175, 613 *A.*2d 1059 (comparing category of cases proposed by defendant). In the last proportionality review case, the Court reaffirmed its commitment to restricting comparisons to like cases, "adhering to the AOC's 'unique assignment' of each case to a specific category." *DiFrisco III, supra,* 142 *N.J.* at 169, 662 *A.*2d 442 (citation omitted). Even so, the Court adjusted the defendant's comparison group when conducting precedent-seeking review. *Id.* at 186, 662 *A.*2d 442.

Understandably, some limits must be placed on what comparisons are made. I believe, however, that limiting comparison to category B in the present case, is too restrictive. I would assess the propriety of defendant's death sentence by comparing it with a number of cases outside the category. *See* App. D, *infra* at 449–453, 724 *A.*2d at 230–232 (providing comparison cases summaries of defendants outside category B). Defendant is a prior murderer. Therefore, comparisons should be limited to other cases where the defendant killed more than one person. Nevertheless,

comparison to cases that involve multiple victims is appropriate. The multiple-murder cases that involved sequential murders are most like defendant's case because, but for the prosecutor's discretion to charge the crimes together, the prosecutor could have waited for a conviction on one murder and then proceeded on the second murder charging the c(4)(a) prior murder aggravating factor. In short, four defendants—John Lee Allen, Kim Kuchler, Frank Marsini, and Ronald Mazique—would have fallen within the B category had the State so chosen to prosecute them. *See id.* at 449–453, 724 *A.*2d at 230–231. Defendant should also be compared to two A class defendants, Joseph Harris and Hector Sanabria, whose crimes would have placed them within the B category had their subsequent offenses not involved multiple victims. *See id.* at 449–451, 452–453, 724 *A.*2d at 230–231, 231–232.

Even the most simplistic comparisons to those cases reveal that defendant's offense is less blameworthy and defendant less culpable. All of these defendants, except Kuchler, had motivations at least as blameworthy as defendant. Harris sought sadistic revenge for a firing. Sanabria wanted to enhance his criminal drug enterprise. Masini was apparently motivated by a desire for sexual gratification. Allen and Mazique were both looking for money.

Every one of these crimes was more horrific than defendant's offense. Allen killed a person who was terrified and pleading for his life. Harris hunted down particular victims with lengthy planning and premeditation. Kuchler chopped up his sister and her husband. Marsini sexually assaulted and murdered four elderly victims. Mazique brutally murdered a grandmother and her six-year old grandson with a hammer; and Sanabria shot two different victims.

Each of these defendants had a more substantial criminal record than defendant. Allen murdered two people during the instant offense and had previously murdered another. Harris murdered four people, had previously murdered one, and had

kidnapped, sexually assaulted, and threatened other victims. Kuchler committed two murders in addition to one prior murder. Masini killed four victims. Mazique's was a double homicide and he had killed two people previously; and Sanabria, who killed two people, had killed one person previously and was implicated in another murder at the time of the prosecution.

Even so, Allen, Kuchler, Marsini, and Sanabria were permitted to plead guilty in exchange for a life sentence. Although both Harris and Mazique were capitally tried, only Harris received a death sentence. Loftin is clearly less deathworthy than Harris, the sole death-sentenced offender, and less deathworthy than all of the life-sentenced cases. Thus, gross disproportionality is evident in comparisons to this select group of cases.

### 3.

Apart from defendant's status as a prior murderer, the facts of this case do not demand the death penalty. Defendant's sentence is disproportionate.

Nevertheless, it is clear from the Court's review that Loftin's is a close case. As the preceding analysis underscores, one might determine that Loftin's sentence is disproportionate as readily as one may find it proportionate. The fact that conflicting interpretations are equally justifiable inevitably leads to the conclusion that precedent-seeking review is a subjective exercise.[25]

---

[25] I have previously noted that proportionality review inherently involves subjective assessments of moral culpability and that in undertaking such reviews the Court indeed goes beyond simply determining the proportionality of a death sentence:

> The fallacy of proportionality review inheres in its attempt to identify precisely what makes some cases similar and others dissimilar. It inheres in the notion that we, as judges, can identify the qualities that make some murderers deathworthy and others not. The Court's efforts to do that—by assessing moral culpability—amply demonstrate that proportionality review often serves to perpetuate rather than eliminate arbitrary sentencing. Moral culpability determinations may appear to be a more sophisticated and refined exercise than the statutory process by which jurors determine death eligibility and deathworthiness. As I have often said, the latter process does

Even if one accepts that the Court must engage in some value judgments in making determinations about proportionality, precedent seeking review suffers from a more fundamental problem. The process involves making critical distinctions between defendants based upon individual characteristics and circumstances. The comparisons the Court is required to make do not always yield obvious or objective results. Pressed to search for possible differences, this validating process, which properly looks to see if similar defendants are generally sentenced to death or life for committing similar offenses, becomes an inquisition of the defendant's idiosyncrasies.

The results of this distorting inquiry are unfortunate and problematic. The exercise encourages making something out of nothing; microscopic and hypercritical examination in this context

---

not sufficiently restrict the discretion of jurors or direct and guide them to sound and reliable decisions concerning capital murder and life-and-death judgments. The objective of proportionality review is to enable the reviewing court to compensate for such subjectivity and correct its unfair results, as when similar defendants committing similar crimes do not in fact receive the same sentence. The irony of proportionality review is that the reviewing court itself resorts to extra-statutory factors that are also inherently subjective. Because the Court at this end-point of capital prosecution validates or invalidates the defendant's death sentence based on its own judgment of culpability, the Court, make no mistake about it, becomes the ultimate sentencer.

As the majority itself recognizes, a "value judgment is built into practically every measurement" of proportionality. That inescapable entanglement with subjective moralistic judgment renders proportionality part of the problems rather than the remedy to the problems inherent in the statutory scheme. The Court's decision only perpetuates the myth that the death penalty can be imposed in an objective, principled, non-random manner, and that any given death sentence can be validated as a fair, reliable expression of just punishment or community values. The Court thus makes comparison after comparison with absolutely no legal or logical foundation for support. Is it worse to kill for money or for hatred? Is it worse to kill over a woman or over a dog? Is it worse to kill to support a gambling habit or to support a drug habit? Is it worse to kill a relative or a stranger? To pose those questions is to pose insoluble moral conundrums.

[*Marshall II*, *supra*, 130 *N.J.* at 273–74, 613 *A.2d* 1059 (Handler, J., dissenting) (citations omitted).]

will produce an exaggerated magnification of minutiae. Further, the institutional investment in individualized review completely overwhelms its interest in achieving uniformity. Precedent-seeking review that strains to make distinctions renders it nearly impossible to assemble a defined class of defendants from which one could make a determination of whether the death penalty was generally imposed. If every capital defendant is so unique, the Court will hardly ever—perhaps never—be able to say that a death sentence is generally imposed on a class of defendants. Precedent-seeking review's inherent lack of defined categories of defendants thus makes the detection of arbitrariness a moot point—where all defendants are ultimately distinguishable from one another, one's death sentence can never be an aberration, no less disproportionate.

## D.

"[N]o death sentence can be validated under a process of review that is extraordinarily vague, rife with contradictions, wildly inconsistent, and inextricably mired in subjective valuations and intuitive moral judgments." *Martini II*, 139 *N.J.* at 109, 651 *A.*2d 949 (Handler, J., dissenting). Loftin's case emphasizes these problems. The differences identified by the Court do not explain disparate treatment of Loftin. The Court's technical discussions lead only to the conclusion that the process is unprincipled. Despite the Court's best efforts to do so, there is no way to escape the conclusion that the methods cannot be applied consistently and objectively, and that proportionality review in this form cannot lead to a result in which we can be confident.[26]

---

[26] I maintain:

> Although I believe proportionality review is required constitutionally, I do not believe that its use can save an otherwise unconstitutional death-penalty statute from constitutional infirmity. Proportionality review has its limits. It cannot keep its own promise—it cannot assure evenhandedness, uniformity, or consistency in the imposition of the death sentence. It does not and cannot overcome the arbitrariness that plagues the imposition of the death

Although this Court has acknowledged that frequency analysis is unreliable, it nevertheless finds precedent-seeking review sufficient to determine the proportionality of defendant's sentence in this case. As currently conducted, proportionality review does little to assess the arbitrariness of a defendant's sentence; if anything, it merely adds an arbitrary step to what is already suspected to be an arbitrary process. Even worse, we apply this suspect methodology in a situation where defendant's life depends upon the result.

That said, I would not conduct proportionality review of the defendant's death sentence until this Court has adopted a system for proportionality review from which we can confidently deduce that a defendant was fairly sentenced to death. In anticipation of the Special Master's report, I refrain from commenting on what such a methodology might be. At a minimum, however, we must assure that defendants will be compared to a defined class of those similarly situated, and that the relative likelihood of a death sentence within a class is taken into account rather than the relationship between the defendant and the class. We must also be certain that the comparable class of defendants is drawn from a universe of all those death eligible, not merely those sentenced to death.

In that regard, we should finally acknowledge that the Legislative amendment to *N.J.S.A.* 2C:11–3e, *L.* 1992, *c.* 5 (eff. May 12, 1992), which limits the universe of cases available for proportionality review to those in which a death sentence has been imposed, is unconstitutional. I have previously expressed doubts regarding the amendment, *see DiFrisco III, supra,* 142 *N.J.* at 218 n. 6, 662 *A.*2d 442 (Handler, J., dissenting), *Martini II, supra,* 139 *N.J.* at 83 n. 1, 651 *A.*2d 949 (Handler, J., dissenting); *Bey IV, supra,* 137

penalty. Our experience with proportionality review itself now confirms that chronic and profound constitutional deficiencies endure in the New Jersey system for administering capital punishment.

[*Marshall II, supra,* 130 *N.J.* at 273, 613 *A.*2d 1059 (Handler, J., dissenting).]

*N.J.* at 402 n. 1, 645 *A.2d* 685 (Handler, J., dissenting), but logic, experience, and this Court's precedent now compel the conclusion that the 1992 amendment effectively abolishes proportionality review as a meaningful procedural safeguard against the arbitrary and capricious imposition of the death penalty. It is inescapably clear that proportionality review based on a universe that does not comprehensively encompass all cases deemed to involve similar defendants who are death-eligible under a uniform and reasonable standard would be constitutionally deficient. Postponing a ruling on the constitutionality of the amendment only compounds the uncertainty and confusion that already surrounds our imposition of capital punishment.[27]

---

[27] In the unlikely event that this Court were to apply the 1992 amendment to Loftin, it would have to address the possibility that the amended law as applied to Loftin would violate State and Federal *Ex Post Facto* Clauses. *U.S. Const.,* art. I, § 21; *N.J. Const.,* art. IV, § 7, ¶ 3. A statute is in violation of the *Ex Post Facto* Clauses if it serves to

> (1) punish as a crime an act previously committed, which was innocent when done; (2) make more burdensome the punishment for a crime, after its commission; or (3) deprive a defendant of any defense available according to the law at the time when the crime was committed.
> [*State v. Muhammad,* 145 *N.J.* 23, 56, 678 *A.2d* 164 (1996) (citing *Beazell v. Ohio,* 269 *U.S.* 167, 169–70, 46 *S.Ct.* 68, 68–69, 70 *L.Ed.* 216, 217 (1925)).]

This Court has recognized that "laws that affect the length of a prisoner's term, or are likely to affect it, passed after commission of the crime, obviously constitute 'additional punishment' " and are *ex post facto* laws as applied to defendants whose crimes were committed prior to the laws' enactment. *Doe v. Poritz,* 142 *N.J.* 1, 45, 662 *A.2d* 367 (1995). The proportionality review provisions of the 1992 amendment, which are retrospective as applied to Loftin because his offense was committed one week before the effective date of the amendment, are likely to affect the term of his sentence. The 1992 amendment has the potential to render an once-disproportionate sentence proportionate, and to convert defendants who are effectively not death-eligible into death-eligible defendants. In contrast to laws that merely alter the scope of evidence admissible at trial, *see Muhammad, supra,* 145 *N.J.* at 57, 678 *A.2d* 164 (1996) (holding statute that "simply modified the scope of evidence that may be admitted during the penalty phase of a capital case and did not alter any substantive rights of defendant ... would not violate the State or Federal *Ex Post Facto* Clauses" when applied to defendant who committed offense prior to enactment of statute); *State v. Erazo,* 126 *N.J.* 112, 135, 594 *A.2d* 232 (1991) (holding new law

I am in complete agreement with the forceful reasoning of the Court that, under the separation of powers doctrine, the Court's power, derived from the its constitutional authority to review convictions and death sentences in capital cases, to determine the necessity and standards for proportionality review of death sentences, is paramount. *See ante* at 279–285, 724 A.2d at 142–145. Given the terms of the amendment at issue, however, and the enhanced protections this Court has deemed necessary to provide the capitally accused, such reasoning must ultimately lead to the conclusion that the Legislature has exceeded its constitutional authority in this case.

The New Jersey Legislature's 1992 amendment of *N.J.S.A.* 2C:11–3e, in pertinent part, limits proportionality review "to a comparison of similar cases in which a sentence of death has been imposed."[28] The amendment thus restricts proportionality review

---

permitting the State to introduce evidence regarding statutory prior murder aggravating factor did not violate *Ex Post Facto* Clauses when applied to defendant who committed offense prior to enactment of statute), the 1992 amendment appears to be precisely the type of law that the *ex post facto* ban is designed to avoid.

[28] The Legislature had previously amended the proportionality review portion of the death-penalty statute to make proportionality review available only when requested by the defendant. *N.J.S.A.* 2C:11–3e, *L.* 1985, *c.* 478, § 2 (eff. June 10, 1985). The Court has never ruled on the constitutionality of the 1985 amendment because all six capital defendants eligible for proportionality review have requested it. The Court, however, has recognized the change, *see State v. Bey,* 129 *N.J.* 557, 625, 610 A.2d 814 (1992) *(Bey III )*, *cert. denied,* 513 *U.S.* 1164, 115 *S.Ct.* 1131, 130 *L. Ed.*2d 1093 (1995); *State v. Marshall,* 123 *N.J.* 1, 170, 586 A.2d 85 (1991) *(Marshall I )*, *cert. denied,* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L. Ed.*2d 694 (1993), and expressed some misgivings, *see State v. Ramseur,* 106 *N.J.* 123, 193, 524 A.2d 188 (1987) ("We share many of the dissent's concerns with respect to ... the importance of proportionality review even in the absence of a request by the defendant."). In other cases, the Court has indicated, by implication at least, that providing proportionality review on a request-only basis may be unconstitutional. *See State v. Martini,* 144 *N.J.* 603, 614, 677 A.2d 1106 (1996) *(Martini III )* (mandating post-conviction review in death penalty cases), *cert. denied,* 519 *U.S.* 1063, 117 *S.Ct.* 699, 136 *L.Ed.*2d 621 (1997); *State v. Hightower,* 120 *N.J.* 378, 415, 577 A.2d 99 (1990) *(Hightower I )* (mandating presentation of mitigating evidence in capital sentencing proceedings); *State v.*

to comparisons with those few capitally-charged cases that not only reached the penalty phase, but also resulted in the death penalty. This Court has expressly addressed and rejected the possibility that a universe restricted to cases in which the death penalty has been imposed could serve as a basis for meaningful and principled proportionality review; none of the three purposes that this Court has identified for proportionality review—assessing disproportionality, ensuring appropriate exercise of prosecutorial discretion, and monitoring impermissible racial discrimination either by prosecutors or by juries—could be served by a proportionality review methodology so restricted. *Marshall II, supra,* 130 *N.J.* at 137, 613 *A.*2d 1059 ("[T]he purposes to be achieved by proportionality review require that the universe include clearly death eligible homicides in which the prosecutor elected not to seek the death penalty.").

In addition to frustrating the purposes of proportionality review, the amendment renders the very methodology of proportionality review unworkable. Our proportionality review thus far has depended on comparisons to non-death-sentenced cases. Logic would dictate that it would be pointless to conduct proportionality review otherwise. Indeed, "[a] death sentence is comparatively excessive if other defendants with similar characteristics generally receive sentences *other than death* for committing factually similar offenses in the same jurisdiction." *Id.* at 153–54, 613 *A.*2d 1059 (emphasis added) (citation omitted). Measuring societal consensus and determining whether defendants with similar characteristics generally receive life sentences will be impossible without comparison to life-sentenced cases.[29] Therefore, it cannot sensibly

---

*Koedatich,* 98 *N.J.* 553, 489 *A.*2d 659 (1984) (Order) (mandating direct appeal in capital cases); *see also Martini III, supra,* 144 *N.J.* at 625, 677 *A.*2d 1106 (Coleman, J., dissenting) (agreeing with majority "that the death penalty should not be carried out until defendant's guilt *and the lack of disproportionality* have been reliably established") (emphasis added).

[29] A 1988 study that detailed the performance of different state courts in proportionality review found only one death sentence reversed in proportionality

be assumed that the Court's probable modifications of proportionality review methodology will approach or approximate the restricted universe prescribed by the 1992 amendment.

### III

The Court, in my view, mishandles the three fundamentally important issues before it. It finds this defendant's death sentence to be proportionate and, therefore, that the death sentence may be carried out. The defendant's sentence under current standards for determining death-sentence proportionality cannot be squared with the sentences generally received by similar defendants who committed similar crimes. Those current standards are, I submit, not capable of identifying a proportionate death sentence and, indeed, are unconstitutional. The 1992 amendment of the Death Penalty Act that drastically restricts the basis for comparing capital defendants destroys meaningful proportionality review and cannot meet constitutional standards. It should be declared to be unconstitutional. That determination cannot be influenced by any recommendations to change the standards or methodology of proportionality review as may be proposed by the Special Master, and, consequently, such a determination must not be delayed.

Most importantly, the accumulated evidence before the Court, understood in the light of a sad history and a tragic legacy of invidious and vicious racial discrimination in the imposition of the death penalty, further illuminated by common and recurrent experience, demonstrates the presence of racial discrimination in the

---

review by a state court that restricted its universe to death-sentenced cases. Steven M. Sprenger, *A Critical Evaluation of State Supreme Court Proportionality Review in Death Sentenced Cases,* 73 *Iowa L.Rev.* 719, 738 (1988). In comparison, 32 cases were identified in which courts that included life sentences in their proportionality review universe had vacated death sentences as disproportionate. *Ibid.; cf.* David Baldus, *When Symbols Clash: Reflections on the Future of the Comparative Proportionality Review of Death Sentences,* 26 *Seton Hall L.Rev.* 1582, 1587 (1996) (estimating that, nationwide, "fewer than 75 of 5,000 plus death sentences have been reversed based on excessiveness").

prosecution of capital murder offenses. That evidence is "significant under the New Jersey Constitution." *Bey IV, supra,* 137 *N.J.* at 381, 645 *A.2d* 685 (citing *Marshall II, supra,* 130 *N.J.* at 210, 613 *A.2d* 1059). An unconstitutional risk of racial discrimination in the imposition of the death sentence has, in my opinion; been laid bare and exposed. If the evidence of racial discrimination is perceived to be less damning than I believe it to be, the Court should, at a minimum, pause in permitting any executions to go forward unless and until the State definitively demonstrates that racial discrimination plays no role in New Jersey's administration of the death penalty.

I, therefore, dissent.

### Appendix A–1

### AOC Culpability Rankings

Percent of Cases Capitally Tried According to Victims' Race by Culpability Levels [1]

| Culpability Level | Black Victim | Nonblack Victim | Disparity |
|---|---|---|---|
| 1 (range .00 to .19) | 21% (25/119) | 40% (72/178) | 19 |
| 2 (range .20 to .39) | 55% (6/11) | 68% (15/22) | 13 |
| 3 (range .40 to .59) | 75% (3/4) | 83% (5/6) | 8 |
| 4 (range .60 to .79) | 100% (2/2) | 100% (2/2) | 0 |
| 5 (range .80 to 1.0) | 80% (4/5) | 100% (8/8) | 20 |

### Appendix A–2

### AOC Culpability Rankings

Percent of Defendants Sentenced to Die According to Race by Culpability

---

[1] The data for this chart were provided by the AOC, Table 18A.1, using the Special Master's universe and the AOC's culpability rankings.

## Appendix A–2—Continued
### Levels with Equal Range [2]

| Culpability Level | Black Def. | Nonblack Def. | Disparity |
|---|---|---|---|
| 1 (range .00 to .19) | 13% (5/40) | 0% (0/30) | 13 |
| 2 (range .20 to .39) | 40% (4/10) | 13% (2/16) | 28 |
| 3 (range .40 to .59) | 57% (4/7) | 67% (4/6) | –10 |
| 4 (range .60 to .79) | 100% (4/4) | 67% (6/9) | 33 |
| 5 (range .80 to 1.0) | 92% (11/12) | 77% (10/13) | 15 |

## Appendix A–3
### AOC Culpability Rankings

Percent of Defendants Sentenced to Die According to Race by Culpability Levels with Equal Numbers of Defendants [3]

| Culpability Level | Black Def. | Nonblack Def. | Disparity |
|---|---|---|---|
| 1 (range .00 to .02) | 0% (0/14) | 0% (0/15) | 0 |
| 2 (range .02 to .14) | 5% (1/19) | 0% (0/11) | 5 |
| 3 (range .14 to .33) | 43% (6/14) | 7% (1/15) | 36 |
| 4 (range .35 to .73) | 69% (9/13) | 53% (9/17) | 16 |
| 5 (range .74 to 1.0) | 92% (12/13) | 75% (12/16) | 17 |

## Appendix B–1
### Culpability Levels According to Race Based on Judges' Rankings [4]

| Culpability Level | Black Def. | Nonblack Def. | Disparity |
|---|---|---|---|
| 1 (range 1.00 to 1.40) | 0% (0/3) | 33% (1/3) | – 33 |
| 2 (range 1.50 to 2.40) | 17% (2/12) | 7% (1/14) | 10 |
| 3 (range 2.50 to 3.40) | 33% (8/24) | 26% (5/19) | 7 |
| 4 (range 3.50 to 4.40) | 52% (15/29) | 37% (10/27) | 15 |
| 5 (range 4.50 to 5.00) | 60% (3/5) | 45% (5/11) | 15 |

---

[2] This is AOC's Table 18.1 from *Loftin Report* (App.24–27). Each defendant's culpability level is based on the predicted probability of death computed by a logistic regression employing the penalty-trial universe and comprising statutory aggravating and mitigating factors. The data are incomplete.

[3] This is AOC's Table 18.2 (App.24–27). Unlike *Bey IV, supra,* 137 *N.J.* at 392, 645 *A.2d* 685, in which culpability level four ranged from .20 to .75, the broadest culpability level in this case ranges from .35 to .73. That is a narrower range, that, unlike culpability level four in *Bey IV*, groups similar cases.

[4] This is Special Master's Table D.

### Appendix B–2
Culpability Levels According to Race With Equal Ranges

| Culpability Level [5] | Black Def. | Nonblack Def. | Disparity |
|---|---|---|---|
| 1 (range 1.00 to 1.79) | 20% (1/5) | 33% (1/3) | −13 |
| 2 (range 1.80 to 2.59) | 9% (1/11) | 13% (2/15) | −4 |
| 3 (range 2.60 to 3.39) | 33% (7/21) | 24% (4/17) | 9 |
| 4 (range 3.40 to 4.19) | 41% (9/22) | 33% (8/24) | 8 |
| 5 (range 4.20 to 5.00) | 71% (10/14) | 47% (7/15) | 24 |

### Appendix B–3
*Culpability Levels According to Race With Equal Numbers of Defendants*

| Culpability Level | Black Def. | Nonblack Def. | Disparity |
|---|---|---|---|
| 1 (range 1.00 to 2.40) | 13% (2/15) | 12% (2/17) | −1 |
| 2 (range 2.50 to 3.17) | 38% (6/16) | 42% (5/12) | −4 |
| 3 (range 3.20 to 3.75) | 36% (4/11) | 27% (4/15) | 9 |
| 4 (range 3.80 to 4.17) | 35% (6/17) | 27% (4/15) | 8 |
| 5 (range 4.20 to 5.00) | 71% (10/14) | 47% (7/15) | 24 |

### Appendix B–4
Culpability Levels According to Race With Averages
Without Highest and Lowest Score [6]

| Culpability Level | Black Def. | Nonblack Def. | Disparity |
|---|---|---|---|
| 1 (range 1.00 to 1.79) | 17% (1/6) | 20% (1/5) | −3 |
| 2 (range 1.80 to 2.59) | 17% (2/12) | 14% (2/14) | 3 |
| 3 (range 2.60 to 3.39) | 30% (6/20) | 25% (4/16) | 5 |
| 4 (range 3.40 to 4.19) | 44% (8/18) | 27% (6/22) | 17 |
| 5 (range 4.20 to 5.00) | 65% (11/17) | 53% (9/17) | 12 |

### Appendix C
Comparison of AOC and Judges' Culpability Rankings

#### AOC's Culpability Rankings [7]

---

[5] The culpability rankings are broken into five levels, each with an equal range of .8.

[6] This is based on Table D.3, of *Special Master's Report*, Judges' Culpabilities Percent of Defendants Sentenced to Die by Culpability Levels and Race (w/ equal ranges of culpability).

[7] *Loftin Report*, Table 21 (logistics); *see also Loftin Report*, Table 23. Here, the AOC culpability rankings show an increase in the rate of death sentences as the

| Level | Death–Sentencing Rate |
|-------|----------------------|
| 1 | 7% |
| 2 | 21% |
| 3 | 54% |
| 4 | 53% |
| 5 | 81% |

## Judges' Culpability Rankings [8]

| Level | Death–Sentencing Rate |
|-------|----------------------|
| 1 | 17% |
| 2 | 12% |
| 3 | 30% |
| 4 | 45% |
| 5 | 50% |

## Appendix D

*Comparison Case Summaries:*
*Multiple Murderers not Classified in Comparison Case Category*
*B:*

A.   John Lee Allen (life sentence)

Defendant, along with his twin brother and another man, conspired to rob cab drivers. Armed with pistols, they held up a cab driver and forced him to drive to the back of a bar, where they robbed him of $100 and shot him in the head. That same day, the three confederates robbed another cab driver of six dollars, and shot him to death, this time because they feared the driver "was going for something." Neither victim was armed.

---

culpability ranking increases, as one would expect. The judges' culpability rankings do not show similar correlations between culpability and death sentences.

[8] *Special Master's Report,* Table D (revised).

Allen's brother confessed to a wired informant that the first cab driver pleaded for his life, he "was saying 'don't hurt me man, I got a wife and kids.'" The codefendant recalled that the cab driver "was so scared he almost shit himself."

At the time of these offenses, defendant was facing prosecutions for murder, attempted murder, robbery, and aggravated assault on a police officer. He also had two prior convictions for receiving stolen property. He had no known mental or physical problems.

Defendant was tried for non-capital murder and convicted. The AOC coded the c(4)(f) (escape detection), c(4)(g) (felony murder), and c(5)(h) (catch-all) factors as being present.

### B. Joseph Harris (2) (1 death sentence; 3 life sentences)

Defendant, a postal worker, went on a rampage. He first went to his supervisor's house, where, after picking the lock and turning off the phone, he shot and killed the supervisor's sleeping husband with a silenced handgun. Harris then snuck upstairs and woke up the supervisor. The victim begged him not to shoot her, but to no avail. However, the gun jammed. So, instead, Harris drew his twenty-five inch ninja sword and chased her as she ran through the house. He stabbed her more than ten times, killing her, and leaving her with defensive wounds on her hands. Adding a gas mask and a bullet-proof vest to his ninja outfit, Harris headed to the post office. He shot two co-workers at close range with an Uzi machine pistol, lit and threw something at the police when they arrived, and, after the SWAT team raided the building, surrendered. Defendant also booby-trapped his house, but the bomb squad disarmed the device without injury.

Upon arrest, defendant confessed, asserting that he had been the victim of racial discrimination while employed at the post office and that he had killed his supervisor in revenge for being fired. Harris admitted to the police that he thought about raping his supervisor, and that his plan was to take hostages, then

murder certain people as they arrived for their shifts. He named five individuals that "deserved to die."

Defendant had a history of psychiatric problems that were never treated. Based on the ninja outfit, the police tied him to the murder of a businessman after the rapes and brutal assaults of his wife and two young daughters.

Defendant was capitally tried and convicted. The penalty-phase jurors found aggravating factors c(4)(a) (prior murder), c(4)(f) (escape detection), c(4)(g) (felony murder), and mitigating factor c(5)(h), present. Defendant was sentenced to death for the murder of the first victim, and to life imprisonment for the other three homicides.

### C. Kim Kuchler (life sentence)

Defendant murdered her two sisters and one sister's husband following a series of disputes between the parties. In 1985, during one of the disputes, the police were called. They found ten plastic garbage bags emitting foul odors. The bags contained bones and flesh, but the officers, believing the contents to be cow bones, placed the bags at the curb for garbage pickup.

Seven years later, defendant confessed that she had hired three gang members to kill her sister and the sister's husband. Defendant also admitted that she had continued to use the victims' money by forging checks. Eventually, defendant admitted that she shot the victims herself and cut up their bodies.

Defendant, thirty-nine years old at the time, was a resident alien from Korea who had been raised in a poor and dysfunctional family. She had no prior convictions, aside from a shoplifting charge and the pending murder charge of her other sister. She had no known history of child abuse or mental illness. She pleaded guilty to two counts of non-capital murder (in exchange for dismissal of all other charges relating to the three murders). The AOC coded the c(4)(c) (vile), c(5)(a) (mental disturbance),

c(5)(b) (provocation), c(5)(f) (no criminal history), and c(5)(h) (catch-all) factors as present.

### D. Frank Marsini (1, 2 and 3) (life sentence)

Defendant murdered four people in the course of a year. First, he stabbed his eighty-five-year-old aunt to death in her home, and sexually assaulted her. Almost a year later, defendant killed an eighty-three-year-old male and his seventy-eight-year-old wife, for whom he had worked as a carpenter. As in the prior case, the victims were found nude from the waist down. All four victims had defensive wounds on their hands.

Defendant, forty-seven years old at the time of the murders, claimed to have suffered from "detachments of reality." He had an eighth-grade education and was self-employed as a carpenter.

Defendant pleaded guilty to all four murders, for which he received consecutive and concurrent life sentences. The AOC found the c(4)(g) (felony murder), c(5)(d) (mental disease), and c(5)(h) (catch-all) factors present in all murders.

### E. Ronald Mazique (life sentence)

Defendant sought to rob the victim of her tax refund. As defendant approached, the victim, forty-one years old, and her six-year-old grandson began to scream and yell. Defendant struck both victims at least thirty times with a hammer. He then turned on the gas stove, intending to blow up the apartment in order to cover up what he had done.

Defendant had previously committed a double homicide in South Carolina for which he had confessed; he had robbed and assaulted a cab driver as well.

At the time of this offense, defendant, was twenty-one years old, had dropped out of high school, and was unemployed. He admitted to using alcohol and drugs.

The State charged defendant with capital murder. The penalty jury found the c(4)(c) (vile), c(4)(f) (escape detection), and c(4)(g)

(felony murder) aggravating factors as well as the c(5)(h) (catch-all) mitigating factor, but not the c(5)(c) (defendant's age) or c(5)(d) (intoxication) factors. The jurors could not agree on punishment. Consequently, defendant was sentenced to life.

F.   Hector Sanabria (2) (life sentence)

In an attempt to gain a monopoly over drugs sales in Paterson, defendant shot and killed a twenty-eight-year-old and a twenty-nine-year-old man. One of the victim's reached for his own gun before defendant shot him in the chest, liver, pancreas, and stomach.

Defendant, twenty-three years old, was the father of three children. He left school in ninth grade and had been unemployed. Defendant was in good mental and physical health and denied drug abuse. He was, however, an alcoholic.

Prior to these offenses, defendant had another murder conviction. He was also charged with an additional murder prior to the resolution of the instant offense.

Defendant was charged and tried for non-capital murder. He was convicted and sentenced to life. The AOC coded the c(4)(a) (prior murder), c(4)(b) (creating grave risk of death to another person), and c(5)(h) (catch-all) factors as being present.

*For affirmance*—Chief Justice PORITZ, and Justices POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—6.

*For reversal*—Justice HANDLER—1.

### IN THE MATTER OF THE PROPORTIONALITY REVIEW PROJECT.

### ORDER

The Supreme Court having completed its proportionality review of the death sentence of defendant Donald Loftin, *State v. Loftin,* 157 *N.J.* 253, 724 *A.*2d 129 (1999);

And the Court having determined that the current proportionality review methodologies are in need of careful review and reconsideration;

And the Court having further determined to appoint a Special Master for the conduct of supplemental proceedings to consider the proportionality review methodologies used by the Court;

And the Court having further determined that the Special Master should develop a record and examine a broad range of factual issues before the Court can rule on the constitutionality of an amendment to *N.J.S.A.* 2C:11–3e that limits the Court's proportionality review to a specific group of similar cases in which a jury has sentenced the defendant to death, and, specifically, whether the statutory limitation unduly restricts appellate review by this Court;

And good cause appearing;

It is ORDERED that Superior Court Judge David S. Baime, now serving as a Presiding Judge in the Appellate Division is appointed as a Special Master for the Supreme Court; and that he shall conduct a review, perform analyses, and make findings and recommendations relating to the proportionality review methodology used by the Court since *Marshall II*, that shall consider and address: the size of the universe of comparison cases; particular issues in respect of individual proportionality review; questions relating to the statistical models used in both individual and systemic proportionality review; and the status of proportionality review as a separate proceeding in death penalty appeals; and it is further

ORDERED that such review and analyses shall encompass the following areas:

(1) The Special Master shall conduct additional fact-finding concerning the proper scope of the proportionality review universe. The Special Master shall make an independent evaluation of the deathworthiness of a sample of cases previously classified by the Administrative Office of the Courts (AOC) as either death-

eligible or death-ineligible. The "provability" of the selected cases and the presence or absence of aggravating and mitigating factors shall be considered and the results compared to the data-coding decisions made by the AOC. If there is a variance between the survey results and the AOC data-coding decisions, possible causes of the variance shall be identified along with recommendations for improved data-coding procedures. The Special Master shall consider whether a questionnaire should be filled out by the judge in each case and used to improve both the data-collection and data-coding process. Alternatively, if the Special Master determines that the intrinsic difficulties and ambiguities of data-coding death-eligible cases cannot be overcome, the Special Master shall consider the impact of anticipated coding errors on the AOC models;

(2) The Special Master shall review data-coding generally and make recommendations for improvements if appropriate;

(3) The Special Master shall attempt to determine, based on projections about the size of the database over time and other relevant considerations, how long it will take before frequency review results can attain a level of statistical reliability;

(4) The Special Master shall undertake a review of both the strengths and weaknesses of the index-of-outcomes test and make recommendations whether the statistical models can be modified and improved or whether the index-of-outcomes test should be eliminated;

(5) The Special Master shall consider methods by which to select a representative number of cases within the group of similar cases for consideration and comparison to the defendant's case in the salient-factors test and precedent-seeking review. The Special Master shall examine alternate case sorting approaches that account for mitigating factors. The Special Master shall assess whether some reduction in the number of case classifications is possible without compromising the principle that only similar cases be compared;

(6) The Special Master shall attempt to develop parsimonious statistical models for more reliable regression studies of race effect and shall consider whether the process of purging, *i.e.*, the removal of the indirect effects of race from variables that appear to be unrelated to race, produces results that are useful;

(7) The Special Master shall consider Special Master Cohen's recommendation, submitted in *State v. Loftin, supra,* that the Court appoint a panel of judges to perform periodic assessments of penalty-trial outcomes, along with the composition and mandate of such an independent judicial panel, as independent verification of the culpability ratings derived from the models;

(8) The Special Master shall develop a factual record and issue findings concerning the desirability of maintaining proportionality review as a separate proceeding or, alternately, conducting proportionality review in connection with a capital defendant's direct appeal; and it is further

ORDERED that to assist the Special Master in this project, the AOC shall forthwith provide the Special Master, the Public Defender, and the Attorney General with: (1) a list of all penalty-phase cases, broken down by the race of the defendants, the sentences, and the aggravating and mitigating factors found; (2) a brief synopsis of all penalty-phase cases; and (3) copies of the reports on all prior proportionality reviews including, among others, the reports submitted to the Court by Professor Baldus and Special Master Cohen; and it is further

ORDERED that the Special Master shall conduct the review directed by this Order using all available data and reports, together with the assistance of the AOC and a consultant to be appointed by the Special Master with the approval of the Court; and it is further

ORDERED that in respect of the relevant issues, the Special Master may invite participation of interested parties not otherwise participating in the within matter; and it is further

ORDERED that the Special Master shall have the authority to conduct hearings, procure technical and judicial expert advice, call witnesses, and direct the AOC and the selected consultant to perform such analyses and provide such advice as the Special Master deems necessary and appropriate to comply with the terms of this Order; and it is further

ORDERED that the Special Master shall promptly undertake the review required by this Order and shall file a report consisting of the Master's findings and recommendations, as well as the underlying evidence, data, and analyses by May 14, 1999; and it is further

ORDERED that the within Order may be modified or supplemented by the Court on the application of the Special Master or on the Court's own motion; and it is further

ORDERED that nothing in this Order should be construed by the Special Master or the parties to represent a position of the Supreme Court on any issue before it.